2015-1659

# United States Court of Appeals
# for the Federal Circuit

_____

## PURDUE PHARMACEUTICAL PRODUCTS L.P., PURDUE PHARMA L.P., TRANSCEPT PHARMACEUTICALS, INC., nka Paratek Pharmaceuticals, Inc.,
*Plaintiffs-Appellants,*

v.

## ACTAVIS ELIZABETH LLC, NOVEL LABORATORIES, INC., PAR PHARMACEUTICAL, INC., DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., TWI PHARMACEUTICALS, INC.,
*Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of New Jersey in Case No. 2:12-cv-05311-JLL-JAD, Judge Jose L. Linares

_____

## NONCONFIDENTIAL BRIEF OF PLAINTIFFS-APPELLANTS

_____

Christopher N. Sipes
Michael N. Kennedy
Erica N. Andersen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTEREST

Counsel for the Plaintiffs-Appellants certify the following:

**1.    The full name of every party or amicus represented by me is:**

- Purdue Pharmaceutical Products L.P.
- Purdue Pharma L.P.
- Transcept Pharmaceuticals, Inc. (n/k/a Paratek Pharmaceuticals, Inc.)

**2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

The parties named above in (1) are the real parties in interest.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Purdue Pharmaceutical Products L.P. is a Delaware limited partnership. Purdue Pharmaceutical Products L.P. has one limited partner, Purdue Pharma L.P., a Delaware limited partnership. No publicly held corporation owns 10% or more of the partnership interests of Purdue Pharmaceutical Products L.P. or Purdue Pharma L.P.

Purdue Pharma L.P. is a Delaware limited partnership. Purdue Pharma L.P. has one limited partner, Purdue Holdings L.P., a Delaware limited partnership. No publicly held corporation owns 10% or more of the partnership interests of Purdue Pharma L.P. or Purdue Holdings L.P.

Transcept Pharmaceuticals, Inc., now known as Paratek Pharmaceuticals, Inc., is a publicly held Delaware corporation. Paratek Pharmaceuticals, Inc. has no parent corporation. No

publicly held corporation owns 10% or more of Paratek Pharmaceuticals, Inc.'s stock.

4. **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:**

Covington & Burling LLP: Christopher N. Sipes; Michael N. Kennedy; Erica N. Andersen; Matthew Kudzin; Brianne Bharkhda; Michael A. Chajon; Kaveh Saba; Bryant Lee; Gisselle Bourns*; Janet Freilich*.

(* formerly of Covington & Burling LLP.)

Lowenstein Sandler LLP: Michael Dore; Stephen R. Buckingham; Adam B. Lavinthal.

*/s/Christopher N. Sipes*
Christopher N. Sipes

# TABLE OF CONTENTS

**Page**

**CERTIFICATE OF INTEREST** ......................................................i

**TABLE OF CONTENTS**.............................................................iii

**TABLE OF AUTHORITIES**.......................................................vi

**STATEMENT OF RELATED CASES**.....................................viii

**JURISDICTIONAL STATEMENT** ........................................... 1

**STATEMENT OF THE ISSUES**.................................................. 2

**STATEMENT OF THE CASE**...................................................... 4

The '131 Patent ............................................................. 9

Intermezzo.................................................................... 12

The District Court's Opinion.......................................... 13

Prophylactic Treatment for MOTN Insomnia ................ 18

*Ambien Was Indicated Only for Prophylactic Dosing* ..........19

*The Prior Art Teaches Prophylactic Dosing*........................20

The Prior Art Does Not Teach Safe and Effective, Non-Prophylactic Dosing of Zolpidem .........................23

A Patient's Diminished Sleep Drive in the Middle of the Night Created a Seemingly Irreconcilable Tension Between Safety and Efficacy ................................27

The Prior Art of Record Did Not Demonstrate That Sub-10 mg Zolpidem Doses Would Have Been Effective in the Middle of the Night ................................................29

The Prior Art Did Not Teach That Transmucosal Delivery Would Permit a Drastic Reduction in the Lowest Effective Zolpidem Dose........................................34

FDA Responded to Intermezzo's Clinical Data by Telling All *Other* Manufacturers of Zolpidem Products to Lower Their Recommended Doses ................................................... 38

**SUMMARY OF THE ARGUMENT** .................................................... 40

**STANDARD OF REVIEW** .................................................... 43

**ARGUMENT** .................................................... 45

I.    The District Court Erred in Finding That a Person of Ordinary Skill Would Have Used Non-Prophylactic, As-Needed Administration of Zolpidem to Treat MOTN Insomnia ............... 45

    A.    In Contravention of Federal Circuit Precedent, the District Court Expressly Relied on the Need for a Non-Prophylactic Treatment for MOTN Insomnia to Render the Asserted Claims Obvious ................................................ 46

    B.    In Contravention of Federal Circuit Precedent, the District Court Rested its Obviousness Conclusion on References That Expressly Taught Away from Non-Prophylactic Use of Zolpidem ................................................ 47

II.   The District Court Erred in Concluding That A Skilled Artisan Would Have Reasonably Expected the Low Doses Claimed by the '131 Patent to Be Efficacious ....................................................... 54

    A.    The Court's Legal Conclusion of Obviousness Was Error Because It Contradicts Its Factual Findings Concerning Efficacy of Low Doses of Zolpidem .................... 55

    B.    The Court's Incorrect Conclusion of Law on Obviousness Was Compounded By Clear Error in Its Findings Concerning Key Prior Art ..................................................... 59

    C.    The District Court's Conclusion That Transmucosal Delivery Would Achieve the Claimed Doses Is Devoid of Evidentiary Support ......................................................... 63

**CONCLUSION** .................................................... 71

**ADDENDUM**......................................................................... 73

(Opinion, Final Judgment, '131 Patent) ................................. 73

**PROOF OF SERVICE** .......................................................... 74

**CERTIFICATE OF COMPLIANCE**.................................... 76

**Confidential Material Omitted:**

Material in the sealed opinion of the District Court on Addendum pages A000033–38, A000042–43, A000045–60, and A000062–66 has been omitted because it discusses Appellees' confidential Abbreviated New Drug Applications (ANDAs) and formulation information.

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abbott Labs. v. Sandoz, Inc.,*
    544 F.3d 1341 (Fed. Cir. 2008) ........................................................... 47

*Alcon Research Ltd. v. Barr Labs., Inc.,*
    745 F.3d 1180 (Fed. Cir. 2014) ........................................................... 44

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,*
    796 F.2d 443 (Fed. Cir. 1986) ...................................................... 49, 62

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    381 F.3d 1371 (Fed. Cir. 2004) ........................................................... 47

*Crocs, Inc. v. Int'l Trade Comm'n,*
    598 F.3d 1294 (Fed. Cir. 2010) ......................................................... 50

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)................................................................................ 43

*In re Gurley,*
    27 F.3d 551 (Fed. Cir. 1994) .............................................................. 48

*In re Hedges,*
    783 F.2d 1038 (Fed. Cir. 1986) ......................................................... 57

*K/S Himpp v. Hear-Wear Techs., LLC,*
    751 F.3d 1362 (Fed. Cir. 2014) ......................................................... 40

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007)............................................................................ 43

*McGinley v. Franklin Sports, Inc.,*
    262 F.3d 1339 (Fed. Cir. 2001) ......................................................... 48

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011)........................................................................ 43

*Perfect Web Techs., Inc. v. Infousa, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009) ......................................... 40

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ..................................... 43, 44

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    272 F.3d 1335 (Fed. Cir. 2001), *judgment vacated on other
    grounds sub nom. DeKalb Genetics Corp. v. Bayer
    CropScience, S.A.*, 538 U.S. 974 (2003) and *opinion modi-
    fied and reinstated*, 345 F.3d 1366 (Fed. Cir. 2003)........................... 66

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) ............................... 48, 50, 63

*St. Jude Med., Inc. v. Access Closure, Inc.*,
    729 F.3d 1369 (Fed. Cir. 2013) ......................................... 44

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ......................................... 69

*Teets v. Chromalloy Gas Turbine Corp.*,
    83 F.3d 403 (Fed. Cir. 1996) ......................................... 44

*Upjohn Co. v. Mova Pharm. Corp.*,
    225 F.3d 1306 (Fed. Cir. 2000) ......................................... 66

## Federal Statutes

28 U.S.C. § 1291 ......................................................... 1

28 U.S.C. § 1295(a)(1)................................................... 1

28 U.S.C. § 1331 ......................................................... 1

35 U.S.C. § 103 ......................................................... 43

35 U.S.C. § 282 ......................................................... 43

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals. Plaintiffs-Appellants (hereinafter, "Appellants") currently are not aware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal. Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331. On March 27, 2015 the District Court issued an Opinion and Order on all issues of infringement and invalidity, and directed the parties to submit a proposed form of Judgment. (A000011–120.) In accordance with the Court's Order, the parties submitted a proposed form of Judgment on April 8, 2015, which was subsequently entered by the Court on April 9, 2015. (A000121–25.) Appellants filed a Notice of Appeal on May 6, 2015 (D.I. 1-2), which was sent to the Federal Circuit on May 11, 2015, (D.I. 1 "Appeal docketed. Received: 05/11/2015."). This is therefore a timely appeal of a final judgment in a case arising under the patent laws, and this Court has jurisdiction under 28 U.S.C. §§ 1291 and 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred in concluding it would have been obvious to treat middle-of-the-night insomnia on an as-needed basis "without prophylactically administering zolpidem," as required by all asserted method claims of the '131 Patent, where the prior art expressly taught away from such administration, and the Court's conclusion was based entirely on that art and what should have been an objective indicia of non-obviousness—the perceived long-felt (unmet) need for as-needed dosing.

2.    Whether the District Court erred in concluding that a person of ordinary skill in the art ("POSA") would have been motivated, with a reasonable expectation of success, to lower the standard doses of zolpidem to treat middle-of-the-night insomnia, when (a) the prior art taught that greater than standard doses were needed to treat the condition; (b) the District Court itself found that, all things being equal, it was more difficult to induce sleep in the middle of the night than at bedtime; and (c) the District Court's analysis was premised on the finding, contradicted by Appellees' own experts, that switching the type

of dosage form would lead that person to use significantly lower doses of zolpidem.

## STATEMENT OF THE CASE

This case is about a novel treatment for middle-of-the-night (or "MOTN") insomnia, a form of insomnia where patients are able to get to sleep at bedtime but unable to maintain sleep through the night. (A000018.) Although "hypnotics" (sleep drugs) have been sold for decades, a satisfactory treatment for MOTN insomnia proved elusive through 2005, the date of the invention at issue. Before the invention, MOTN insomnia was treated using standard doses (or greater than standard doses) of hypnotics administered "prophylactically" every night at bedtime, in the hope the patient would stay asleep for the duration of the night. (A000018; A000081.)

Zolpidem, the hypnotic drug at issue in this case, was approved for the treatment of insomnia in 1992, under the trade name Ambien®. (A000020; A000071.) As specifically relevant here, Ambien was indicated for prophylactic administration at bedtime to address sleep-maintenance issues (like MOTN insomnia), at much higher doses than those in the asserted claims (10 mg versus 3.5 mg for non-elderly adults). (A000020; A003027; A003030; A000238.) If the patient still woke up in the middle of the night after prophylactic dosing, the prior

art taught using an extra dose of zolpidem at that time. (A003062; A001682–83 (8.83:23–86:10).)

The 2001 *Teitelbaum* prior art book described this practice of treating MOTN insomnia, teaching that the "best way to need less medication in the long run is to use *as much as it takes* to get seven to eight hours of solid sleep each night without waking or hangover for six months." (A003059.) *Teitelbaum* expressly describes the use of zolpidem to treat MOTN insomnia as follows:

> The normal dosage is one-half to one 10-milligram tablet, taken at bedtime. If you wake up in the middle of the night you can take an extra one-half to one tablet (leave it by your bedside with a glass of water) and any sedation is usually worn off by the time you are ready to wake up in the morning.

(A003062.)

Appellees' own expert, Dr. John Winkelman, acknowledged that *Teitelbaum* teaches the treatment of MOTN insomnia through the administration of more than standard doses of zolpidem, both at bedtime prophylactically and additionally upon awakening, and that this is the approach described in the prior art literature generally. (A001592–93 (7.153:21–154:23); A001682–83 (8.83:23– 86:10).)

The art recognized the desirability of avoiding prophylactic dosing, if possible. (*See generally, e.g.,* A002994–3001; A003002–08; A003589–97.) But, as of 2005, it was not believed feasible to use zolpidem this way. At that time, the standard therapeutic dose of Ambien was 10 mg for non-elderly patients and 5 mg for elderly patients, administered at bedtime.[1] The prior art recognized that administering these doses in the middle of the night would lead to "residual sedative effects" (roughly, hangovers or next-day grogginess) that, among other things, would make the patient a danger behind the wheel in the morning. (*See, e.g.,* A002994–3001; A003002–08; A003589–97.) Indeed, the *Doghramji*, *Danjou*, and *Hindmarch* references used by the District Court found

---

[1] (*See* A003028; A003030; *see also* A001590–91 (7.145:19–146:4); A001684 (8.93:16–18); A001945 (10.210:13–15); A001952 (10.241:15–21); A001954 (10.248:3–5, 10.248:13–249:1); A001958 (10.262:8–24, 10.264:1–265:10).) The recommended dose for the elderly is one-half the dose for non-elderly adults, as the elderly metabolize zolpidem more slowly. (A000020; A003030; A001586 (7.126:2–12).) This brief will discuss the recommended dose of zolpidem for non-elderly adults at the time of the invention (10 mg), and asserted claims 8 and 10 of the '131 Patent, which require 3.5 mg zolpidem for non-elderly adults. The analysis for asserted claims 18 and 19, which require 1.75 mg of zolpidem for the elderly, parallels that for claims 8 and 10. Accordingly, the analysis concerning the non-elderly dose claims should be understood to apply equally to the elderly dose claims.

that 10 mg of zolpidem led to residual sedative effects up to 5 hours after MOTN dosing, and therefore was *not* suitable for as-needed, non-prophylactic dosing. (*See* A002994; A002999–3000; A003005; A003589; A003594–95.) After evaluating zolpidem and zaleplon (another hypnotic) for non-prophylactic, as-needed dosing, *Doghramji* explicitly concluded "*only zaleplon* appears to be suited for middle of the night administration." (A003002 (emphasis added).) Nonetheless, the District Court found "[n]on-prophylactic dosing in [the claims] of the '131 patent [is] obvious based upon *Doghramji*, *Danjou* and *Hindmarch*." (A000099.)

Lowering the dose of zolpidem was not thought to be a viable option, because lower doses were not believed to be *effective* to induce sleep in the middle of the night. This is because of the principle, undisputed by the parties and the District Court, that "[a]t bedtime a person's drive to sleep is at its peak, as opposed to the middle of the night, after some sleep has occurred." (A000075; *see also* A000019–20 ("[T]o skilled artisans, the interaction of these processes results in a person's overall urge—or drive to sleep—to be the greatest at bedtime (as opposed to the middle of the night).") This means that it is easier to

get a person to sleep at the beginning of the night (and keep that person asleep), than it is to get a person back to sleep after waking up in the middle of the night. (*See* A000076; A001904–05 (10.47:21–50:14).) Treatments for MOTN insomnia therefore focused on using "as much [drug] as it takes" *at bedtime* to get a person to sleep throughout the night, rather than an approach centered around dosing in the MOTN. (A003059.) Tellingly, in instructing the treatment of MOTN insomnia with extra zolpidem (10 mg at bedtime plus 5 mg upon awakening), *Teitelbaum* recognized the risk of residual sedative effects. But far from recommending lowering zolpidem doses, *Teitelbaum* instructs that if those high doses of zolpidem are causing a hangover, that patient should be switched to a different drug altogether—zaleplon. (A003062.)

The patent at issue, embodied in Appellants' sleep drug Intermezzo®, represented a dramatic departure from the conventional way of treating MOTN insomnia. Intermezzo used approximately one-third of Ambien's recommended dose of zolpidem, administered sublingually (under the tongue) only as needed in the middle of the night. (A000013–14; A003494.) Indeed, Intermezzo's clinical trial results surprised even FDA, causing the Agency to lower the dosing of

every other zolpidem drug on the market, *twenty years* after approval of Ambien. (A001705 (8.174:8–21).)

Transcept received multiple patents for its advances; including U.S. Patent Nos. 8,242,131 (the "'131 Patent"); 8,252,809 (the "'809 Patent"); and 7,682,628 (the "'628 Patent"), which were litigated at trial. Appellants have limited this appeal to the '131 Patent, which has the latest expiration date (2029) and is the only patent asserted against all Appellees in this action. (A000014–16; A001013 (1.50:1–7).)

**The '131 Patent**

The '131 Patent issued on August 14, 2012, and is entitled "Methods of Treating Middle-of-the-Night Insomnia." (A000210.) It has a priority date of May 25, 2005. (A000014; A000210.) Transcept Pharmaceuticals, Inc. is the owner of the '131 Patent, and Purdue Pharmaceutical Products and Purdue Pharma are exclusive licensees. (A000012.)[2]

---

[2] Transcept is now known as Paratek Pharmaceuticals, Inc. For consistency with the District Court Opinion's, Appellants use the former name Transcept throughout this brief. (A000012–13.)

Appellants assert claims 8, 10, 18, and 19 against all Appellees. (A000014–16.) The asserted claims of the '131 Patent are directed to the treatment of MOTN insomnia with low doses of zolpidem administered only when the patient wakes up in the middle of the night (without prophylactic dosing), which allow the patient to awaken after four hours without residual sedative effects.

Claim 10 of the '131 Patent depends from claim 8, which in turn depends from claim 1:

> **1.** A method of treating middle-of-the-night insomnia in a non-elderly patient without prophylactically administering zolpidem, comprising:
>
>> dosing the patient with a pharmaceutical composition comprising about 0.5 to about 4.75 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep, and desires to resume sleep for less than 5 hours,
>>
>> wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and
>>
>> wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.
>
> **8.** The method of claim 1, wherein the pharmaceutical composition comprises about 3.5 mg of zolpidem hemitartrate.

—10—

**10.** The method of claim 8, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

(A000238.)

Claims 18 and 19 parallel claims 8 and 10, but are directed to the treatment and dosing for elderly patients. Claim 19 depends from claim 18, which in turn depends from claim 12:

**12.** A method of treating middle-of-the-night insomnia in an elderly patient without prophylactically administering zolpidem, comprising:

dosing the patient with a pharmaceutical composition comprising about 1.5 to about 2.5 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep, and desires to resume sleep for less than 5 hours,

wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and

wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.

**18.** The method of claim 12, wherein the pharmaceutical composition comprises about 1.75 mg of zolpidem hemitartrate.

**19.** The of claim 18, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

(*Id.*)

**Intermezzo**

Intermezzo, the commercial embodiment of the '131 Patent, is the first FDA-approved drug product indicated for as-needed treatment of middle-of-the-night insomnia. (A000013; A003475–76.) The active ingredient in Intermezzo is zolpidem tartrate (sometimes referred to as zolpidem). (*Id.*) While the active ingredient in Intermezzo is the same as that in Ambien, the two drugs differ in administration, indication, dosage, and formulation. (A000071–72.)

*First*, Ambien is administered prophylactically at bedtime (meaning at the beginning of the night, to try to keep a patient asleep throughout the night). (A003028 (Indications & Usage); A003030–31 (Dosage & Administration; Information for Patients); A000020.) Intermezzo, however, is administered only if and when the patient wakes up in the middle of the night and experiences insomnia. (A003475–76.) While a patient must be sure to get a full-night's sleep (7–8 hours) after taking Ambien, Intermezzo allows a patient to safely awaken after four hours and drive or perform other daily tasks. (A000072; A003030–31; A003475–76.)

*Second*, at the time Intermezzo was approved, the recommended dose of Ambien was 10 mg at bedtime for non-elderly adults, and 5 mg for the elderly (as the elderly metabolize zolpidem more slowly). (A003030.) Meanwhile, the recommended dose of Intermezzo is 3.5 mg for non-elderly males, and 1.75 mg for non-elderly women and the elderly. (A003475–77.)

*Third*, Ambien is a tablet which is swallowed by the patient and absorbed in the gastrointestinal tract, whereas Intermezzo is a sublingual tablet which is placed under the tongue and absorbed through the oral mucosa. (A003027; A003030; A003476–77; A000072.)

**The District Court's Opinion**

Appellees are generic drug manufacturers, each of which filed an Abbreviated New Drug Application ("ANDA") seeking FDA approval to market a generic version of Intermezzo. (A000012.) Appellants first filed suit against Actavis on August 23, 2012. (A000018.) By early 2014, actions against DRL, Novel, Par, and TWi had been consolidated with the Actavis case in the District of New Jersey. *Id.*

This consolidated action was tried to the bench on December 1–15, 2014, with closing arguments on February 13, 2015. (A000018.)

Appellants proceeded to trial only against Appellees Novel, DRL, and Actavis. (A000013.)[3] Appellees' definition of a person of ordinary skill in the art for the '131 Patent, adopted by the District Court, required at "least a Ph.D. in clinical psychology having at least one year of research experience in the field; or an MD having at least one year of clinical experience in the field." (A000069.)

The District Court issued its Opinion on March 27, 2015, and entered final judgment according to that Opinion on April 9, 2015. (A000118; A000125.) As relevant to this appeal, the District Court held that the asserted claims of the '131 Patent were not indefinite and were infringed by all three defendants, but that those claims were invalid as obvious. (A000118.) In so concluding, the Court acknowledged that "[p]rior to 2005, the method of treating all types of insomnia was

---

[3] Just before trial, Par stipulated that its ANDA filing infringes the '131 and '809 Patents, agreed to stay the Par action until final judgment with respect to the remaining defendants, and stipulated to be bound by the final judgment on the validity of the '131 and '809 Patents with respect to the remaining defendants. (A000013; A000851–55.) Similarly, TWi agreed to stay the TWi action until final judgment with respect to the remaining defendants and stipulated to be bound by the final judgment on validity and infringement of the '131 Patent with respect to the remaining defendants. (A000013; A000858–62.)

primarily through prophylactic administration to prevent insomnia rather than on the 'as needed' basis described in the '131 patent." (A000018.) With respect to zolpidem specifically, the District Court stated "[w]hile it is undisputed that Ambien was indicated for MOTN insomnia, Ambien's label instructed patients to take Ambien at bedtime, therefore treating MOTN insomnia through prophylactic dosing." (A000071.) Moreover, the District Court recognized that the standard, bedtime dose of Ambien was 10 mg for the non-elderly, and that "[a]t bedtime a person's drive to sleep is at its peak, as opposed to the middle of the night, after some sleep has occurred." (A000075.)

In reaching its conclusion that the asserted claims of the '131 Patent were obvious, the District Court relied on three prior art references, *Danjou*, *Doghramji*, and *Hindmarch*, as teaching the use of zolpidem for MOTN insomnia without prophylactic administration. (A000091.) The District Court found that all three references "promote the benefits of taking a hypnotic agent on an 'as needed' basis." (*Id.*) It then concluded that a POSA would not disregard these benefits "simply because the final conclusion of a reference chooses zaleplon [a different sleep drug] at a dose more than double that of the claimed invention."

—15—

(A000092–93.) However, the District Court failed to recognize the references went further than choosing zaleplon—they affirmatively indicated zolpidem would not work as a non-prophylactic, as-needed treatment for MOTN insomnia. The *Doghramji* reference explicitly concluded "*only zaleplon* appears to be suited for middle of the night administration," but the Court excerpted this quote in its opinion— omitting the word "only." (*Compare* A003002 (emphasis added) *with* A000084 ("*Doghramji* concluded that 'zaleplon appears to be suited for flexible use on an as-needed basis.'").) The District Court also found that the desirability of as-needed treatment for MOTN insomnia "in and of itself, is convincing to the Court that non-prophylactic administration [of zolpidem] was obvious." (A000091.)

In finding that the prior art taught low doses administered only in the middle of the night, the District Court relied on the *Teitelbaum* reference, despite the fact that "*Teitelbaum* suggests taking a total of 15 mg of zolpidem, 10 mg at bedtime and 5 mg in the middle of the night." (A000076.) The Court cited no expert testimony supporting this finding. (*Id.*) Indeed, every expert (including Appellees') offering an opinion on *Teitelbaum* concluded that the reference taught higher doses of

zolpidem, administered *prophylactically* at bedtime and *again* in the middle of the night. (*See, e.g.*, A001592–93 (7.153:21–154:23); A001937–38 (10.181:16–182:2).) The asserted claims of the '131 Patent require 3.5 mg zolpidem (non-elderly) or 1.75 mg (elderly) administered on an as-needed basis, *without prophylactic dosing.* And, as discussed above, *Teitelbaum* expressly teaches away from lowering the zolpidem dose, instructing that if the large zolpidem doses used for MOTN insomnia cause residual sedative effects, the patient should be switched to zaleplon—a different drug.

The District Court also acknowledged "that there is no single prior art reference . . . teaching a POSA that 3.5 mg and 1.75 mg [zolpidem] doses are effective." (A000088.) It nonetheless found that there was a reasonable expectation of success in achieving effectiveness with such low doses of zolpidem in the middle of the night, in large part because switching from Ambien's oral administration to the transmucosal administration in the claims would allow sleep to be induced at lower doses than previously thought effective. (A000089.)

The District Court thus concluded that the asserted claims of the '131 Patent, which require low doses of zolpidem, administered as-

needed without prophylactic administration, would have been obvious to a person of ordinary skill in the art. It entered final judgment accordingly on April 9, 2015, and Appellants timely filed this appeal on May 6, 2015. (D.I. 1-2.)

**Prophylactic Treatment for MOTN Insomnia**

Before the invention claimed in the '131 Patent, the prior art taught that MOTN insomnia should be treated using prophylactic administration of medication (meaning dosing at bedtime). (A000018; A000071; A000081; A000097.) In other words, physicians would instruct a patient to take medication at the beginning of the night to keep the patient asleep through the entire night. Prophylactic dosing, however, has the clear disadvantage that the patient must take the drug whether or not a middle-of-the-night awakening will ultimately occur. (*See, e.g.,* A000081–82; A000102.) Despite this disadvantage, the prophylactic approach was used because it is easier to get someone to sleep at the beginning of the night and keep him asleep throughout that night, than to get a person back to sleep in the middle of the night. (A000019–20; A001904–05 (10.47:21–50:17).) Moreover, prophylactic administration was less likely than as-needed treatment to cause residual sedative

effects, because the drug has a longer amount of time to wear off after

dosing. (A001905–06 (10.53:24–54:17); *see also* A000082.)

*Ambien Was Indicated Only for Prophylactic Dosing*

Ambien, the most widely prescribed drug for the treatment of

insomnia at the time of the invention, embodied the approach of using

prophylactic dosing to treat MOTN insomnia. Ambien was used to treat

two types of sleep issues—problems with sleep *onset* (trouble falling

asleep) and problems with sleep *maintenance* (trouble staying asleep,

including MOTN insomnia). (A000071–72; A003030; A001947

(10.220:19–24).) Specifically, the Ambien label instructed patients that

Ambien "is used to treat different types of sleep problems, such as:

- trouble falling asleep
- waking up too early in the morning
- waking up often during the night."

(A003030.) The Ambien label was explicit, however, that a patient was

to take the drug prophylactically, before bedtime, and to be sure to have

a full-night's sleep before engaging in daily activities:

> The recommended dose for adults is 10 mg immediately
> before bedtime.
> . . . .
>
> Do not take Ambien unless you are able to get a full night's
> sleep before you must be active again. For example, Ambien

should not be taken on an overnight airplane flight of less than 7 to 8 hours since "traveler's amnesia" may occur.

(A003030–31.)

From Ambien's approval in 1992 through the introduction of Intermezzo in 2011, the prevailing approach was prophylactic dosing for MOTN insomnia. (A000071; A000081.) Indeed, in September 2005, just after the priority date of the '131 Patent, FDA approved Ambien CR®, an extended-release zolpidem product aimed at better keeping patients asleep and addressing sleep maintenance issues such as MOTN insomnia. (A001672 (8.43:5–12).) In stark contrast to Intermezzo and the invention of the asserted claims of the '131 Patent, Ambien CR used prophylactic dosing and *raised* the recommended dose compared to Ambien—from 10 mg to 12.5 mg for non-elderly adults. (A003637.)

*The Prior Art Teaches Prophylactic Dosing*

The scientific literature confirmed that MOTN insomnia should be treated by prophylactic administration. A book by Appellees' consultant[4] Jacob Teitelbaum ("*Teitelbaum*"), published in 2001,

---

[4] Dr. Winkelman, Appellees' sleep expert, referred to Dr. Teitelbaum as "an expert and long-time physician in the field of sleep disorders." (continued . . .)

explained that the "best way to need less medication in the long run is to use *as much as it takes* to get seven to eight hours of solid sleep each night without waking or hangover for six months." (A003059.) In other words, *Teitelbaum* recommends taking enough medication prophylactically at bedtime to avoid waking prematurely. (A001938 (10.183:9–23).)

A POSA also knew that prophylactic dosing at bedtime with zolpidem did not always prevent an MOTN awakening, so some physicians recommended taking an *extra* dose to treat such an awakening. *Teitelbaum* described the standard practice of dosing prophylactically and then using extra zolpidem if the patient still woke up in the middle of the night:

> The normal dosage is one-half to one 10-milligram tablet, taken at bedtime. If you wake up in the middle of the night you can take an extra one-half to one tablet (leave it by your bedside with a glass of water) and any sedation is usually worn off by the time you are ready to wake up in the morning. One-half tablet is usually enough for the middle of the night. If you find that taking an additional dose in the middle of the night leaves you hung over, use Sonata [zaleplon] instead.

(A001684 (8.91:6–92:4).) Appellees hired Dr. Teitelbaum as a consultant back in 2011, before litigation even began. (A001951 (10.236:8–237:14).)

(A003062.)[5] A 2005 article by a past president of the Associated Professional Sleep Societies described a similar treatment approach: "Possibly because of its limited efficacy for sleep maintenance problems, patients may take higher-than-recommended doses or take a second dose [of zolpidem] during the night, which may increase the risk of both acute side effects and next-day residual effects." (A001682–83 (8.83:23–86:21).)

More generally, other art in the record established that the "standard pattern for use of hypnotics" is "to take the agent in anticipation of the occurrence of a sleep disturbance." (A003617; A001040–41 (1.160:13–161:16); *see also* A004045 (2005 book chapter stating that "[z]olpidem at bedtime is indicated for late-night sleep maintenance and early morning awakening.").) Appellees' expert, Dr. Winkelman, agreed that MOTN insomnia was treated with prophylactic dosing. (A001671–72 (8.41:7–42:2).)

---

[5] Zaleplon, further discussed below, is another hypnotic from the same class as zolpidem, which was thought to be a superior option for as-needed dosing because it was cleared from the patient's system more quickly.

\*    \*    \*

Thus, the express teaching of the prior art in 2005 was to give patients enough zolpidem at bedtime to *keep* them asleep through the entire night. If that failed, physicians would prescribe patients *more* zolpidem—sometimes at bedtime and sometimes as an extra dose in the middle of the night. This is the opposite of the approach articulated in the asserted '131 Patent claims—low doses of zolpidem administered *only* in the middle of the night, without prophylactic dosing.

## The Prior Art Does Not Teach Safe and Effective, Non-Prophylactic Dosing of Zolpidem

This is not to say that the literature overlooked the potential benefits of as-needed dosing. "[B]ecause the pattern of sleeplessness across any given night is variable, treatment flexibility is optimal when it allows for administration of the hypnotic agent in the middle of the night, if insomnia occurs at that time." (A003004.) Prophylactic treatments could lead to over-medication, as treating a patient in anticipation of symptoms means taking a drug whether or not it ultimately will be needed. (*See* A000082; A004026–27; A003004; A003617.) And, as suggested above, prophylactic treatment did not always work—people woke up and needed additional doses of a

—23—

hypnotic. Responding to this need, several researchers explored non-prophylactic dosing options for MOTN insomnia.

The District Court relied on three such studies, *Danjou*, *Doghramji*, and *Hindmarch*, to show a person of ordinary skill would have employed zolpidem non-prophylactically to treat MOTN insomnia. (A000081–84; A000091–93; A000099.) But these studies all concluded that zolpidem was an *inappropriate* candidate for as-needed treatment of MOTN insomnia, because it led to residual sedative effects when used at the doses that were thought to be needed to induce sleep.

*Danjou* was a 1999 article investigating residual sedative effects of 10 mg of zolpidem and 10 mg of another hypnotic, zaleplon (also known as Sonata®) after middle-of-the-night administration. (A002994.) Patients went to bed around midnight, were woken up, and given placebo, 10 mg zaleplon, or 10 mg zolpidem 2–5 hours before the planned time for awakening. (A002995.) The results of the study "demonstrate[d] that zaleplon at the dose of 10 mg is free of residual hypnotic or sedative effects when administered nocturnally as little as 2 h before waking in normal subjects" but that "residual effects of zolpidem are still apparent on objective assessments up to 5 h after

nocturnal administration." (A002994; A001938 (10.184:24–185:24); A001686–87 (8.101:24–102:5).) In other words, because patients experienced lingering effects from zolpidem 5 hours after administration, it could not be safely administered in the middle of the night. Indeed, Appellees' expert Dr. Winkelman admitted that "[t]he conclusions" of *Danjou* "were that if you wanted to choose a drug to use in the middle [of the] night for insomnia, that you would use zaleplon and that you would not use zolpidem." (A001601 (7.188:25–189:4); *see also* A001686–87 (8.101:24–102:5).)

A 2001 article called *Hindmarch* reported on administration of placebo, zaleplon 10 mg or 20 mg, or zolpidem 10 mg in the middle of the night, "to assess residual effects of zaleplon and zolpidem after a middle of the night administration." (A003589.) *Hindmarch*, too, found that zolpidem was inappropriate for middle of the night use because of the residual sedative effects that would last until morning, but that zaleplon would be "a useful hypnotic . . . for the management of insomnia and sleep disturbance in ambulant patients . . . even when administered in the middle of the night." (A003589, A003596.) Dr. Winkelman stated: "the general conclusion . . . was that zaleplon is the

treatment of choice for middle-of-the-night insomnia." (A001603 (7.197:9–14).)

*Doghramji*, a 2000 review article entitled *The Need for Flexibility in Dosing of Hypnotic Agents*, reported on various studies involving 10 mg doses of zolpidem. After evaluating those studies, *Doghramji*, too, ultimately concluded that "*only zaleplon* appears to be suited for middle of the night administration." (A003002 (emphasis added).)

Thus, these three articles all instructed that *zaleplon* can be used for MOTN insomnia, and expressly indicated that zolpidem could *not* be used for such administration. Nor did it apparently occur to any of the authors to suggest, much less study, what the District Court found to be an obvious course of action—lowering the zolpidem dose to avoid the residual sedative effects. (*See generally* A002994–3001; A003002–08; A003589–97; A003062.)

## A Patient's Diminished Sleep Drive in the Middle of the Night Created a Seemingly Irreconcilable Tension Between Safety and Efficacy

To be considered effective, any hypnotic must induce sleep.[6] The challenge for a hypnotic for as-needed, MOTN dosing, is that it is *more difficult* to induce sleep in the middle of the night as compared to bedtime. The Court recognized as much, finding that "[a]t bedtime a person's drive to sleep is at its peak, as opposed to the middle of the night, after some sleep has occurred" and that "it may be more difficult for a person to return to sleep" after sleeping for a few hours. (A000075–76.) Both sides' experts agreed on this point. (A001904 (10.46:21–49:4) ("[I]t is much easier to go to sleep at night—at bedtime—than it is if you have been woken up in the middle of the night."); A001587 (7.132:10–15) ("The urge to sleep would be greatest right before bed.").) Indeed, this is common sense—once a person has slept for a few hours, she no longer feels as tired. (A001904 (10.46:21–49:4); A001587 (7.132:10–15).)

---

[6] In assessing whether a medication is effective in initiating sleep, studies often evaluate a parameter called "latency to persistent sleep." This is an objective measure of the amount of time it takes to reach the first 10 minutes of sleep, and is a standard in the art for determining the efficacy of a sleep medication. (A001915–16 (10.93:18–94:1); A001906 (10.55:13–56:12).)

The overall "drive for sleep" is the result of the interaction of two different processes: "homeostatic sleep drive" and "circadian drive." With each hour a person stays awake, homeostatic sleep drive builds. (A001901 (10.35:2–36:13).) But once a person starts sleeping, his homeostatic sleep drive quickly declines—by the middle-of-the-night it is estimated that 75–90% of homeostatic sleep drive has been dissipated. (A001904 (10.47:21–49:4); A001901 (10.36:21–37:8).) Despite this, a person is normally *kept* asleep by the circadian drive, which is at a low in the middle of the night. (A001904 (10.47:21–49:4).) However, the combined drive for sleep in the middle of the night is still only about 20% of the combined drive at bedtime. (A001904 (10.46:21–47:20).) Thus, if a person wakes up in the middle night—say because a car alarm goes off outside—it will be more difficult for that person to *fall back asleep* than at the beginning of the night (when the drive for sleep is high). (A001905 (10.50:11–14); A001586–87 (7.129:10–132:15).)

This reduced drive for sleep implies that the indicated bedtime dose of Ambien also would be needed in the middle of the night to induce sleep. (A001905 (10.51:16–52:12).) But skilled artisans also recognized that using the bedtime dose of zolpidem was a non-starter,

because the art demonstrated that such a dose would cause harmful residual sedative effects. (*See, e.g.,* A002994; A003002; A003589.) In short, the person of ordinary skill in 2005 would have concluded that an efficacious dose of zolpidem would not be safe if administered only in the middle of the night, but a safe dose would not be efficacious. (A001905–06 (10.52:16–55:12); A001912 (10.79:19–80:14).) The District Court identified no prior art suggesting that this conundrum was solvable.

### The Prior Art of Record Did Not Demonstrate That Sub-10 mg Zolpidem Doses Would Have Been Effective in the Middle of the Night

The District Court's conclusion of obviousness rested in part on literature studying attributes of zolpidem at varying doses. As shown below, *none* of this literature purported to answer the relevant question, which is whether a 3.5 mg dose of zolpidem would have been expected to be effective to induce sleep if administered on a non-prophylactic basis in the middle of the night.

Studies on potential treatments for insomnia, and the dosing for those treatments, are frequently conducted on healthy individuals. This is because healthy individuals often experience "transient insomnia"—

very short-term insomnia that "may be induced by stress, sleep in unfamiliar surroundings, jet lag and other factors." (A003032.) These studies are also often conducted using a model that replicates transient insomnia. For example, healthy volunteers may be asked to take the medication and sleep for one night in a lab setting, as people often do not sleep as well in new surroundings. (A001916 (10.96:20–97:9).) This is known as the "first-night effect" or "first-night model of insomnia." (*Id.*)

One such study was a 1988 article entitled *The Effects of Zolpidem on Transient Insomnia* ("*Vogel*"), which used healthy volunteers in the first-night model of insomnia. *Vogel* was a placebo-controlled, double-blind study that administered different doses of zolpidem to 225 non-elderly subjects at *bedtime*. (A003073; *see also* A001916–17 (10.96:20–99:10.) For the 5 mg dose, *Vogel* found that latency to persistent sleep was not statistically different from placebo. (A003073; A001917 (10.98:3–10.99:10); *see also* A001931–32 (10.157:18–158:21); A001934–35 (10.168:18–170:12).) In plain English, *Vogel* found that 5 mg of zolpidem did not put patients to sleep better than placebo, even at bedtime, when the drive to sleep is greatest.

Vogel's results were confirmed by a 1995 study in SLEEP entitled *Zolpidem in the Treatment of Transient Insomnia: A Double-Blind, Randomized Comparison With Placebo* ("*Roth 1995*"). (A003032–37.) *Roth 1995* was a placebo-controlled, double-blind study that administered 5–20 mg doses of zolpidem to a total of 462 non-elderly subjects. (A003033; A001917 (10.100:21–101:12).) *Roth 1995* also used the first-night model of insomnia in healthy volunteers, and administered zolpidem at bedtime, when the overall drive for sleep is the highest. (A003032; A001917 (10.100:3–101:12).) *Roth 1995* compared the 7.5 and 10 mg zolpidem doses with placebo and found that latency to persistent sleep was statistically significantly shorter for both doses. (A003033–35; A001917–18 (10.101:21–102:8).)

While *Roth 1995* itself did not perform the statistical analysis on the 5 mg dose, in the following year one of the authors performed a full statistical analysis of the *Roth 1995* study. (A003033–34; A003985; A001918–19 (10.102:9–109:4).) That article concluded "zolpidem was highly effective in shortening latency to persistent sleep and in reducing the number of nighttime awakenings and time spent awake after sleep onset. These effects were highly significant in the groups that had

received 7.5 or 10 mg zolpidem, *but not in the 5 mg group* (although numerical trends were evident at this dose)." (A003985; *see also* A000077–78; A001918–19 (10.105:12–108:6).)

The District Court placed much weight on the 1989 *Merlotti* study, entitled *Dose Effects of Zolpidem on the Sleep of Healthy Normals*. This was a study of the effects of 2.5, 5, 7.5, 10, and 20 mg of zolpidem in 12 healthy non-elderly males. (A002275.) Subjects spent three consecutive nights per week for seven weeks in a sleep laboratory, and were given a dose of drug or placebo thirty minutes before bedtime. (A002276.) *Merlotti* did find that for these 12 males, 5 mg zolpidem led to a statistically significant difference in latency to persistent sleep—in contrast to *Vogel* and *Roth 1995*. (A002277.) However, the "2.5 mg dose was not different from placebo in latency to persistent sleep." (*Id.*) Moreover, *Merlotti* measured the effects of zolpidem at bedtime, when the overall drive to sleep is the highest. (A002276.)

Other prior art discussed by the District Court did not even measure latency to persistent sleep. For example, a 2004 abstract ("*Kim*") administered placebo, 5 mg, or 10 mg zolpidem in the morning to 16 healthy male subjects. (A002733.) Kim did not evaluate the

primary measure of efficacy in this context, latency to persistent sleep (*see supra* note 6). Rather, *Kim* reported results from a Multiple Sleep Latency Test ("MSLT"), a test originally developed to assess the ability to sustain wakefulness during the day (for example, in patients with narcolepsy), or to measure sedative effects. (A001913–14 (10.85:23–86:12); *see also* A002733.) The MSLT is typically composed of four or five tests, one conducted every two hours. (*Id.*) Subjects are placed in a room and instructed to try to sleep, then awakened once they have "slept" for 30–90 seconds. (A001929 (10.146:9–12).) Based on the MSLT and psychomotor tests, *Kim* concluded that "zolpidem" (no dose specified) produced "sedation"—not sleep—in these volunteers. (A002733; A001935–36 (10.173:17–174:6).) At trial, the parties agreed that sedation and sleep are not the same thing.[7]

Two other studies discussed by the District Court kept patients awake for the duration of the experimentation. The 2003 *Olubodun* article administered 5 mg of zolpidem, then measured blood concentrations of the drug post-dosing. (A003009; A003011.) The

---

[7] (A001692–93 (8.122:2–126:21); A001913–14 (10.85:23–86:15); A001955–56 (10.253:11–254:8).)

*Olubodun* paper did not study or report on sleep. (*See* A003009–16; A001914–15 (10.89:20–90:13).) Similarly, a 1994 article ("*Patat*") measured EEG and pharmacokinetic profiles for various doses of zolpidem. (A003017; A001914 (10.88:10–15).) As in *Olubodun*, the subjects in *Patat* were not allowed to go to sleep. (A003018; A001914 (10.88:19–23); A001604 (7.200:1–3).)

**The Prior Art Did Not Teach That Transmucosal Delivery Would Permit a Drastic Reduction in the Lowest Effective Zolpidem Dose**

Even viewed in the most generous light, the art reviewed above suggests only that doses such as 5 mg or 7.5 might induce sleep in healthy subjects at bedtime (two large-scale studies, however, found 5 mg would not even induce sleep at the beginning of the night). (*Compare* A003073 *and* A003032 *with* A002275.) It does not suggest that such doses would be effective in the less favorable environment of the middle of the night. And in any event, this art does not address whether the even-lower claimed doses (3.5 mg for non-elderly, 1.75 mg for elderly) would have been effective to induce sleep. The Court thus acknowledged that "there is no single prior art reference before the

Court teaching a POSA that 3.5 mg and 1.75 mg doses are effective" as required by asserted claims 8, 10, 18, and 19. (A000088.)

To bridge this gap in the prior art, the District Court concluded that a person of ordinary skill would have reformulated Ambien into a tablet designed for transmucosal delivery. (*See* A000085–90.) The art reviewed above generally involves administration of zolpidem by tablets (like Ambien) that are swallowed and absorbed through the gastrointestinal tract. Intermezzo, by contrast, is placed under the tongue, and zolpidem is absorbed directly through the mucosal membranes in the mouth. (A003476–77; A000013.) This is known as "oral transmucosal delivery" (or, more specifically for Intermezzo, "sublingual delivery"). (*Id.*) The District Court found that a POSA would have used transmucosal delivery of zolpidem to lower the dose, because it avoids the "first-pass effect" and thus allows a higher percentage of zolpidem to enter the bloodstream (known as higher "bioavailability"). (A000085–90.)[8]

---

[8] When a drug is swallowed, the liver metabolizes a portion of the drug first, thereby making that portion of the drug unavailable for absorption into the bloodstream. Drugs that are intended to pass through the oral mucosa and to be absorbed directly into the (continued . . .)

The District Court's analysis on this point is *essential* to its ultimate conclusion that a POSA would have arrived at the claimed doses. And in turn, its conclusion was based on a specific assumption—that a person of ordinary skill would expect a transmucosal dosage form of zolpidem to achieve nearly 100% bioavailability, improved from the 70% figure reported for Ambien (*See* A003010). Based on this assumption, the District Court found that a 5 mg swallowed dose of zolpidem, with 70% bioavailability, would have equivalent effectiveness to a 3.5 mg transmucosal dose. It expressed this conclusion with the following equation: 5 mg * 0.7 = 3.5 mg. (A000088–89.) This equation necessarily assumes that transmucosal administration would *entirely* eliminate the 30% "loss" of active ingredient caused by administering zolpidem as a swallowed tablet.

*Both* sides' experts agreed, however, that the *only* way to achieve 100% bioavailability is through intravenous ("IV") administration, where the drug is injected directly into the bloodstream. (A001798–99

---

bloodstream may avoid this first-pass metabolism. (A001817 (9.156:12–157:20).) The amount of drug that actually gets into the bloodstream is known as its "bioavailability." (A001800 (9.86:20–87:12).)

(9.81:17–82:19); A001801 (9.91:15–20); A001501 (6.216:11–217:18);
A001606 (7.208:2–17).) Appellees' experts could say only that
transmucosal delivery would be "quite close" to IV administration, but
they admitted that they had no literature to support this assumption.
(A001606 (7.208:2–24); A001502 (6.218.18–24).)

In fact, the record showed that, because some of a transmucosal
tablet will not be absorbed across the mucosa, transmucosal delivery
will not achieve perfect, 100%, delivery into the bloodstream. (A001798–
99 (9.81:17–82:19), A001801 (9.91:18–92:5).) The record also refutes the
notion that bioavailability would be "quite close" to IV. The
bioavailability of many different drugs delivered across the oral mucosa
varied between about 20–75%—well short of the 100% bioavailability of
IV drugs.[9] And while in some cases, the bioavailability increased by
converting to an oral transmucosal dosage form; in others, the
bioavailability actually *decreased*.[10]

---

[9] (A002285; A004000; A004012; A004017; A003074–93; A001803–04
(9.101:20–102:17); A001805 (9.107:14–109:24); A001806–10 (9.113:12–
128:11).)

[10] (A002289; A003080; A003083–84; A004012; A001810 (9.128:14–
129:12).)

Appellants' pharmacokinetics expert calculated Intermezzo's bioavailability at 74.5%, barely above the 70% bioavailability reported in the prior art for Ambien. (A000089; A001801 (9.93:17–22).) The district court discounted this evidence because it was not prior art, but the real point is that if a person of ordinary skill in 2005 expected *anything less than* 100% bioavailability from transmucosal zolpidem, there is no record basis to find a reasonable expectation of success in using the claimed doses at any time of night, much less in the middle of the night.

**FDA Responded to Intermezzo's Clinical Data by Telling All *Other* Manufacturers of Zolpidem Products to Lower Their Recommended Doses**

The results of the studies leading to the approval of Intermezzo surprised even *FDA*. As documented in a 2013 article in the New England Journal of Medicine, after reviewing the data produced in connection with the approval of Intermezzo, FDA ordered the lowering of the dose of every other zolpidem product on the market in the United States. (A004031–32; A001705 (8.174:3–21).)[11] Ambien had been on the

---

[11] This article was written by officials of FDA's Center for Drug Evaluation and Research. (A004033.)

market nearly 20 years—but FDA did not change course on Ambien's dosing until it received data on Intermezzo. (*See* A004032; A001705 (8.174:3–21).) FDA also recommended that if a patient takes a long-acting zolpidem product at night (like Ambien CR), she should refrain from "driving or engaging in any activity that requires full alertness" the *entire next day*. (A004032.) Intermezzo thus changed the way the industry viewed the safety and efficacy of zolpidem.

## SUMMARY OF THE ARGUMENT

An obviousness analysis must be grounded in the prior art available at the time of the invention. Here, the District Court acknowledged that the prior art does not teach all of the elements of the asserted claims. Indeed, the dose, route, and timing of the administration of zolpidem in the claims of the '131 Patent were significant departures from the prior art and the prevailing practice at the time. This Court has accordingly cautioned that "general conclusions about what is 'basic knowledge' or 'common sense'" cannot serve "as a replacement for documentary evidence for core factual findings in a determination of patentability." *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014); *see also Perfect Web Techs., Inc. v. Infousa, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) ("Common sense has long been recognized to inform the analysis of obviousness *if explained with sufficient reasoning*." (emphasis added)). The District Court committed this fundamental error in assessing two key elements of the claims, and each such error independently requires reversal.

*First*, the '131 Patent's asserted claims cover the treatment of MOTN insomnia "without prophylactically administering zolpidem," a departure from the only prior art method identified for treating the condition. While the District Court stated that prophylactic dosing was the "prevailing" method, it found that departing from this method would have been obvious simply because the "nature of MOTN insomnia" would have led a POSA to administer zolpidem as needed and not prophylactically. If so, this insight eluded researchers for decades and contradicts the express conclusions of the prior art. The District Court also relied on prior art that found the approved dose of zolpidem would cause residual sedative effects if administered in the middle of the night, and *expressly* taught away from non-prophylactic administration of the drug. Instead of recommending the solution the District Court found obvious (lowering the zolpidem dose), this art suggested using a different active ingredient entirely. (*See* Part I.B below.)

*Second*, the asserted claims of the '131 Patent recite zolpidem doses (3.5 mg for the non-elderly and 1.75 mg for the elderly) that were approximately a third of the approved Ambien (zolpidem) doses as of

2005. The District Court acknowledged that there was no art in the record teaching that these doses would be efficacious to induce sleep. And for good reason—the record established that it would take more zolpidem to put a person to sleep in the middle of the night, when the drive for sleep had substantially dissipated. But, while adopting the premise that bedtime was the easiest time to induce sleep, the District Court ignored the clear implication of that premise—that there would be no expectation of success in lowering the bedtime dose for use in the middle of the night. In order to arrive at the claimed doses, the District Court made a further finding that even Appellees' experts did not agree with—that transmucosal administration would raise zolpidem's bioavailability from 70% to 100%, the same as intravenous administration. This finding is wholly lacking in evidentiary support. (*See* Part II.C below.)

## STANDARD OF REVIEW

The '131 Patent is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011); 35 U.S.C. § 282. To prevail, Appellees must prove by clear and convincing evidence that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention [here, May 2005] was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (2010); *Microsoft*, 131 S. Ct. at 2246. In assessing whether Appellees met this burden, this Court must consider (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

The Court must also determine whether a POSA would have reasonably expected success in arriving at the claimed invention, and ask whether a POSA "would have seen a benefit" in combining known elements to arrive at the claimed invention. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 995 (Fed. Cir. 2009); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415–17, 424 (2007). Courts

considering obviousness challenges to issued patents must also avoid reasoning by hindsight. *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1381 (Fed. Cir. 2013) ("We must guard against 'hindsight bias' and '*ex post* reasoning.'") (citation omitted).

The District Court's finding of obviousness is reviewed *de novo*, with the underlying factual determinations reviewed for clear error. *Procter & Gamble*, 566 F.3d at 993. A factual finding is clearly erroneous "if the record lacks adequate evidence to support it," *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 406 (Fed. Cir. 1996), or when, despite some evidence in support, this Court is left with "a definite and firm conviction that the district court was in error." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1186 (Fed. Cir. 2014).

# ARGUMENT

## I. The District Court Erred in Finding That a Person of Ordinary Skill Would Have Used Non-Prophylactic, As-Needed Administration of Zolpidem to Treat MOTN Insomnia

Every asserted claim of the '131 Patent requires that the claimed method of treatment be carried out "without prophylactically administering zolpidem." (A000238.) The Court found that this ran contrary to the pre-2005 conventional wisdom, which was to treat all types of insomnia, including MOTN insomnia, "primarily through prophylactic administration . . . rather than on the 'as needed' basis described in the '131 patent." (A000018; *see also* A000097 ("As stated, MOTN insomnia was previously being treated the same way as other types of insomnia, prophylactically.").) Nonetheless, the Court concluded that "[n]on-prophylactic dosing in Claims 1 and 12 of the '131 patent [is] obvious based upon *Doghramji*, *Danjou* and *Hindmarch*, as well as the nature of MOTN insomnia." (A000099.) As shown below, this conclusion constitutes reversible error in several respects.

**A.    In Contravention of Federal Circuit Precedent, the District Court Expressly Relied on the Need for a Non-Prophylactic Treatment for MOTN Insomnia to Render the Asserted Claims Obvious**

The District Court concluded that the "non-prophylactic dosing in Claims 1 and 12 of the '131 patent [is] obvious based upon . . . the nature of MOTN insomnia." (A000099.) The Court explained what is meant by the "nature of MOTN insomnia":

> [A] POSA seeking to treat MOTN insomnia by a better means than Ambien® would inevitably use non-prophylactic dosing. This is because MOTN insomnia as a "condition wherein a subject, after falling asleep, awakens and has difficulty returning to sleep," is so entangled with treatment "as-needed" as it is impossible to know, until the middle of the night, whether the insomnia will occur. This principle, in and of itself, is convincing to the Court *that non-prophylactic administration was obvious*.

(A000091 (internal citations omitted, emphasis added).) Thus, the District Court concluded that it would have been obvious to administer zolpidem on an as-needed basis in the middle of the night simply because that is the time of night at which the condition happens.

The District Court's findings are not internally consistent. Elsewhere in its opinion, as noted above, it acknowledged that there was nothing inevitable about using non-prophylactic dosing, because MOTN insomnia was seen as an issue of sleep maintenance and was

addressed in 2005 by *prophylactic* administration. (*See* A000018; A000097.)

But the District Court's error here is more fundamental, because "[r]ecognition of a need does not render obvious the achievement that meets that need. . . . Recognition of an unsolved problem does not render the solution obvious." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008) (same). This is exactly what the District Court did here. It asserted that there was an inherent need for non-prophylactic, as-needed dosing because of the "nature of MOTN insomnia," and then assumed that it would have been obvious to meet that need with zolpidem, regardless of any obstacles perceived from the prior art. This erroneous analysis was fundamental to the District Court's conclusion that it would have been obvious to administer zolpidem on a non-prophylactic basis.

**B.    In Contravention of Federal Circuit Precedent, the District Court Rested its Obviousness Conclusion on References That Expressly Taught Away from Non-Prophylactic Use of Zolpidem**

Aside from the "nature of MOTN insomnia," the District Court identified three references—*Doghramji*, *Danjou* and *Hindmarch*—as

teaching a non-prophylactic, as-needed dosing option for zolpidem. (*See* A000099.) The District Court's reliance on these references is also error, because all of them expressly teach away from the '131 Patent's asserted claims.

As a "general rule" "references that teach away cannot serve to create a *prima facie* case of obviousness." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001). "A reference 'teaches away' when it 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.'" *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) (citation omitted); *see also In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.").

Here, *Doghramji*, *Danjou* and *Hindmarch* go much further than "suggesting" that the use of as-needed zolpidem was "unlikely to be productive"—all three pieces of prior art expressly stated that non-

prophylactic dosing of zolpidem *would not work*, and instructed that a different hypnotic compound, zaleplon was the *only* one suitable for as-needed, MOTN administration. (A003002; A003589; A002994.)

In evaluating zaleplon and 10 mg zolpidem, *Doghramji* explicitly concluded "*only zaleplon* appears to be suited for middle of the night administration," discouraging a person of ordinary skill from pursuing non-prophylactic dosing of zolpidem. (A003002 (emphasis added).) The Court's opinion, however, excerpts this quote from *Doghramji*, omitting the crucial word "only": "*Doghramji* concluded that 'zaleplon appears to be suited for flexible use on an as-needed basis.'" (A000084.)

The District Court cannot ignore portions of the prior art that undermine its conclusion. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art.") (citation omitted). Indeed, this Court has found it "unreasonabl[e]" to conclude that a particular use of a material is "known in the art without

acknowledging that [the] prior art references rendered the material out of place" for that use. *Crocs, Inc. v. Int'l Trade Comm'n,* 598 F.3d 1294, 1308–09 (Fed. Cir. 2010); *see also Santarus,* 694 F.3d at 1355 (reversing obviousness holding where prior art discussed four options, but explicitly "ruled out" the option claimed in the patent and stated that another option "offers the best possibilities"). This principle applies here—although the District Court's opinion does not acknowledge as much, *Doghramji* expressly ruled out the solution found by the '131 Patent.

The express conclusions of *Hindmarch* and *Danjou* parallel that of *Doghramji. Hindmarch* found that the as-needed dosing of 10 mg zolpidem, but not 10 mg zaleplon, led to residual sedative effects up to 5 hours after administration. (A003589.) *Hindmarch* thus concluded "[t]hese results suggest *zaleplon* will prove a useful hypnotic . . . for the management of insomnia and sleep disturbance in ambulant patients . . . even when administered in the middle of the night." (A003596 (emphasis added).) Dr. Winkelman admitted: "the general conclusion . . . was that zaleplon is the treatment of choice for middle-of-the-night insomnia." (A001603 (7.197:9–14).)

*Danjou* also "demonstrate[d] that zaleplon at the dose of 10 mg is free of residual hypnotic or sedative effects when administered nocturnally as little as 2 h before waking in normal subjects" but that "residual effects of zolpidem" were still present five hours after MOTN dosing. (A002994; A001938 (10.184:24–185:24); A001686–87 (8.101:24–102:5).) Again, Appellees' expert admitted that *Danjou* taught away from the use of MOTN zolpidem: "The conclusions were that if you wanted to choose a drug to use in the middle [of the] night for insomnia, that you would use zaleplon and that you would not use zolpidem." (A001601 (7.188:25–189:4); *see also* A001686–87 (8.101:24–102:5); A001938 (10.185:21–24).)

Despite the explicit language of the references and concessions by Appellees' experts, the District Court found that a person of ordinary skill "would not be deterred," because "a POSA would not disregard the touted benefits of non-prophylactic dosing to achieve their ultimate goal simply because the final conclusion of a reference chooses zaleplon at a dose more than double that of the claimed invention." (A000092.) But a person of ordinary skill reading these references would not conclude she should give up searching for a non-prophylactic treatment altogether—

she would conclude she should disregard *zolpidem*, and pursue zaleplon or some other option.

As with its reliance on the "nature of MOTN insomnia," the District Court reached its obviousness conclusion from a design need alone, in derogation of what the prior art it relied upon actually says. The District Court also presumed, without record support, that *zolpidem* must be the solution to the need for a non-prophylactic treatment. (*See also* A000088 ("As an initial premise, the Court finds that in light of *Danjou* and *Hindmarch*, a POSA seeking to treat MOTN insomnia non-prophylactically *with zolpidem*, would have been motivated to lower the 10 mg dose to eliminate the residual sedative effects.") (emphasis added).)

The District Court's conclusion that a POSA "would not be deterred" by the observed residual sedative effects from zolpidem is directly contradicted by the *Teitelbaum* reference upon which the District Court elsewhere relied. *Teitelbaum* recommends taking 10 mg zolpidem prophylactically, and then adding an *extra* 5 mg in the middle of the night if insomnia still occurs. (A003062.) If that dosing leaves a

patient with residual sedative effects, *Teitelbaum* recommends *switching* to zaleplon—it never suggests lowering the zolpidem dose:

> The normal dosage is one-half to one 10-milligram tablet, taken at bedtime. If you wake up in the middle of the night you can take an extra one-half to one tablet (leave it by your bedside with a glass of water) and any sedation is usually worn off by the time you are ready to wake up in the morning. One-half tablet is usually enough for the middle of the night. If you find that taking an additional dose in the middle of the night leaves you hung over, use Sonata [zaleplon] instead.

(*Id.*)

*        *        *

The District Court acknowledged that non-prophylactic dosing, as claimed by the '131 Patent, represented a departure from the prevailing method of treating MOTN insomnia. (A000018; A000097.) It nonetheless concluded that a POSA would have arrived at non-prophylactic dosing of zolpidem because of the inherent "nature of MOTN insomnia," irrespective of the prior art, which reported that zolpidem was inappropriate for this use. This does not constitute a proper obviousness analysis and requires reversal.

## II.    The District Court Erred in Concluding That A Skilled Artisan Would Have Reasonably Expected the Low Doses Claimed by the '131 Patent to Be Efficacious

Even if it were obvious to treat MOTN insomnia with zolpidem without prophylactic administration (which it was not), it would not have been obvious to do so at the very low doses claimed by the '131 Patent, providing an independent ground for reversal.

The asserted claims require 3.5 mg of zolpidem (non-elderly), and 1.75 mg (elderly), taken in the middle of the night without prophylactic administration. (A000238.) The District Court found that Appellants "are correct in their contention that there is no single prior art reference before the Court teaching a POSA that 3.5 mg and 1.75 mg doses [of zolpidem] are effective." (A000088.) The Court also acknowledged that the drive to sleep is greatest at the beginning of the night, thus creating a higher barrier to inducing sleep in the middle of the night. (A000020; *see also* A000019; A000075–76.)

To find a path from the prior art standard of 10 mg at bedtime (the recommended Ambien dose), to the 3.5 mg (non-elderly) dose in the middle of the night recited in claims 8 and 10 of the '131 Patent, the Court made two different sets of findings:

- Despite the prevailing Ambien doses for prophylactic use, a person of ordinary skill would have considered 5 mg to be an effective dose for getting a non-elderly person to sleep in the middle of the night. (A000088.)

- The bioavailability of a swallowed dose of zolpidem is 70% due to the first-pass effect. A person of ordinary skill would have assumed a transmucosal dose of zolpidem would completely avoid the first-pass effect, and therefore have a bioavailability of about 100%. Therefore, a person of ordinary skill would have converted a 5 mg swallowed dose to a 3.5 mg oral transmucosal dose for the non-elderly ($5*0.7=3.5$ mg). (A000088–89.)

In reaching these conclusions, the Court explicitly stated it was ignoring the prior art as a whole. (A000078.) Instead of crediting the art, the Court relied on unsupported testimony by Appellees' experts and the inventor's own insights. Viewed in light of the art as whole, these statements cannot support a conclusion of obviousness by clear and convincing evidence.

## A. The Court's Legal Conclusion of Obviousness Was Error Because It Contradicts Its Factual Findings Concerning Efficacy of Low Doses of Zolpidem

In analyzing whether a skilled artisan would have expected success in treating MOTN insomnia at the claimed doses, the District Court adopted a key premise supporting *non*-obviousness. Specifically, it found "[a]t bedtime a person's drive to sleep is at its peak, as opposed

to the middle of the night, after some sleep has occurred." (A000075; *see also* A000019–20 ("In any event, to skilled artisans, the interaction of these processes results in a person's overall urge—or drive to sleep—to be the greatest at bedtime (as opposed to the middle of the night).") The Court also acknowledged that given the diminished drive for sleep in the middle of the night "it may be more difficult for a person to return to sleep" if awakened. (A000076.) The Court even found that "intuitively a POSA may conclude . . . that higher doses [of zolpidem] may be needed in the middle of the night." (A000078.)

These findings are inconsistent with the District Court's ultimate conclusion of obviousness. While the Court's findings suggest that an effective dose would be *higher* in the middle of the night than at bedtime, it ultimately concluded that a POSA would have pursued a much *lower* dose with a reasonable expectation of success.

The starting point for the analysis is the recommended dose of Ambien in 2005, 10 mg at bedtime. (A003030.) By 2005, two double-blind, placebo-controlled studies, each containing hundreds of patients, had found that 5 mg of zolpidem was *not* effective in putting a non-elderly person with transient insomnia to sleep, even at the beginning

of the night when sleep drive is at its greatest. (*See* A003073; A003032; A003984.) Multiple references indicated that if a patient still woke up in the middle of the night after taking zolpidem, he should take an *extra* dose (on top of the zolpidem already in his system). (A003062; A001682–83 (8.85:1–86:21).) Thus, there is no record basis to conclude that a person of ordinary skill would have *lowered* an already-ineffective bedtime dose such as 5 mg for MOTN dosing, when sleep drive is lower in the middle of the night than at bedtime.

The District Court nonetheless concluded that it would have been obvious to employ the claimed low doses, finding that "the relevant prior art as a whole" "was unconvincing," because "the goal of efficacy must always be counterbalanced with the requirement of no residual effects in the morning." (A000078.) "[T]he prior art as a whole must be considered," and the District Court's explicit disregard of it is error. *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986). Moreover, the District Court's analysis is backward—a POSA would seek to achieve efficacy without sacrificing safety, she would not abandon efficacy in the name of safety. A treatment according to the claims must achieve *both* efficacy and safety, and there is no record basis to suppose that a person of

—57—

ordinary skill in 2005 would have thought that the '131 Patent's method would do so.

Indeed, the District Court's own factual findings support the conclusion that (a) an effective bedtime zolpidem dose would not have been safe in the middle of the night (*Danjou*, *Hindmarch*, and *Doghramji* show as much); and (b) lowering the effective bedtime zolpidem dose to safe levels would not have been effective (the District Court adopted the basic principles of sleep science that establish this). In other words, a safe dose of zolpidem would not have been thought to be efficacious, but an efficacious dose would not have been thought to be safe. A person of ordinary skill in 2005 was well aware of this dilemma, but the record shows that the response to the dilemma was to continue to rely on the prevailing prophylactic treatment, not to assume motivation to lower the zolpidem dose simply because a POSA would "seek[] to treat MOTN insomnia non-prophylactically with zolpidem." (A000088).

### B. The Court's Incorrect Conclusion of Law on Obviousness Was Compounded By Clear Error in Its Findings Concerning Key Prior Art

Aside from assuming obviousness based on a perceived motivation to move towards the claimed method of treatment, the Court relied on certain prior art to establish its premise that a 5 mg zolpidem dose (half of the recommended Ambien dose) would have been effective to treat insomnia at least at bedtime. The District Court's analysis in this regard was infected by clear error in its evaluation of the prior art.

For example, the Court concluded that *Roth 1995* supported the efficacy of 5 mg of zolpidem, at least at the beginning of the night. (A000078.) *Roth 1995* was a placebo-controlled, double-blind study that administered 5 mg, 7.5 mg, 10 mg, 15 mg, and 20 mg of zolpidem to 462 non-elderly subjects. (A003033; A001917 (10.100:21–101:12).) It used the first-night effect in healthy volunteers as a model of transient insomnia, and administered zolpidem at bedtime, when the overall drive for sleep is the highest. (A003032; A001917 (10.100:3–101:12).)

The study itself found that latency to persistent sleep was statistically significantly shorter for 7.5 and 10 mg zolpidem doses. (A003033, 35; A001917 (10.101:21–102:8).) The next year, one of the

authors performed and published a full statistical analysis of the *Roth 1995* study, and concluded "zolpidem was highly effective in shortening latency to persistent sleep and in reducing the number of nighttime awakenings and time spent awake after sleep onset. These effects were highly significant in the groups that had received 7.5 or 10 mg zolpidem, *but not in the 5 mg group* (although numerical trends were evident at this dose)." (A003985 (emphasis added).) The literature is clear: *Roth 1995* did not find a statistically significant difference in latency to persistent sleep for the 5 mg dose.

Nonetheless, Appellees' expert, Dr. Winkelman "concluded that the 5 mg dose in Roth, if a statistical analysis had been done, it would have been 'statistically significant,' and therefore, effective." (A000078.) The Court agreed with Dr. Winkelman, despite the fact that a statistical analysis *had* been performed, was in the record, and *had reached the opposite conclusion.* (*Id.*) In doing so, the Court substituted its own analysis for the clear analysis set forth by the prior art. This alone is clear error that kept the District Court from properly assessing

the prior art and addressing the perceived efficacy of 5 mg of zolpidem in putting a patient to sleep.[12]

The Court also found *Teitelbaum* "suggests 5 mg is effective even when overall propensity to sleep is decreased" in the middle of the night. (A000076.) But *Teitelbaum* recommended that those with MOTN insomnia take *15 mg* of zolpidem over the course of the night: 10 mg at bedtime and 5 mg in the middle of the night. (A003062.) *Teitelbaum* suggested higher than approved amounts of zolpidem, including prophylactic plus middle-of-the-night dosing, *not* low doses administered only as needed. *Teitelbaum*'s conclusion that an extra 5 mg will suffice on top of the zolpidem already in the patient's system does not support the conclusion that 5 mg *alone* with work.

---

[12] *Roth 1995* confirmed the results of the *Vogel* study, performed 7 years earlier. *Vogel*, too, was a placebo-controlled, double-blind study that administered different doses of zolpidem to 225 non-elderly subjects at bedtime. (A003073.) For the 5 mg dose, *Vogel* found that latency to persistent sleep was not statistically different from placebo. (A003073; A001917 (10.98:3–99:10); *see also* A001931–32 (10.157:18–158:21), A001934 (10.168:18–170:12).) Moreover, 5 mg of zolpidem had no significant impact on sleep efficiency or on awake time during sleep. (A001917 (10.98:3–15).)

The Court appears to have found that *Teitelbaum* taught low doses because it states "*[o]ne-half* tablet *is usually enough for the middle of the night*." (*Id.*) But "[i]t is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art." *Bausch & Lomb*, 796 F.2d at 448 (citation omitted). Here, in the full context of the paragraph—which recommends taking 15 mg of zolpidem over the course of the night—the sentence unambiguously refers to the *extra* 5 mg of Ambien administered *after* prophylactically giving the patient 10 mg. This is how the Appellees' expert interpreted *Teitelbaum*:

> Q: He is describing take your normal dosage at bedtime, and if you wake up in the middle of the night, take an extra 5 to 10 milligram of zolpidem, correct?
>
> A: Yes.

(A001685 (8.94:8–11).) And far from recommending lower doses of zolpidem in the middle of the night, *Teitelbaum* recommends *switching* to zaleplon if 15 mg of zolpidem creates residual sedative effects. (A003062.) The Court's contrary reading of this reference, which was

critical to its ultimate conclusion of obviousness, was clear error. *See Santarus*, 694 F.3d at 1355 (reversing obviousness holding premised on clearly erroneous reading of prior art).

### C. The District Court's Conclusion That Transmucosal Delivery Would Achieve the Claimed Doses Is Devoid of Evidentiary Support

The District Court recognized there was no prior art indicating that the claimed 3.5 mg dose of zolpidem would be effective to get a person to sleep—even at the beginning of the night when the overall drive to sleep is the highest. (A000088.) Nonetheless, the Court concluded that a skilled artisan would have used doses this low for MOTN insomnia, and had a reasonable expectation of success in doing so. This conclusion relies on several assumptions that are lacking evidentiary support.

*First*, the District Court's starting point to arrive at the claimed dose is its conclusion that 5 mg zolpidem in the oral swallow tablet form would be effective in the middle of the night. This starting point is erroneous for the reasons reviewed. (*See supra* II.A–B.)

*Second*, even assuming that a 5 mg oral zolpidem dose would have been thought to be efficacious, the District Court also acknowledged

that a switch to transmucosal administration is essential to any conclusion that it would have been obvious to use the claimed doses with a reasonable expectation of efficacy. (*See* A000088–89; *see also* A001688 (8.106:5–15) (Dr. Winkelman admitting he did not opine that a 3.5 mg *oral swallowed tablet* would have been obvious).) Moreover, in order for a 3.5 mg oral transmucosal dosage form to deliver the same amount of zolpidem as a 5 mg swallowed tablet (which has 70% bioavailability), the oral transmucosal dosage form would need to have 100% bioavailability (as expressed in the equation $5*0.7=3.5$). The record is entirely devoid of support for this assumption, which is *indispensable* to the District Court's conclusion that the asserted claims would have been obvious.

The Court relied on Appellees' experts, Drs. Michniak-Kohn and Winkelman, who opined that a POSA would have thought oral transmucosal zolpidem would have 100% bioavailability, or at least "quite close" to it. (A001606 (7.208:2–17); A001501 (6.216:11–217:18).) Appellees' experts, however, admitted they had no support for these assertions. When questioned directly by the Court, Dr. Winkelman stated he had not reviewed any literature that said transmucosal

bioavailability was close to 100%, and was instead relying on Dr.

Michniak-Kohn's testimony:

> [DR. WINKELMAN]: [Transmucosal bioavailability] is not the same as intravenous, but it is quite close.
>
> THE COURT: How do you know that? Is there any literature that says that?
>
> THE WITNESS: Well, I think that this was something that—
>
> THE COURT: Was it in anything that you reviewed?
>
> THE WITNESS: **No, this was not something that I reviewed**. I think we heard about that yesterday from Dr. Michniak-Kohn, you know, that putting it under your tongue, it is going to work faster. You are going to lose much less of it when you put it under your tongue than when you swallow it. It is not identical to intravenous, but it is going to be quite close to that level of absorption.

(A001606 (7.208:16–209:5) (emphasis added).) But Dr. Michniak-Kohn

herself stated she was *not* relying on the prior art for her conclusion

that transmucosal delivery would wholly avoid the first-pass effect and

lead to 100% bioavailability of zolpidem:

> Q. You pointed to no data in the prior art showing that zolpidem delivered transmucosally would have entirely avoided the first-pass metabolism effect, correct?
>
> [Dr. Michniak-Kohn]. No, I didn't.
>
> Q. You didn't point to any such art, correct, so the record is clear?

A. No, I did not.

(A001502 (6.218:18–24).)

"In an obviousness determination, some evidentiary support must be offered beyond an expert's conclusory opinion." *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1358 (Fed. Cir. 2001), *judgment vacated on other grounds sub nom. DeKalb Genetics Corp. v. Bayer CropScience, S.A.*, 538 U.S. 974 (2003) and *opinion modified and reinstated*, 345 F.3d 1366 (Fed. Cir. 2003); *see also Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion."). Here, Appellees' experts admitted they had no support for their statements that the transmucosal bioavailability of zolpidem would be "close" to 100%. Nor did they even explain what "close" meant.

When pressed, Drs. Michniak-Kohn and Winkelman agreed with *Appellants* that a person of ordinary skill would have known that a transmucosal dosage form of zolpidem could *never* reach the 100% bioavailability of IV administration. (A001501 (6.216:11–217:18) ("But don't misunderstand me, I am not saying that transmucosal is equal to

IV. Obviously, it isn't, but it's close to."); A001606 (7.208:2–17) ("It is not the same as intravenous, but it is quite close.").) But if a person of ordinary skill would have known that transmucosal zolpidem cannot be 100% bioavailable, that person also would not have equated a 3.5 mg transmucosal dose to a 5 mg oral swallowed dose. Rather, that person would have known it would take *more* than 3.5 mg for the transmucosal dose to equate to the 5 mg oral swallowed dose.

In contrast to Appellees, Appellants presented prior art evidence regarding the bioavailability of a number of oral transmucosal drugs. In each case, the bioavailability was significantly below 100%—and in no instance was it above 75%.[13] Moreover, the ultimate bioavailability was highly variable and unpredictable.[14] While in some cases the bioavailability increased when moving from a swallowed dosage form to a transmucosal one, in others the bioavailability actually *decreased*.

---

[13] (A002285; A004000; A004012; A004017; A003074–93; A001803–04 (9.101:20–102:17); A001805 (9.107:14–109:24); A001806–10 (9.113:12–128:11).)

[14] (A002289; A003080; A003083–84; A004012; A001810 (9.128:14–129:12).)

(*Id.*) The District Court does not mention this evidence in concluding the claims were obvious.

Moreover, Appellants' pharmacokinetics expert calculated the bioavailability of Intermezzo, and determined it to be 74.5%, in line with what a person of skill would have known about the bioavailability resulting from transmucosal delivery. (A000089; A001801 (9.93:17–22).) Based on these calculations, a 5 mg oral dose of zolpidem is equivalent to a **4.7 mg** transmucosal dose. (A001803 (9.98:3–14).) The Court stated it was "unfettered" by this argument, because it is a *post hoc* calculation not available in 2005. (A000089.) But the calculation is reflective of the prior art on transmucosal bioavailability, and what a person of ordinary skill in the art would have believed at the time about transmucosal zolpidem. The record is clear that, while transmucosal delivery has the potential to increase bioavailability, a person of ordinary skill in 2005 would have known it would not reach 100%.

Lacking prior art to support a conclusion that transmucosal administration achieves 100% bioavailability, the Court uses the inventor's own reasoning to conclude that Drs. Michniak-Kohn and Winkelman's estimates for transmucosal delivery were "well within the

knowledge of a POSA." (A000089.) However, "[i]nventors . . . possess something . . . which sets them apart from the workers of ordinary skill, and one should not go about determining obviousness under § 103 by inquiring into what patentees (*i.e.*, inventors) would have known or would likely have done, faced with the revelations of references." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). The inventor may have viewed his calculations of transmucosal delivery as "simple," but that does not mean the low doses in the claims are obvious. (A000089.)

*        *        *

As explained above, there was no prior art teaching non-prophylactic dosing of zolpidem, no art teaching low doses of zolpidem administered only in the middle of the night, and no art teaching the likely bioavailability of oral transmucosal zolpidem. The industry response to Intermezzo is real-world evidence of these gaps in the art, and makes clear that the invention of the '131 Patent led to a marked shift in the understanding of zolpidem. Intermezzo surprised even FDA, causing FDA to change course on zolpidem dosing after *20 years*.

The District Court stated that in assessing the proper dose of a drug, "efficacy must always be counterbalanced with the requirement of no residual effects in the morning." (A000078.) From 1992–2013, FDA believed it had struck the proper balance with Ambien: 10 mg administered to non-elderly adults at bedtime, 5 mg administered to the elderly. But the review and approval of Intermezzo, "prompted [FDA] to revise dosing recommendations for the labels of zolpidem-containing products to lower doses." (A004032.) Moreover, the data from Intermezzo convinced FDA there were serious, previously unappreciated safety issues with longer-acting zolpidem products like Ambien CR. (*Id.*) In 2013, patients were instructed they should avoid "driving or engaging in any activity that requires full alertness" for a full day after using these products. (*Id.*) This real-world evidence was never cited in the District Court's opinion, and shows how the invention changed the thinking on the treatment and safety of insomnia medication.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment that claims 8, 10, 18, and 19 of the '131 Patent are invalid as obvious.

Respectfully submitted,

*/s/ Christopher N. Sipes*

Christopher N. Sipes
Michael N. Kennedy
Erica N. Andersen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5525
Fax: (202) 778-5525
Email: csipes@cov.com

*Attorneys for Plaintiffs-Appellants*

# ADDENDUM

## (Opinion, Final Judgment, '131 Patent)

<u>NOT FOR PUBLICATION</u>                    <u>**FILED UNDER SEAL**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PURDUE PHARMACEUTICAL PRODUCTS L.P. et al.,<br><br>           Plaintiffs,<br><br>v.<br><br>ACTAVIS ELIZABETH LLC, et al.,<br><br>           Defendants. | Civil Action No. 12-5311 (JLL) (JAD)<br><br><br>**OPINION** |

**LINARES, District Judge.**

This case involves the issues of infringement and validity of three patents covering Plaintiffs' product Intermezzo®.  Intermezzo® is a drug manufactured for the treatment of insomnia when middle-of-the-night awakening is followed by difficulty returning to sleep.  After careful consideration of the evidence presented at a bench trial held December 1 -15, 2014, the Court finds as follows:  As to the '131 patent, Defendants have met their burden of proving this patent is invalid as obvious, but failed to prove that the claim element "without residual sedative effects" is invalid as indefinite.  Plaintiffs have proved by a preponderance of the evidence that the asserted claims of the '131 patent are infringed by all Defendants.  As to the '628 patent, Plaintiffs have failed to meet their burden of proving infringement as to Defendants, DRL and Actavis.  Plaintiffs, however, have met their burden of proving that Novel infringes the '628 patent.  While Defendants have failed to prove this patent is invalid as anticipated, the '628 patent is invalid as obvious.  As to the '809 patent, Plaintiffs have met their burden of proving infringement as to

Defendants, DRL and Novel. Defendants, on the other hand, have proved by clear and convincing evidence that the '809 patent is obvious and therefore invalid. This Opinion articulates the basis for each of these conclusions.

## INTRODUCTION

This is an infringement action brought by Plaintiffs relating to the patents covering Intermezzo®. This action was commenced as a result of Defendants each filing an Abbreviated New Drug Application ("ANDA") pursuant to the Hatch-Waxman Act, seeking FDA approval to sell a generic version of Intermezzo® prior to the expiration of the relevant patents. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a). No party contests personal jurisdiction or venue for the purposes of this civil action.

## BACKGROUND[1]

### I. The Parties

Plaintiffs, Purdue Pharma L.P., and Purdue Pharmaceutical Products L.P., are the current holders of New Drug Application No. 022328, for sublingual tablets containing 1.75 mg and 3.5 mg of zolpidem tartrate. These Plaintiffs market the approved drug under the tradename Intermezzo®. Plaintiff, Transcept Pharmaceuticals, Inc., ("Transcept"), is the owner of the relevant patents where Purdue Pharma L.P., and Purdue Pharmaceutical Products L.P.[2] are exclusive licensees under these patents. Plaintiffs offer that Transcept is currently known as "Paratek Pharmaceuticals, Inc." (*See e.g.* Pls.' Proposed Findings of Fact, ("PFOF") ¶42). The

---

[1] The facts set forth herein are the Court's findings of facts which are based on the Court's observations and credibility determinations of the witnesses who testified and a thorough review of all the evidence admitted at trial.

[2] Transcept Pharmaceuticals, Inc., Purdue Pharma L.P., and Purdue Pharmaceutical Products L.P, will collectively be referred to as "Plaintiffs."

Court, however, for purposes of this Opinion, refers to the named assignee of the patents-in-suit as "Transcept."

While there are five Defendants in this action, two of said Defendants, Par Pharmaceutical, Inc. (hereinafter "Par"), and TWi Pharmaceuticals, Inc. (hereinafter "TWi"), entered into stipulations wherein both agreed to be bound by the outcome of the trial without them actually participating. That is, TWi "agree[s] to be bound by the Final Judgment … including any related injunctions, of the District Court in the Intermezzo Action resolving all claims and counterclaims of infringement, validity and enforceability of the '131 patent following litigation on the merits." (Stipulation, ECF No. 332, ¶4). Similarly, Par, "agree[s] to be bound by the Final Judgment … including any related injunctions, of the District Court in the Intermezzo Action resolving all claims and counterclaims of infringement, validity and enforceability of the '131 and '809 patents following litigation on the merits." (Stipulation, ECF No. 323, ¶3). Both TWi and Par stipulated to personal jurisdiction for purposes of this action. The remaining Defendants in this action are Actavis Elizabeth, LLC (hereinafter "Actavis"), Dr. Reddy's Laboratories, Inc., and Dr. Reddy's Laboratories, LTD, (hereinafter collectively "Dr. Reddy's" or "DRL"), and Novel Laboratories, Inc., (hereinafter "Novel").

## II. Intermezzo and the Patents-in-Suit

Intermezzo® is a drug manufactured for the treatment of insomnia when middle-of-the-night (or "MOTN") awakening is followed by difficulty returning to sleep. (PTX-225 at 1). Intermezzo® is intended for use only if the patient has four hours or more remaining before the planned time of waking. Intermezzo® is in the form of a tablet that is placed under the tongue to disintegrate. This formulation is for transmucosal absorption. The three relevant patents at issue

covering Intermezzo are U.S. Patent No. 8,242,131 (the "'131 patent"), U.S. Patent No. 7,682,628 (the "'628 patent"), and U.S. Patent No. 8,525,809 (the "'809 patent"). Nikhilesh N. Singh is the sole named inventor of each of the three relevant patents, except regarding the '131 patent only, where Sathasivan Indiran Pather is named as a co-inventor.

The '809 patent is a patent indicated for the treatment of MOTN insomnia. The '131 patent is directed to a method of treating MOTN insomnia where the '628 patent is directed to a method of treating insomnia. The '131 Patent is entitled "Methods of Treating Middle-of-the-Night Insomnia" and was issued by the PTO on August 14, 2012. The '628 Patent is entitled "Compositions for Delivering Hypnotic Agents Across the Oral Mucosa and Methods of Use Thereof" and was issued by the United States Patent and Trademark Office ("PTO") on March 23, 2010. The '809 Patent is entitled "Compositions for Treating Insomnia" and was issued by the PTO on August 28, 2012. The priority dates are: 1) for the '628 Patent, February 17, 2004; 2) for the '131 Patent, May 25, 2005; and 3) for the '809 Patent, May 25, 2005.

### III. The Claims at Issue and Relevant Markman Construction

### A. Claims of the '131 Patent

Plaintiffs claim all Defendants will induce infringement of Claims 8, 10, 18 and 19 of the '131 patent. Because Claims 1 and 12 of the '131 patent are independent claims, and therefore Claims 8, 10, 18, and 19 depend therefrom, a detailed analysis of Claims 1 and 12 is applicable to the infringement and validity inquiries. Claims 1 and 12 are distinct insofar as Claim 1 applies to non-elderly patients and Claim 12 applies to elderly patients. Defendants argue that that the claims of the '131 patent are obvious. Defendants also argue that limitation found in Claims 1 and 12, namely, "without residual sedative effects" is indefinite. These claims state the following:

Claim 1: A method of treating middle-of-the night insomnia in a non-elderly patient without prophylactically administering zolpidem, comprising: dosing the patient with a pharmaceutical composition comprising about 0.5 to about 4.75 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep and desires to resume sleep for less than 5 hours, wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.

Claim 12: A method of treating middle-of-the-night insomnia in an elderly patient without prophylactically administering zolpidem, comprising dosing the patient with a pharmaceutical composition comprising about 1.5 to 2.5 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep, and desires to resume sleep for less than 5 hours, wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.

This Court construed "without residual sedative effects" to mean "with no or minimal subjective feelings of sedation, as evaluated by: (a) testing acceptably in at least one test exploring psychomotor performance, attention, information processing, and memory used by those of skill in the art; and/or (b) demonstrating plasma levels of zolpidem, at an appropriate time point, below about 20 ng/ml." (Opinion, ECF No. 185 at 5-7). A list of appropriate psychomotor performance, attention, information processing, and memory used by those of skill in the art are exemplified in the patent specification.

Claim 8 depends from Claim 1 and is substantially identical to such except it refers to the 3.5mg dose. (JTX 1, Claim 8). Claim 10 of the '131 Patent recites: "The method of claim 8, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa." (JTX 1, Claim 10). Claim 18 depends from Claim 12 and is substantially identical to such except it refers to the 1.75mg dose. Claim 19 of the '131 Patent recites: "The method of Claim 18, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa."

**B. Claims of the '628 Patent**

Plaintiffs claim Defendants will induce infringement of Claims 9, 16 and 17 of the '628 patent. The '628 patent contains an independent Claim 1 which states the following:

> Claim 1: A method for treating insomnia, comprising the steps of: administering a solid pharmaceutical composition comprising zolpidem or a pharmaceutically acceptable salt thereof to a subject prone to insomnia, the pharmaceutical composition further comprising a buffer, wherein the buffer raises the pH of saliva to a pH of about 7.8 or greater, wherein zolpidem is absorbed across a permeable membrane of the subject's oral mucosa, and wherein at least 75% of the solid pharmaceutical composition dissolves within 10 minutes or less within an oral cavity following administration.

Claim 9 of the '628 Patent recites as follows: "The method of claim 1, wherein the buffer comprises a carbonate buffer and a bicarbonate buffer." (JTX 003, Claim 9). Claim 16 of the '628 Patent recites as follows: "The method of claim 1, wherein the zolpidem or pharmaceutically acceptable salt thereof is in an amount from about 1 mg to about 5 mg." (JTX 003, Claim 16). Claim 17 of the '628 Patent recites: "The method of claim 1, wherein the zolpidem or pharmaceutically acceptable salt thereof is in an amount from about 2 mg to about 5 mg." (JTX 003, Claim 17).

**C. Claims of the '809 Patent**

Claim 1 of the '809 Patent, upon which asserted Claims 11, 17, and 18 depend, recites as follows:

> A solid unit dosage composition for the treatment of MOTN insomnia, said composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across a subject's oral mucosa, wherein said effective amount is an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem, and between about 25 ng/mL and about 50 ng/mL within 20 minutes of administration, when evaluated in an appropriate patient population.

Claim 11 of the '809 Patent recites: "The solid unit dosage composition of claim 1, wherein the zolpidem is delivered across at least one of the sublingual or buccal mucosa." Claim 17 of the '809 Patent recites: "The solid unit dosage composition as in any of claims 1–6, 15, or 16, containing about 1.75 mg of zolpidem hemitartrate." Claim 18 of the '809 Patent recites: "the solid unit dosage composition as in any of claims 1–6, 15, or 16, containing about 3.5 mg of zolpidem hemitartrate."

Claim 12 of the '809 Patent, upon which asserted Claim 22 depends, recites:

> A solid unit dosage composition for the treatment of MOTN insomnia, said composition comprising an effective amount of zolpidem or a salt thereof and at least one buffering agent, formulated for delivery of zolpidem across a subject's oral mucosa, wherein said effective amount is 0.5 to 4.75mg of zolpidem hemitartrate, and is an amount sufficient to produce a plasma concentration between about 25 ng/mL and about 50 ng/mL within 20 minutes of administration, when evaluated in an appropriate patient population.

Claim 22 of the '809 Patent recites: "The solid unit dosage composition of claim 12, further comprising a binary buffer system that raises the pH of said subject's saliva to a pH greater than about 8.5, irrespective of the starting pH of saliva."

"Binary buffer system" was construed by the Court to mean "a system used to maintain and/or achieve an approximate pH range comprising at least one proton-donating component and at least one proton accepting component." (Opinion, ECF No. 185 at 26). This element is similar

7

to the "buffer" element of the '628 patent except it is somewhat more specific as it refers to a "system."

## IV. Procedural History

The original Complaint in this action was filed on August 23, 2012 against Defendant, Actavis.  By February 26, 2014, all actions brought by Plaintiffs relevant to Intermezzo® and patent infringement were consolidated.  Each of the Defendants represented to the Court that it will not launch its ANDA product prior to March 31, 2015. The consolidated action against Actavis, DRL, and Novel was heard by the Court at a bench trial on December 1–15, 2014.

## V. MOTN Insomnia

Insomnia is a common malady that occurs in approximately one third of the adult population.  (*See* JTX 016).  The term insomnia is used to describe all conditions related to the patient's perception of inadequate or non-restful sleep. (Tr. 7.136:17-21 (Winkelman)).[3] Insomnia possesses three elements of difficulty: falling asleep, staying asleep, or waking up too early in the morning.  (Tr. 7.133:16-21 (Winkelman)).  Prior to 2005, the method of treating all types of insomnia was primarily through prophylactic administration to prevent insomnia rather than on the "as needed" basis described in the '131 patent.  Middle-of-the-night insomnia was construed by the Court to be a "condition wherein a subject, after falling asleep, awakens and has difficulty returning to sleep."  (ECF No. 92 at 2).  In sum, those who suffer from MOTN insomnia suffer from frequent nocturnal awakenings.

---

[3] "Tr.," refers to the bench trial transcript.

While prophylactic administration made sense for those who had trouble initially falling asleep, patients suffering from MOTN insomnia irregularly were in some cases medicating themselves unnecessarily because whether they would wake in the middle-of-the-night on that particular night was unpredictable. The treatment for MOTN insomnia (as opposed to other forms of insomnia) also presented an obstacle as the ability to get a person back to sleep in the middle of the night rather than before bed, was assumed at one point to be at least slightly more difficult because a person's drive to sleep is lessened.

Indeed, overall propensity or drive to sleep depends on the interaction between two biological processes: the homeostatic sleep drive and circadian drive. (Tr. 10.32:10–10.33:7 Czeisler)). Homeostatic sleep drive increases with every waking hour, but when a person falls asleep, homeostatic sleep drive declines, such that by the middle of the night, much of homeostatic sleep drive is dissipated. (Tr. 10:35:4–24 (Czeisler)). On the other hand, the circadian drive is governed by a biological clock that sends out a signal to wake or be alert during the day and a signal to quiet the drive to wake at night. (Tr. 10.37:16–10.39:19 (Czeisler)). The circadian drive promotes waking during the day (as the circadian signal for alertness increases) and promotes sleep (or the absence of waking) through the night (as the circadian signal for alertness decreases). (Tr. 10.37:16–10.39:19, 10.44:19–10.45:14 (Czeisler)).

But these processes must be reconciled with the average person who sleep for eight straight hours. In other words, what keeps them asleep when their homeostatic sleep drive is decreasing by the hour? Ultimately the conclusion inevitably drawn is that the circadian signal keeps someone asleep.[4] In any event, to skilled artisans, the interaction of these processes results in a person's

---

[4] Indeed, this was the only plausible explanation provided to the Court for how a person sleeps *stays* asleep. (Tr. 7.133:10-11).

overall urge—or drive to sleep—to be the greatest at bedtime (as opposed to the middle of the night).

## VI. Ambien®/Zolpidem

Physicians and psychiatrists were routinely prescribing the drug Ambien® to treat insomnia, prior to the filing of the patents-in-suit.  (Tr. 2.93:13-20 (Ocalssen)).  The active ingredient in Ambien® is the same as that in Intermezzo®, zolpidem tartrate.  As of 2004, Ambien® was commercially available and prescribed in two dosages, a 10 mg tablet for non-elderly patients and a 5 mg tablet for the elderly.  (JTX 41 at DRL0013528).  Ambien®'s dosing information indicates that the elderly are dosed with half the normal dose as they may be especially sensitive to the effects of zolpidem tartrate.  This is consistent with the general understanding that elderly people are more sensitive to the side effects of medications and metabolize drugs differently (usually more slowly) causing medications to reside in the body at high levels for longer.  (Tr. 7.126:2-12 Winkelman)).

Ambien® was an incredibly successful drug commercially, which stimulated the medical research community to extensively investigate and review zolpidem.  Undeniably, by 2004 the prevailing view amongst medical professionals was that zolpidem was well tolerated and posed minimal risk of abuse and dependence at the therapeutic doses of 5 mg and 10 mg.  Ambien®, through its label, was indicated for prophylactic administration. While it unclear how common the practice was, at least *some* doctors were prescribing fractional (half of one) Ambien® to treat MOTN insomnia prior to 2004. (Tr. at 2.78:7-21 (Oclassen), 7.145:19-7.147:10, 7.149:23-7.150:23 (Winkelman)).  This is likely because Ambien® was known by 2004 to be a safe/effective

sleep drug but more importantly, have a short duration of action of about 4 hours. (Tr. 2.75:14-16 (Oclassen), 6.161:11-21 (Michniak-Kohn), 7.143:16-7.144:10 (Winkelman)).

## VII. Zolpidem v. Zaleplon

As a general proposition medication will be gone from the body in three half-lives. (Tr. 1.161:21-1.62:9 (Kryger)).   While zolpidem was known to have a rapid onset and short half-life of about two to three hours, another hypnotic, zaleplon, was known to have an even shorter half-life of just one hour.  Zaleplon is the active ingredient in the sleeping pill Sonata®, which around 2001, was a "comparatively new medication."  (JTX 033 at 116).  Pertinent articles and studies prior to 2004 were predomininantly limited to analyzing zolpidem and zaleplon, therefore suggesting that these two hypnotics were the only current effective options to treat insomnia. While on the surface it may seem as though zaleplon's ultra short half life could be ideal for treatment in the middle of the night to avoid morning residual sedative effects, zaleplon proved unsatisfactory as the risk of waking up again was identified.  (Tr. 1.161:21-1.162:9 (Kryger)). Particularly when analyzed according to the indication of Intermezzo®, which targeted patients who woke up in the middle of the night with at least four hours of sleep remaining, Sonata®, zaleplon, was too short acting, where a patient could not count on getting four hours of sleep.  (Tr. 7.156:22-24 (Winkelman); *see also Teitelbaum* (PTX 033: "[M]ost FMS patients I have treated with Sonata have *not* found it to be helpful. I think Ambien is better." (emphasis in original)).

## VIII. Dosage Strength of Hypnotics

Given the prophylactic nature of administration of hypnotics such as zolpidem and zaleplon prior to 2004, the dosage strengths of such were usually 5mg for an elderly patient and 10mg for non-elderly.  The primary goal of hypnotics, as with many drugs, was to find the lowest effective

dose to prevent overmedicating without compromising the dose's efficacy.  Similarly, for safety reasons, any dose of a hypnotic should leave a patient without a "hangover" in the morning, meaning they are free from residual sedative effects.  For example, in the morning many patients would wake up and then drive to work.  Driving while experiencing residual sedative effects is both hazardous to the patient and the general public.  This is why one method for determining if residual sedative effects are present after administration of a hypnotic, is in fact a driving test. (*See Vermeeren* study).  One well-known solution for sleep experts and drug formulators to combat side effects including residual sedative effects, was to lower the amount of the hypnotic in a given dose.  (*See e.g.* (Tr. 7.156:7-15 (Winkelman): *Teitelbaum* is suggesting that Ambien is the go to drug, but if a patient was too hungover "you could…reduce the dose."  (Tr. 7.156:7-15 (Winkelman)).  Thus, the overarching objective in treating MOTN insomnia was to strike a balance between lowering doses to avoid residual sedative effects, while maintaining a dosage strength that was effective for four hours.

## IX. Transmucosal Delivery

Most medications are formulated in an oral, swallow form.  However, routes of administration of a drug are changed when taking into account the indication of the treatment (for example, a drug indicated for the treatment of MOTN insomnia) and the amount of active ingredient.  When taking an oral swallow pill, at least some portion of the drug will not get absorbed and in turn, goes out through the system.  More specifically, when a drug endures a "first pass effect" it goes to the liver where some of it gets broken down before making its way to systemic circulation.  (Tr. 7.84:2-25 (Winkelman)).  Importantly, systemic circulation provides the

delivery of the drug to the brain. (Id.). Thus, the primary benefits of systemic administration in general, are that a drug will work more quickly and therefore potentially wear off more quickly.

While there are a number of methods of systemic administration, such as intravenous, skin permeation and inhalation, many are not practical for specific treatments. One more sensible and universal method involves delivery through the body's mucosal surfaces—in the mouth or nose— where there are many blood vessels close to the surface for a drug to enter directly. Within the mouth, drugs can therefore be delivered across the sublingual or buccal mucosa by "transmucosal delivery." While this method was well known prior to 2004, it was noted that not all drugs can or should be delivered this way. This is for the same reason that not all drugs—for example those that must be delivered in voluminous quantities to be efficacious—are suitable for delivery by an oral swallow tablet, either because it is an impossible route or is less beneficial.

Fortunately, for many drugs whose properties are well known (*e.g.* pharmacokinetics) and have been extensively researched and published by the medical community, formulations for transmucosal delivery became more identifiable. Pharmacokinetic behavior of a drug is in some cases an accurate parameter for determining if a drug is suitable for transmucosal delivery. By way of example, in broad terms, drugs that are considered "lipophilic" will pass more easily through membranes, a determination that can be made when the logP value is known or published. (*See e.g.* Tr. 6.156: 9-11: Zolpidem's published logP value is 2.42.). Further, a well-known theory called the Henderson-Hasselbalch principle explains that a drug can be made more lipophilic by changing the pH, using for instance, a buffer. (Tr. 5.63:7-17 (Singh)). While zolpidem contains apparent properties that are suitable for transmucosal delivery, prior to 2004 there was not a developed formulation for zolpidem in sublingual doses.

## X. Trial Witnesses

The following witnesses either appeared or had their recorded deposition admitted as evidence and played at the bench trial.[5]

## A. Plaintiffs' Witnesses

## 1. Meir Kryger, M.D.

The Court accepted Dr. Kryger as an expert in sleep medicine and the clinical research and treatment of sleep disorders, including insomnia. (Tr. 1.136:4–16). Dr. Kryger is a Professor in the Department of Internal Medicine at Yale University in New Haven, Connecticut. (Tr. 1.124:7–10; PTX 11 at 1). He is also the Director of the Clinical Sleep Fellowship Program at the Yale Program of Sleep Medicine, and a practicing physician in the VA Connecticut Health System, specializing in sleep medicine. (Tr. 1.124:7–10, 1.128:12–21; PTX 11 at 1). Dr. Kryger has experience with Ambien® in clinical trials, and opined on its properties and how it was prescribed by physicians, dating from before its U.S. approval in 1992. (Tr. 10.189:12–10.190:9). Dr. Kryger was presented by Plaintiffs and testified regarding the understanding in the art concerning insomnia and MOTN insomnia and appropriate treatments of the condition at the time of the inventions claimed in the patents-in-suit. Dr. Kryger also offered opinions on invalidity (objective indicia of non-obviousness) and infringement.

---

[5] The Court has omitted some witnesses from this section having found their testimony either redundant or irrelevant based upon the Court's findings. The Court did however, consider *all* of the testimony at trial to make such findings.

**2. Charles Czeisler, Ph.D., M.D.**

The Court accepted Dr. Czeisler as an expert in sleep and sleep disorders. (Tr. 10.24:8–15 (Czeisler)). Dr. Czeisler is the Baldino Professor of Sleep Medicine and the Director of the Division of Sleep Medicine at the Harvard Medical School, and Chief of the Division of Sleep Medicine in the Department of Medicine at the Brigham and Women's Hospital in Boston, Massachusetts. (PTX 13 at 1, 3). Dr. Czeisler opined on the physiology of the human circadian timing system and its relationship to the sleep-wake cycle.

**3. David Drover, M.D., M.Sc**

The Court also accepted Dr. Drover as an expert in clinical pharmacology. (Drover Tr. 2.133:21–2.134:5). Dr. Drover is a Professor of Anesthesia at Stanford University, where he has been teaching since 1995. (PTX 14 at 1, 7; Drover Tr. 2.128:1–2). He conducts research within the field of clinical pharmacology and has been involved in more than 50 clinical studies, some involving the hypnotics zaleplon and zolpidem. (Drover Tr. 2.130:18–19, 2.131:11—2.133:1). Dr. Drover testified about the pharmacokinetic properties of different dosage forms, zolpidem formulations known at the time of the inventions and those formulations claimed in the patents-in-suit.

**4. James Polli, Ph.D.**

The Court accepted Dr. Polli as an expert in pharmaceutics, pharmaceutical formulation, and drug delivery. (Tr. 3.39:14–20). Dr. Polli is a Professor of Pharmaceutical Sciences and the Ralph F. Shangraw Endowed Chair in Industrial Pharmacy and Pharmaceutics at the University of Maryland School of Pharmacy. (PTX 15 at 1; Tr. 3.30:18–22, 3.32:8–12). Dr. Polli gave expert testimony about drug formulation, delivery, and absorption, including of course, zolpidem.

### 5. Glenn Oclassen

Mr. Oclassen was a co-founder of Transcept. (Tr. 2.57:13–21.) During the development of Intermezzo, and until 2014, Mr. Oclassen was President and CEO of Transcept. (Tr. 2.57:7–12).

### 6. Thomas Roth, Ph.D.

Dr. Roth was a consultant to Plaintiff, Transcept during the time that it developed Intermezzo® and submitted a declaration during the prosecution of the '131 Patent. (Tr. 10.237:18–20). From 1978 to 2014, Dr. Roth was the Director of the Sleep Disorders and Research Center at Henry Ford Health Systems. (PTX 536 at 1; Tr. 10.238:22–25). Dr. Roth was deposed by Defendants in this matter on April 15, 2014.

### 7. James Garegnani

Mr. Garegnani's deposition testimony was admitted at trial. At the time of his deposition, Mr. Garegnani was Director of Product Development for Novel. Mr. Garegnani was Novel's Rule 30(b)(6) designee on topics related to the development of Novel's ANDA Product, the formulation of Novel's ANDA Product, and any validity analysis of prior art conducted by Novel. (Tr. 2.216:9–12).

### 8. Alfred Liang, Ph.D.

Mr. Liang's deposition testimony was admitted at trial. At the time of his deposition, Dr. Liang was a Director of Product Development for Actavis. (Tr. 4.77:10–11). Dr. Liang was Actavis' 30(b)(6) designee on topics related to Actavis' ANDA, the research and development

leading to Actavis' ANDA Product, and testing that Actavis did on its products and Intermezzo. (Tr. 4.77:12–15).

### 9. Kranthi Kumar Gorlamari

Mr. Gorlamari is a former employee of Novel, who Plaintiffs deposed in his personal capacity. (Tr. 3.6:18–21). He was a formulation scientist who worked on the development of Novel's ANDA Product. (Tr. 3.7:14–3.8:6).

### 10. Narayanan Badri Viswanathan, Ph.D.

Dr. Viswanathan's deposition testimony was admitted at trial. At the time of his deposition, Dr. Viswanathan was the senior director of formulations for DRL. (Tr. 4.55:1–2 (Viswanathan)). Dr. Viswanathan was DRL's Rule 30(b)(6) designee on topics related to the content of DRL's ANDA, the research and development leading to DRL's ANDA Product, the product's formulation, and DRL's knowledge of Intermezzo and the patents-in-suit. (Tr. 4.55:2–6).

### B. Defendants' Witnesses

### 1. Bozena Michniak-Kohn, Ph.D.

Dr. Michniak-Kohn has a Ph.D. in pharmacology has practiced as a pharmacist. As a pharmacist and as a teacher, she consulted prescribing and labeling information for drugs and has formulated drugs for transmucosal delivery. Dr. Michniak-Kohn's current position is full professor with tenure in pharmaceutics at the Ernest Mario School of Pharmacy, at Rutgers, the

State University of New Jersey. (Tr. at 6.19:23-6.20:1). The Court qualified Dr. Michniak-Kohn as an expert in pharmaceutical sciences, pharmacy, pharmacology and formulation science. (Tr. at 6.30:11-16).

### 2. John Winkelman, Ph.D., M.D.

Dr. Winkelman is a currently a practicing physician and Chief of the Sleep Disorders Clinical Research Program at Massachusetts General Hospital. Dr. Winkelman received his Ph.D. in Psychobiology from Harvard University in Cambridge, Massachusetts in 1983 and a medical degree from Harvard Medical School in 1987. Dr. Winkelman was proffered and accepted as an expert in sleep science, sleep medicine, and the treatment of sleep disorders. (Tr. at 7.81:17-24).

### 3. Umesh Banakar, Ph.D.

Dr. Banakar is an independent consultant and advisor to pharmaceutical companies and governmental agencies for the development and evaluation of pharmaceutical formulations. (DTX 3021 at 1-2). He received his Ph.D. in Pharmaceutical Technology from Duquesne University in Pittsburgh, Pennsylvania and completed his post-doctorate research relating to Advances in Controlled Release Technology at the Massachusetts Institute of Technology in Boston, Massachusetts in 1989. Dr. Banakar has assisted in formulating about 10 to 15 sublingual tablets, including a zolpidem sublingual tablet commercially available outside of the United States. As a result, Dr. Banakar was proffered and accepted by the Court as an expert in the field of pharmaceutical formulations. (Tr. 4.108:15-23).

**4. Jason McConville, Ph.D.**

Dr. McConville is an associate professor of pharmaceutics at the College of Pharmacy at the University of New Mexico in Albuquerque, New Mexico and has over 20 years of experience in the field of drug formulation and delivery and in the field of transmucosal drug delivery. He received of Bachelor of Science with Honors in Applied Chemistry from Coventry University in Coventry, United Kingdom in 1994. (Tr. at (DTX 1000)). Dr. McConville's current area of research is transmucosal drug delivery, which incorporates all transmucosal delivery such as oral and lung transmucosal delivery. (Tr. 4.160:18-21 ). Dr. McConville was proffered and accepted as an expert in the field of drug formulation and delivery, and an expert in the field of transmucosal drug delivery. (Tr. 4.161:3-9).

**5. Ann Kraft**

Ann Kraft, appearing in her capacity as a Fed. R. Civ P. 30(b)(6) corporate designee and in her individual capacity, was deposed by Defendants in this matter on March 11, 2014 deposition. At the time of her deposition, portions of which were presented at trial via designation, Ms. Kraft was the Executive Director of Licensing and Business Development for Plaintiff, Purdue Pharma LP.

**6. Margaret Moline, Ph.D.**

Dr. Moline, appearing in her capacity as a Fed. R. Civ P. 30(b)(6) corporate designee and in her individual capacity, was deposed by Defendants in this matter on March 13th, 2014 deposition. At the time of her deposition, portions of which were presented at trial via designation, Dr. Moline was a Director in the Medical Research department at Purdue Pharma LP.

**7. Nilesh Parikh, Ph.D.**

Dr. Parikh submitted on behalf of Plaintiff, Transcept, a declaration to the U.S. Patent and Trademark Office during the prosecution of the patent application that would eventually issue as the '628 patent. (JTX 8; Tr. at 8.231:3-5 (Parikh)). Dr. Parikh was deposed by Defendants in this matter on March 31, 2014.

**8. Nikilesh Singh, Ph.D.**

Dr. Singh is the named inventor on each of the patents-in-suit. He is also the founder of Plaintiff Transcept. At the time of his deposition, Dr. Singh was the Senior Vice President and Chief Scientific Officer for Plaintiff Transcept. (Tr. 5.61:17-18). Dr. Singh, appearing in her capacity as a Fed. R. Civ P. 30(b)(6) corporate designee and in his individual capacity, was deposed by Defendants in this matter on March 25, 2014 deposition.

## LEGAL ANALYSIS

Plaintiffs assert claims of the '131 and '628 patent against all Defendants. Plaintiffs assert the claims of the '809 patent against Novel and DRL. Defendants argue that each of the patents-in-suit is invalid as obvious. Defendants also claim the '628 patent is invalid as anticipated and the '131 patent element "without residual sedative effects" is invalid as indefinite. While it is Plaintiffs' burden to prove infringement by a preponderance of the evidence, because all patents "shall be presumed valid," 35 U.S.C. § 282, the "burden is on the party asserting invalidity [here, Defendants,] to prove it with facts supported by clear and convincing evidence." *Linear Tech Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1066 (Fed. Cir. 2009) (internal citations omitted).

## I. Infringement

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent ...." 35 U.S.C. § 271(a).  Determining infringement requires a two step inquiry.  Step one requires a court to construe the disputed terms of the patent at issue and step two requires a court to compare the accused products with the properly construed claims of the patent. Step one is a question of law; step two is a question of fact. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979–81 (Fed.Cir.1995).  To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. *Dolly, Inc. v. Spalding & Evenflo Cos.,* 16 F.3d 394, 397 (Fed.Cir.1994).  If even one limitation is missing or not met as claimed, there is no literal infringement. *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)(internal citations omitted).

In Hatch-Waxman litigation, infringement cases are filed before the alleged infringing product is sold.  Consequently, the infringement analysis is based on an assumed or hypothetical set of facts.  Under 35 U.S.C. 271(e)(2):

> It shall be an act of infringement to submit . . . an [ANDA] for a drug claimed in a patent or the use of which is claimed in a patent, . . . if the purpose of such submission is to obtain approval . . . to engage in the commercial manufacture, use, or sale of a drug or veterinary biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

Thus, the filing of an ANDA seeking approval for an indication claimed in a patent constitutes infringement under Section 271(e)(2).  As summarized in Harman, *Patents and the Federal Circuit* 494 n. 161 (9th ed. 2009): "The inquiry under § 271(e)(2) is a standard infringement test. The only difference is that the allegedly infringing drug has not yet been marketed and therefore the question of infringement must focus on what the ANDA applicant will likely market if its application is

approved." *See also Warner–Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1366 (Fed.Cir.2003) ("The proper inquiry under § 271(e)(2)(A) is whether, if a particular drug were put on the market, it would infringe the relevant patent."). Further, "[t]his hypothetical inquiry is properly grounded in the ANDA application and the extensive materials typically submitted in its support." *Id.* at 1248 (quotation omitted). Therefore, it is proper for this Court to consider the ANDA itself, materials submitted by the ANDA applicant in support of its ANDA, and any other pertinent evidence. *Id.* at 1248–49.

Similarly, the sale of a product specifically labeled for use in a patented method constitutes *inducement* to infringe that patent. *See Astrazeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1060 (Fed.Cir.2010) (finding intent to induce infringement based on the product label authorizing the patented use, which "would inevitably lead some consumers to practice the claimed method." (emphasis added)). Indeed, "the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed." *Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1365-66 (Fed. Cir. 2003). This is because "pharmaceutical companies do not generally treat diseases; rather, they sell drugs to wholesalers or pharmacists, who in turn sell the drugs to patients possessing prescriptions from physicians. Pharmaceutical companies also occasionally give samples of drugs to doctors and hospitals. In none of these cases, however, does the company itself treat the disease." *Id.* at 1363. With this framework in mind, the Court analyzes infringement of the elements of each asserted claim and patent.

CONFIDENTIAL MATERIAL OMITTED

## A. '628 Patent

There are two outstanding issues regarding infringement of the '628 patent. First, Defendants, DRL and Actavis (only), argue that their ANDA products do not infringe Claims 16 and 17 of the '628 patent because their products do not contain a "buffer." Second, all Defendants claim that Plaintiffs have failed to meet their burden of proving Defendants' respective ANDA products infringe the *in vivo* limitations recited in Claim 1 of the '628 patent. The Court finds Plaintiffs have failed to meet their burden with reference to the former, but have done so successfully regarding the latter.

### 1. "Buffer"

Claim 1 of the '628 patent recites "a solid pharmaceutical composition comprising zolpidem or a pharmaceutically acceptable salt thereof . . . , the pharmaceutical composition further comprising a buffer . . . ." (JTX 003 at Claim 1). Claims 2-17 of the '628 patent, which each depend directly or indirectly upon Claim 1, incorporate by reference all limitations of Claim 1. (Id. at Claims 12-17). The term "buffer," as used in Claim 1 of the '628 Patent, means "a buffer system of two or more buffering agents." (Claim Construction Order, ECF No. 186, at 2). The term "buffering agent," is construed to mean "a proton-donating component or proton-accepting component used to maintain and/or achieve an approximate pH range." (Id.).

CONFIDENTIAL MATERIAL OMITTED

**a. Tartrate cannot exist as a single chemical entity and zolpidem tartrate is not a buffering agent.**

At trial, Defendants' expert, Dr. McConville, testified in great detail about the structure of zolpidem tartrate and why tartrate could not be removed from its bond with zolpidem to then become a single buffering agent. The Court finds this reasoning persuasive. That is, zolpidem tartrate is a salt containing a stoichiometric amount of two molecules of zolpidem cation per one

tartrate anion.  (Tr. 4.189:4-4.190:13 (McConville)).  Dr. McConville explained that a salt, such as zolpidem tartrate, is a neutral compound consisting of a positively charged cation and a negatively charged anion where the cation and anion are ionically bound (or attracted to one another), forming one of the strongest bonds in chemistry.  (Tr. 4.170:10-23 (McConville)).  It was also explained by Dr. Banakar, that tartrate cannot exist as a single chemical entity because it is a charged negative compound, and thus no portion of zolpidem can separate from the tartrate in the mouth.  (Tr. 4.124:21-24 (Banakar)).

Dr. Banakar, in his testimony, explained further to the Court how a buffer works and why zolpidem tartrate could not provide assistance to this function and therefore, is not a "buffering agent."  That is, in order for a buffer to work, there has to be a conjugate acid for the base. (Tr. 4.125:12-23. (Banakar)).  A "proton-donating component" is an acid and a "proton-accepting component" is a base.  (Tr. 4.168:14-19 (McConville)).  Dr. Banakar then explained zolpidem tartrate is a neutral compound (neither acidic or basic) and thus neutral compounds are neither proton-donating nor proton-accepting as required by the construction of "buffering agent." (Tr. 4.120:4-7 (Banakar)).  In sum, because the Court is persuaded by the evidence that zolpidem tartrate is neutral, and thus unable to form a buffer with ███████ for example, a base, the tartrate cannot be characterized as a buffering agent.

**b. Zolpidem Tartrate in Actavis' and DRL's ANDA products is a single compound which does not contain tartaric acid.**

At trial, Plaintiffs presented evidence through their expert, Dr. Polli, that because the tartrate component of zolpidem tartrate comes from tartaric acid, it donates a proton to the compound and therefore is proton-donating under the Court's construction of "buffering agent." (Tr. 3.73:133-3.74:12 (Polli)).  Dr. Polli supported this proposition by pointing to the USAN, the

committee that gives drugs name in the United States, who characterizes tartaric acid as a buffering agent in pharmaceutics. (Tr. 3.72:21–3.73:12 (Polli); PTX 450 at PLSEXP404).   However, Defendants do not challenge whether or not tartaric acid may in some cases act as a buffering agent, but rather whether tartaric acid is present at all in Defendants' ANDA products.  Indeed, the Court finds there was sufficient evidence at trial to refute Plaintiffs' assertion that tartaric acid exists in DRL or Actavis' ANDA products.

Dr. McConville's testimony exemplified that there is no tartaric acid in either DRL's or Actavis' ANDA products through his explanation of zolpidem tartrate and polymorphism. (Tr. 4.186:6-7 (McConville); DTX 1001).  Polymorphism exists when a compound or material exists in distinct crystalline forms or types, known as "polymorphs," each of which can be can be distinguished from other polymorphs using known methods such as powder X-Ray Diffraction. (Tr. 4.185:25-4.186:5; 5.14:18-5.17:6 (McConville); DTX 1001). ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Plaintiffs have not credibly refuted this analysis and therefore the Court is unconvinced by a preponderance of the credible evidence, that tartaric acid is present. Consequently, tartrate, in the Court's view, is not characterized as the second buffering agent in either DRL or Actavis' ANDA products.

**c. The language of Claim 1 indicates that the active pharmaceutical ingredient and "buffer" are intended be two distinct and separate components of the claimed solid pharmaceutical composition.**

Claim 1 of the '628 patent provides a "method for treating insomnia, comprising the steps of: administering a solid pharmaceutical composition comprising zolpidem or a pharmaceutically

acceptable salt thereof to a subject prone to insomnia, the pharmaceutical composition further comprising a buffer." After a review of the evidence at trial, the Court finds that the claim delineates that *in addition to zolpidem tartrate*, there must be two buffering agents in an ANDA product for it to infringe the '628 patent, therefore eliminating the possibility that tartrate can be categorized as a buffering agent in the composition.

The phrase "further comprising" signals that these claimed elements ("zolpidem or a pharmaceutically acceptable salt thereof," on the one hand, and "a buffer" on the other) are distinct components of the solid pharmaceutical composition. *See HTC Corp. v. IP Com GmbH & Co.,* 667 F.3d 1270, 1275 (Fed. Cir. 2012) ("[F]urther comprising" signals something "additional."); *Remediation Prods., Inc. v. Adventus Ams., Inc.*, 3:07-cv-153-RJC, 2009 WL 57456 (W.D.N.C. Jan. 7, 2009) ("The construction of the phrase 'further comprising' includes additional recited elements."). Dr. Banakar opines that this reading—where one ingredient cannot serve more than one purpose in the same composition—aligns with the FDA and regulatory agencies around the world requiring "that a single ingredient serve one function in any given composition." (Tr. 4.128:20-4.130:18 (Banakar)). Indeed, Intermezzo® which encompasses the '628 patent, further verifies individualized functions as Intermezzo® explicitly contains zolpidem tartrate in addition to two buffering agents (sodium carbonate and sodium bicarbonate). (*See* e.g. Tr.4.123:4-7 (Banakar)). Even if the Court had construed tartrate and/or tartaric acid to be a buffering agent, Plaintiffs have not established by a preponderance of the credible evidence that tartrate, a part of the pharmaceutically acceptable salt, was intended to serve dual functions in the claim. The Court therefore concludes that each listed function of the ingredients in the ANDA products are the sole functions. ████████████████████████████████████████

████████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL OMITTED

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

For the reasons set forth above, the Court determines that substantial evidence supports that DRL and Actavis' ANDA products each contain only one buffering agent and that Plaintiffs have not come forth with sufficient credible evidence to establish infringement of the '628 patent by a preponderance of the evidence.  Having concluded that Defendants, DRL and Actavis ANDA products, if sold, would not infringe Claim 1 of the '628 patent, the Court further concludes that these ANDA products would also not infringe Claims 16 and 17, which depend from Claim 1.

### 2. The *in vivo* claim limitations of the '628 patent.[6]

Defendants assert that Plaintiffs have failed to prove by a preponderance of the evidence that two limitations of the '628 patent are infringed by Defendants' ANDA products.  Defendants therefore maintain that Claims 9, 16 and 17 of the '628 patent are not infringed.  Defendants take issue with the limitation that the buffer "raises the pH of saliva to a pH of about 7.8 of greater" and requirement that the solid pharmaceutical composition "dissolves within about 10 minutes or less within the oral cavity following administration."  (JTX-002 at Claim 1).  Defendants' argument, in sum, provides that Plaintiffs cannot rely on *in vitro* data to establish infringement of the *in vivo* claim limitations articulated above.   For this proposition, Defendants rely almost exclusively on *Alza Corp. v. Mylan Laboratories, Inc.* 388 F.Supp. 2d 717, 725 (N.D. W. Va. 2005) *aff'd* 464 F.3d 1286 (Fed Cir. 2006).  As set forth below, the Court does not agree with

---

[6] The Court hereby incorporates this Section into its later analysis of the *in vivo* limitations of the '809 patent.

Defendants' interpretation of *Alza Corp.,* as it relates to the facts of the case at bar and finds

sufficient evidence of infringement of the *in vivo* limitations of the '628 patent. Defendants[7],

therefore, are found to have infringed Claims 9, 16 and 17 of the '628 patent in this regard.

**a. *Alza Corp. v. Mylan Laboratories, Inc.***

The *Alza Corp.*, litigation arose from Defendants' filings of ANDAs for once-daily,

controlled-release oxybutynin formulations. *Alza Corp. v. Mylan Labs., Inc.,* 464 F.3d 1286, 1288

(Fed. Cir. 2006). Oxybutynin is a drug used to treat urinary incontinence. Once-a-day dosing

provides the usual benefits of convenience, steady-dosing, and in addition, possibly reduced

absorption of a metabolite that leads to side-effects. *Id.* Claim 2 of the '355 patent was at issue

and stated:

> A sustained-release oxybutynin formulation for oral administration
> to a patient in need of treatment for urge incontinence comprising a
> therapeutic dose of an oxybutynin selected from the group
> consisting of oxybutynin and its pharmaceutically acceptable salt
> that *delivers* from 0 to 1 mg in 0 to 4 hours, from 1 mg to 2.5 mg in
> 0 to 8 hours, from 2.75 to 4.25 mg in 0 to 14 hours, and 3.75 mg to
> 5 mg in 0 to 24 hours for treating urge incontinence in the patient.

*Id.* at 1289 (emphasis in original). The district court construed the '355 patent claims in its

*Markman* Order, construing the word "deliver" to refer to the rate of *in vivo* release in the

gastrointestinal ("GI") tract. *Id.*

At trial, Plaintiff, Alza Corp., did not present direct evidence that one Defendants' ANDA

formulation released drug in the GI tract at the rates claimed by the '355 patent. *Id.* However, it

---

[7] Defendants, DRL and Actavis, do not infringe the '628 patent as they do not contain "buffer," but the Court completes its infringement analysis regarding the '628 patent for purposes of Defendant, Novel (as well as TWi and Par if applicable).

did offer two other types of evidence: 1) the rate at which the generic product released oxybutynin

in an *in vitro* dissolution apparatus; and 2) the rate at which the ANDA product resulted in the

accumulation of oxybutynin in the bloodstream.  Ultimately, the district court found that Alza had

failed to meet its burden of proof on infringement, stating:

> Alza cannot rely exclusively on *in vitro* test results to prove infringement of *in vivo* release rates. *See Amgen, Inc. v. Chugai Pharm. Co., Ltd.,* 927 F.2d 1200 (Fed.Cir.1991) (holding that "the district court erred in accepting the *in vitro* data as support for claim containing what has been found to be an *in vivo* limitation"). Indeed, without reliable *in vivo* data comparing the release rates of the accused product against the claimed ranges of the '355 patent, there can be no finding of infringement—either literally or under the doctrine of equivalents.

*Alza Corp. v. Mylan Labs., Inc.,* 388 F. Supp. 2d 717, 725 (N.D.W. Va. 2005).  On September 6,

2006, the Federal Circuit affirmed the ruling of the district court, but made clear why, in the *Alza*

case, the *in vitro* data was insufficient.  The Federal Circuit explained: "The critical deficiency in

the evidence presented by Alza was not that it was 'indirect' rather than 'direct,' but rather that it

failed to *credibly link* these pieces of evidence with the relevant pharmacokinetic parameter—the

rate of *in vivo* dissolution in the GI tract." *Alza Corp. v. Mylan Labs., Inc.,* 464 F.3d 1286, 1296

(Fed. Cir. 2006) (emphasis added).  That is, because "the obtained *in vitro* dissolution rates vary

widely with the choice of experimental parameters," the Federal Circuit found that "Alza's

evidence of *in vitro* dissolution rates [was] irrelevant absent evidence demonstrating that the *in

vitro* system is a good model of actual *in vivo* behavior."  *Id.* at 1297.

Defendants in the present case, read the *Alza Corp.*, litigation to stand for the proposition

that *in vivo* claim limitations can only be infringed upon conduction of *in vivo* testing.  The Court

disagrees.  *In vitro* testing is suitable to prove *in vivo* claim limitations if there is *a credible link*

between the *in vitro* data and *in vivo* data.  In other words, without affront to the Federal Circuit

holding in *Alza Corp.*, infringement can be found based on *in vitro* data where the evidence demonstrates that the *in vitro* system adequately modeled the results that would be derived from *in vivo* conditions. *Allergan, Inc. v. Watson Labs., Inc.-Florida*, 869 F. Supp. 2d 456, 500 (D. Del.) aff'd, 470 F. App'x 903 (Fed. Cir. 2012). Because the Court finds (and explains below) that at trial, Plaintiffs presented evidence of *in vivo* limitations via Defendants' ANDA data and *in vitro* dissolution data which was then considered in combination with the inventor's prosecution declaration, the known information of dissolution rates and *in vivo* data from Intermezzo®, Plaintiffs have met their burden by linking the *in vitro* and *in vivo* data. Accordingly, Defendants are found to infringe the *in vivo* limitations of the '628 patent.[8]

**b. Plaintiffs' evidence, *in vitro* and otherwise, of infringement.**

**i. "[R]aises the pH of saliva to a pH of about 7.8 of greater."**

Defendants argue, in the main, that Plaintiffs have failed to show their products meet the "raises the pH of saliva to a pH of about 7.8 of greater" element of the asserted claims because the dissolution testing results (i.e. the *in vitro* data) does not sufficiently model *in vivo* conditions of the mouth. Defendants cite a number of propositions in support of this contention. First, Defendants assert that simulated saliva does not adequately mimic saliva and therefore pH must be measured in natural human saliva. (Tr. 2.231:4-2:232:11 (Garegnani), 6.41:6-14 (Michniak-Kohn)). Second, Defendants attempt to discredit dissolution test results by reasoning that depending on which simulated saliva recipe one chooses, pH measurements will fluctuate, sometimes dramatically. (DTX 291 at 1109; Tr. 6.61:5-11 (Michniak-Kohn)). Lastly, Defendants point the Court to the fact that Plaintiffs did not conduct any *in vivo* testing on Defendants' ANDA

---

[8] Such an analysis also applies equally to the '809 patent where appropriate.

CONFIDENTIAL MATERIAL OMITTED

products.  After a thorough consideration of the totality of the evidence presented, the Court finds

Defendants' position unpersuasive and disagrees with the contention that Plaintiffs, via Dr. Polli's

testimony, have failed to show that it is more likely than not that Defendants' proposed products

"raise[] the pH of saliva to a pH of about 7.8 of greater."

Plaintiffs also provided the Court with the patent inventor's prosecution declaration. Said declaration expressly instructs that *in vitro* measurements in simulated saliva (███████) or deionized water (█████) are appropriate to establish the *in vivo* pH claim element. Dr. Singh, the inventor, used pH testing in deionized water and simulated saliva to successfully persuade the USPTO that the prior art did not "raise[] the pH of saliva to a pH of about 7.8 or greater." (JTX 6 at TRANSIZ00059306–14; *id.* at TRANSIZ00059338–41) (*See also* Pls.' FOF ¶¶ 461–62, 569–70, 600–01). Dr. Polli explained that this is indicative of how the patent office was "inspired by the experiments … such the simulated saliva allows one to differentiate whether a formulation is within that claim limitation or outside." (Tr. 3.89:19-22 (Polli)). ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████ This is precisely the breed of credible "link" that the *Alza Corp* litigation approved. Here, the *in vitro* testing is authenticated by numerous sources to be "a good model of actual *in vivo* behavior." *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1297 (Fed. Cir. 2006).

With respect to simulated saliva criticisms of Defendants' expert, Dr. Michniak-Kohn, who claimed that there are too many different formulations that can be used with differing results, even she acknowledged that actual saliva varies person to person and can even vary for the same person

at different times of the day. (Tr. 6.56:3–24, 7.25:11–16 (Michniak-Kohn)). Therefore, differing

formulations are actually representative of differing conditions in the mouth from person to person.

Admittedly, saliva is 99% water, and simulated salivas "have compositions[] which are more or

less the same as that of natural saliva." (Tr. 7.25:11–7.26:1, 7.24:4–10 (Michniak-Kohn), DTX

291).  As a result, the Court grants this critique only limited credibility. However, of more practical

importance, it would be difficult to imagine an *in vivo* test to gain the data Defendants request.

Throughout trial, Defendants have persistently criticized Plaintiffs for failing to test Defendants'

respective ANDA products.  However, the Court will not overlook the implications of such

unapproved testing.  Indeed, it would be highly unethical to have testing performed on humans

(*i.e. in vivo*) for unapproved products particularly for the limited purpose of patent litigation as

Defendants' appear to suggest.  *Allergan, Inc. v. Watson Labs., Inc.–Fla.*, 869 F. Supp. 2d 456,

500 (D. Del. 2012) ("[T]esting defendants' unapproved products in live human subjects is neither

feasible nor ethical.").[9]  For both this reason and those articulated above, the *in vitro* data is

credibly and sufficiently linked to other credible evidence presented to prove infringement by a

preponderance of the evidence for the claim limitation "raises the pH of saliva to a pH of about

7.8 of greater."


### ii. "[W]herein the solid pharmaceutical composition dissolves within about 10 minutes or less within the oral cavity following administration."

The majority of Defendants' arguments related to the claim limitation "wherein the solid

---

[9] *See also Zenith Labs. Inc. v. Bristol-Myers Squibb Co.*, No. 91-3423, 1992 WL 340761, at *18 (D.N.J. Aug. 6, 1992) ("[I]n vivo experimentation could not be justified under medical ethics constraints merely to prove patent infringement."), *rev'd on other grounds*, 19 F.3d 1418 (Fed. Cir. 1994).

pharmaceutical composition dissolves within about 10 minutes or less within the oral cavity following administration" revolves around the element "oral cavity." Defendants essentially argue that dissolution of the composition, for purposes of infringement, must be measured in the oral cavity. Defendants note the differences between USP disintegration tests and conditions within the oral cavity in support of this proposition. The Court finds however, as set forth below, that based on the credible evidence presented at trial, Plaintiffs have met their burden of proving infringement of this "oral cavity" *in vivo* element of the '628 patent.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ This is undisputed. To link these results to the oral cavity, Plaintiffs offered evidence that ███████████████████████████████████████████████

██████████████████ all of which are qualities a POSA would anticipate for dissolution in the oral cavity. (*See* PTX 121, PTX 55, PTX 97). Additionally, Plaintiffs provided that both the '628 patent itself, as well as the standard practice in the pharmaceutical industry, specify that *in vitro* USP dissolution data is appropriate to measure *in vivo* dissolution. On cross-examination, Dr. Polli explained how those of skill in the art rely on USP *in vitro* testing as a surrogate for *in vivo* testing, stating:

> I don't know of a way to measure dissolution in the mouth. I don't know anybody that does. That would be extremely unusual. And then when I read the patent, I see what I would have expected, USP dissolution testing, so it kind of confirms what I would have expected anyway.

(Tr. 3.151:8–24 (Polli)). The specification of the '628 Patent further corroborates Dr. Polli's opinion and defines *in vitro* USP tests as suitable for determining the extent to which a solid dosage

form (*e.g.*, Defendants' ANDA Products) dissolves in a patient's mouth (*i.e.*, *in vivo*).  Under the claimed inventions:

> The terms "disintegration" and "dissolution" are used interchangeably to refer to the reduction of a solid dosage form of the present invention to a liquid form. More particularly, a *complete disintegration or dissolution* of a solid dosage form *refers to less than about 25% by weight of the solid dosage form remaining in the mouth* following an appropriate time period, e.g., 5 minutes or less, after administration. . . . *Suitable methods known in the art for determining the dissolution profile of a solid dosage form include, e.g., USP dissolution tests* such as USP <711> Apparatus 1 or USP <711> Apparatus 2.

(JTX 3 at 6:38–51 (emphases added)).



While Defendants appear to take issue with the volume (███████) and paddle speed (███

███) parameters used in their own tests, Dr. Polli testified on cross-examination that these parameters are commonly used to make sure that the tests are not only related to *in vivo* performance but are also reproducible, a point that this Court finds credible.  (Tr. 3.149:7–3.150:13 (Polli)).  Dr. Polli explained that these tests are "intended to mimic what goes on in the mouth." (Tr. 3.148:6–12 (Polli)).  ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████    The preponderance of the evidence thus weighs in favor of infringement of the *in vivo* claim limitation "wherein the solid pharmaceutical composition dissolves within about 10 minutes or less within the oral cavity following administration."

### 3. Remaining Uncontested Infringement Evidence

Beyond the elements discussed *supra* or within this Court's analysis of the '809 patent, and for purposes of completeness, the Court addresses the undisputed elements of the claims asserted against Novel, and finds that Plaintiffs have proven infringement by a preponderance of the evidence.  First, with reference to independent Claim 1 of the '628 patent, administering Novel's ANDA Product according to their proposed labeling comprises a method of treating insomnia. (Kryger Tr. 1.245:19–1.246:8; PTX 50 at NOVZ00007869).  Further, Novel's ANDA Product according to this label includes administering a solid pharmaceutical composition comprising zolpidem or a pharmaceutically acceptable salt thereof to a subject prone to insomnia under Claim 1 of the '628 Patent. (Kryger Tr. 1.246:9–1.247:17; PTX 50 at NOVZ00007869).  Zolpidem is also absorbed across a permeable membrane of the subject's oral mucosa under Claim 1 of the '628 Patent after administration according to Novel's proposed labeling. (Tr. 2.155:13–2.176:4 (Drover)).  Thus, the remaining elements of Claim 1 are found to be infringing.

Novel's ANDA Product contains zolpidem or a pharmaceutically acceptable salt thereof in an amount from about 1 mg to about 5 mg, under Claim 16 of the '628 Patent, and in an amount from about 2 mg to about 5 mg, under Claim 17 of the '628 Patent. (Kryger Tr. 1.247:15–1.249:16; Polli Tr. 3.63:2–12; PTX 50 at NOVZ00007869). Novel did not present any evidence to the contrary to dispute this. ██████████████████████████ in Novel's ANDA product also constitute a "buffer" under Claim 1 of the '628 Patent for the same reasons that these components constitute a "binary buffer system" under Claim 22 of the '809 Patent (*see analysis below*). (Tr. 3.117:6–3.117:21 (Polli)).  That is, because ████████████████████████ ██████ satisfy the "binary buffer system" element of the '809 patent, they necessarily satisfy the broader "buffer" element. ██████████████████████████

CONFIDENTIAL MATERIAL OMITTED

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ Novel

therefore infringes all remaining claims and elements of the '628 patent.


## B. '809 Patent

Plaintiffs assert that Claims 11, 17, and 18 of the '809 patent are infringed by Novel and DRL only.  Additionally, Plaintiffs claim that Novel infringes Claim 22 of the '809 patent.  This Court previously granted Plaintiffs' Rule 52 motion that Novel infringes Claims 11, 17, and 18, therefore isolating this Court's infringement analysis to Claim 22.  (ECF No. 366 at 4).  Similarly, DRL challenges its infringement of the '809 patent only as to the "appropriate patient population" element of (independent) Claim 1.[10]

## 1. Novel Infringes Claim 22 of the '809 Patent.

Novel contested infringement of Claim 22 of the '809 patent only with respect to the "pH of said subject's saliva" limitation.  The Court incorporates by reference Section A., 2., b., i., of this Opinion (finding "the *in vitro* data is credibly linked to other evidence to prove infringement

---

[10] For reference, Claim 1 of the '809 patent recites: A solid unit dosage composition for the treatment of MOTN insomnia, said composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across a subject's oral mucosa, wherein said effective amount is an amount of less than 1.30 x 10-5 moles of zolpidem, and between about 25 ng/mL and about 50 ng/mL within 20 minutes of administration, when evaluated *in an appropriate patient population*. (JTX 002)(emphasis added).

CONFIDENTIAL MATERIAL OMITTED

by a preponderance of the evidence for the claim limitation [']raises the pH of saliva to a pH of about 7.8 of greater.[''']).  For purposes of completeness, the Court provides additional relevant evidence to Novel only, which demonstrates Plaintiffs have proved Novel infringes Claim 22 of the '809 patent.

███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  For these reasons and the corresponding findings articulated in Section A., 2., b., i., of this Opinion, Novel is found to infringe Claim 22 of the '809 patent as its ANDA product contains a system used to "maintain and/or achieve an approximate pH range comprising at least one proton-donating component and at least one proton accepting component," as required by the construction of Claim 22's "binary buffer system."

CONFIDENTIAL MATERIAL OMITTED

**2. DRL Infringes the "appropriate patient population" element of the '809 patent.**



CONFIDENTIAL MATERIAL OMITTED

CONFIDENTIAL MATERIAL OMITTED

### 3. Remaining Uncontested Infringement Evidence

Although Defendant, DRL, did not dispute infringement as to the remaining elements of Claim 1 nor Claims 11, 17, 18, the Court addresses whether Plaintiffs have met there burden of proving infringement.  Likewise, Claim 22 of the '809 patent was asserted against Novel and found by the Court to be infringed.  However, because asserted Claim 22 depends from independent Claim 12 of the '809 patent.  The Court must determine if Claim 12 is also infringed.  The findings below establish that Plaintiffs have met their burden of proving these Claims and elements are infringed by DRL and Novel by a preponderance of the evidence.

**a. DRL Infringes Claim 1 of the '809 Patent**

CONFIDENTIAL MATERIAL OMITTED

CONFIDENTIAL MATERIAL OMITTED

**b. DRL Infringes Claims 11, 16 and 17 of the '809 Patent**

**c. Novel Infringes Independent Claim 12 of the '809 Patent**

CONFIDENTIAL MATERIAL OMITTED

Consequently, Novel's 1.75 mg tablets also contains an effective amount of zolpidem because the pharmacokinetics of zolpidem are linear where a dose reduced by half for the elderly simply

reduces the plasma concentrations by half. (Tr. 1.151:17–25 (Drover); *see also* Tr. 6.112:1–4 (Michniak-Kohn)).  Accordingly, an elderly patient that takes Novel's 1.75 mg tablet will have approximately the same blood concentrations as a non-elderly patient taking the 3.5 mg tablet. (Tr. 1.183:19–24 (Drover); *see also* Tr. 6.116:6–10 (Michniak-Kohn)).

## C. '131 Patent

Plaintiffs claim all Defendants will induce infringement of Claims 8, 10, 18 and 19 of the '131 patent.  Claim 1 of the '131 patent is an independent claim, and therefore Claims 8, 10, 18, and 19 depend therefrom.  The only element at issue is the "without residual sedative effects" limitation highlighted below:

> Claim 1: A method of treating middle-of-the night insomnia in a non-elderly patient without prophylactically administering zolpidem, comprising: dosing the patient with a pharmaceutical composition … wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing **without residual sedative effects.**

This Court construed "without residual sedative effects" to mean "with no or minimal subjective feelings of sedation, as evaluated by: (a) testing acceptably in at least one test exploring psychomotor performance, attention, information processing, and memory used by those of skill in the art; and/or (b) demonstrating plasma levels of zolpidem, at an appropriate time point, below about 20 ng/ml."  (Opinion, ECF No. 185 at 5-7). ■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■    ■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

CONFIDENTIAL MATERIAL OMITTED

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

## 1. *Vermeeren* Driving Study

Each of Defendants' proposed labels includes a section entitled "Driving Study" that reports on the results of a driving performance test conducting on Intermezzo. (Tr. at 1.193:19–22 (Kryger); PTX 46 at ACT-ZOL-0000215; PTX 48 at DRL0000796; PTX 50 at NOVZ0007884.) This is particularly significant as each of Defendants' proposed labels state that "[w]hen you wake up in the morning, be sure that at least 4 hours have passed since you have taken Zolpidem Tartrate Sublingual Tablet and you feel fully awake before driving." (PTX 50 at NOVZ0007894; Tr. 1.218:4–1.219:2 (Kryger)). At the outset, the Court notes that Defendants' argument that the driving study should be discredited simply because it was not conducted on Defendants' ANDA products is, again, dismissed.  From a cumulative standpoint, Plaintiffs have met their burden of proving infringement of this element.  To credit this conclusion, the Court points specifically to the following: 1) Defendants' ANDA products' bioequivalence data[11]; 2) the fact that each ANDA product contains the same amount of the active pharmaceutical ingredient (and undisputedly the only hypnotic agent) zolpidem tartrate; and 3) expert testimony that Defendants' ANDA products

---

[11] While true that bioequivalence alone, does not prove patent infringement, when viewed in light of the totality of the evidence, the Court concludes Defendants have infringed the '131 patent. *See Alza*, 388 F. Supp. 2d at 722.

CONFIDENTIAL MATERIAL OMITTED

are expected to produce no residual sedative effects at four hours after dosing and behave just as Intermezzo® did in the driving study.

According to the '131 Patent and confirmed by Dr. Kryger, a driving performance test is an accepted and reliable test in the art for evaluating residual sedative effects. (JTX 001 at 6:59–60; Tr. at 1.193:15–1.193:18 (Kryger)). ████████████████████████████

████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ A double-blind study means that "the person and the experimenter do not know what treatment the person is on, whether they are on placebo or whether they are on a medication." (Tr. 1.194:19–1.195:6 (Kryger)).  The results of the driving study showed that when driving began 4 hours after taking Intermezzo®, "statistically significant impairment was not found."  (Tr. 1.197:24–1.198:18 (Kryger); PTX 50 at NOVZ0007884).  Dr. Kryger explained that a POSA would understand the word "impairment" in this context to equate to residual sedative effects. (Tr. 1.198:12–18 (Kryger)). ████████████

████████████████████████████████████████

████████████████████████

Defendants, through their expert Dr. Winkelman, challenge the driving study as an acceptable measurement of sedation.  First, Defendants claim that *Vermeeren* did not measure sedation at a time of about four hours after dosing because the protocol required that the test patients were awake and alert 45 minutes prior to starting the driving study, and occurred over the

course of 4 to 5 hours after administration.  Second, Defendants argue that driving studies in the prior art literature that measured residual sedative effects did so based on the "statistically significantly different from placebo" standard rather than the symmetry analysis of subjects who change from their own SDLP (standard deviation of lateral position) as in *Vermeeren*.  Many of these arguments overlap those made by Defendants relating to their indefiniteness argument of the same claim element.  Because the Court finds a more detailed discussion is appropriate in the indefiniteness context, suffice it to say that with reference to Section II., C., 2., c., of this Opinion, the Court concludes that a driving performance test under these conditions is considered an accepted and reliable test in the art for evaluating residual sedative effects and the symmetry analysis used in *Vermeeren* is a persuasive measurement tool.

## 2. DSST

The Digit Symbol Substitution Test (DSST) is an accepted test of psychomotor performance in the art and one of the tests listed in column 6 of the '131 Patent.  Plaintiffs point the Court to two articles by *Roth* to support a finding that the Defendants' ANDA products, which contain the same active ingredient at the same dosages used in those studies, would also test acceptably in a psychomotor performance test at 4 hours after dosing.  A 2007 article by *Roth et al.*, published in the journal Human Psychopharmacology, found that both 3.5 mg and 1.75 mg zolpidem led to no residual sedative effects at 4 hours after dosing, as measured by the DSST.  (Tr. 1.221:23–1.222:19 (Kryger); PTX 258 at PIZ00315144).  In addition, a 2008 article by *Roth et al*. published in the journal Sleep described administering 3.5 mg and 1.75 mg doses of zolpidem to subjects and found that neither dose led to residual sedative effects at 4 hours after dosing. (Tr. 1.225:2–9 (Kryger); PTX 264 at JNTDEF0000559).  Dr. Kryger opined that even when blood

plasma levels after subjects were given a 3.5mg dose or 1.75 mg dose of zolpidem are above 20

ng/ml ███████████████████████████████ a composition can still pass DSST.

Specifically, Dr. Kryger explained: "What we are looking at here is the DSST data. So even though

the level was above 20, even though the level was above 20 at four hours, there was no abnormality

with the DSST." (Tr. 1.227:18-23 (Kryger)).  This evidence supports a finding that Defendants'

ANDA products will test acceptably in the DSST psychomotor performance test and therefore

infringe the '131 patent limitation "without residual sedative effects."


**3. Defendants' Proposed Labelling**

████████████████████████████████████████

████████████████████████████████████████

███████████████    Thus, the labeling Defendants submitted to the FDA for ANDA approval

encourage infringement. ████████████████████████████

████████████████████████████████████████

██████████████████████    By providing instructions for use that when followed

would lead to infringement, each Defendant would induce infringement under 35 U.S.C. § 271(b).

*See*, *e.g.*, *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011) ("We

have long held that the sale of a product specifically labeled for use in a patented method

constitutes inducement to infringe that patent, and usually is also contributory infringement.");

*AstraZeneca LP v. Apotex, Inc*., 633 F.3d 1042, 1060 (Fed. Cir. 2010) ("In the context of specific

intent, . . . [t]he pertinent question is whether the proposed label instructs users to perform the

patented method. If so, the proposed label may provide evidence of [an] affirmative intent to

induce infringement.").

If Defendants truly believed their products would cause residual sedative effects, they could have pursued a non-infringing label. ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ The Court too sees no alternative reading of the label. In further support of this point, Defendants' proposed labels also include a dosing time chart that tells patients when they would need to take the drug depending on when they have to get up. ████████████

████████████████████████████████ (PTX 50 at NOVZ0007891–92; Tr. 1.216:25–1.218:3 (Kryger)).

As a matter of common sense, because Defendants' proposed labels instruct ██████████

███████████████████████████████████████████

████████████████████████████ to argue that Defendants' ANDA products would produce residual sedative effects four hours after dosing would be juxtaposed to their labels' very warnings. This is evidence of infringement as well. To clarify, the Court is not suggesting that FDA regulations and patent laws can or cannot overlap. Production of a non-infringing product may be unsafe and compliance with FDA regulations may induce infringement. However, the two can be reconciled when appropriate. For instance, as indicated previously, having found that DRL's and Actavis' products do not contain "buffer,"

innovation beyond the '628 patent was promoted while safety was maintained. Such is not the case with the '131 patent and the limitation of no residual sedative effects. Should the Court find Defendants' products are likely to yield, by a preponderance of the evidence, residual sedative effects, the Court would also be finding that Defendants' proposed labels are inaccurate. The Federal Circuit also addressed this tension in concluding "[b]ecause drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248 (Fed. Cir. 2000). Indeed, the aforementioned statements in Defendants' proposed labels indicate to patients that they will be free of residual sedative effects four hours after dosing therefore infringing the method delineated in the '131 patent.

### 4. Plasma Levels and Effects on Residual Sedative Effects

However, while higher plasma concentrations can be indicative of residual sedative effects in some cases, Dr. Kryger explains that the problem with using the number 20 is that this number 20 "is really a safe harbor, and it is -- values below 20 would be considered a zero chance of having residual effect from that treatment, and values above 20, we don't know necessarily what they are." (Tr. 1.226:2-8 (Kryger)).

████████████████████████████████████████████████████████

██████████████████████    Additionally, to determine infringement, the Court's inquiry is directly related to the claim construction of the term.  Here, the Court's claim construction is clear in stating that residual sedative effects can be evaluated by testing acceptably in one psychomotor test *or* demonstrating plasma levels of zolpidem below 20ng/ml.  (Opinion, ECF No. 185 at 5-7) (emphasis added).  Thus, this construction uses the word "or" to allow for more than one method of testing for residual sedative effects for the precise reasons articulated by Dr. Kryger, and a finding of infringement follows.

**5. Remaining Uncontested Infringement Evidence**

With regard to the '131 patent, Defendants only contested the "without residual sedative effects" limitation discussed above.  However, the remaining elements of Claims 1 and 12, as well as asserted Claims 8, 10, 18 and 19 are also found to be infringed by Defendants.  The Court first reiterates that all experts agree that there are no differences among Defendants' labels that are relevant to the infringement analysis.  (Tr. 1.17511-1.76:2 (Kryger); 7.106:4-9, 8.175:16-21 (Winkelman)).  With this is mind, Plaintiffs used Novel's label as representative of all Defendants' labels for purposes of the infringement inquiry.

Claims 10 and 19 require "delivery of zolpidem across the patient's oral mucosa."  (JTX 001 at Claims 10 and 19).  These claims are infringed for the same reasons articulated with regards to the '809 patent. (*See* Section I., B., 3., b., of this Opinion: "Specifically, four pieces of evidence regarding DRL's ANDA product—████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████—prove that the zolpidem in DRL's ANDA product is delivered across the sublingual

mucosa. (*citing* Tr. 2.2.169:8–17 (Drover)). Defendants' proposed labels include an indication and usage for treating insomnia ███████████████████████████████ therefore satisfying a method from treating MOTN insomnia in Claims 1 and 12. (*See e.g.* PTX 50 at NOVZ0007870). These labels also indicate usage for non-elderly patients (required by Claims 8 and 10) as well as elderly patients (required by Claims 18 and 19) ████████ which is required by Claims 1 and 12. (Tr. 1.179:20-22, 1.80:10-17 (Kryger)). The quantities of zolpidem hemitatrate (required as a range in Claims 1 and 12, and 3.5 mg and 1.75 mg in Claims 8 and 18) are infringed for the same reasons expressed regarding the '809 patent and Defendants' labels. The only hypnotic agent (required by Claims 1 and 12) in Defendants' ANDA products is zolpidem tartrate. (Stip Facts ¶¶ 111, 116; Tr. 1.181:25-1.182:7 (Kryger)). Finally, Defendants' labels describe a patient desiring to resume sleep ███████ therefore satisfying all elements of Claims 1 and 12. Consequently, each of the asserted claims of the '131 patent are infringed by Defendants.

## II. Patent Invalidity

### A.  Obviousness

"An obviousness analysis measures the difference between the claimed invention and the prior art to determine whether 'the subject matter as a whole would have been obvious at the time the invention was made' to a person having ordinary skill in the art." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Obviousness is a question of law based on underlying factual findings. *Honeywell Int'l, Inc. v. United States,* 609 F.3d 1292, 1297 (Fed. Cir. 2010). "The factual underpinnings, often referred to as the *Graham* factors, include: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the

claimed invention and the prior art; and 4) evidence of secondary factors, also known as objective indicia of nonobviousness." *Id.* at 1360.

"Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Unigene*, 655 F.3d at 1360. Moreover, the party challenging validity must show that a person of ordinary skill in the art "would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success in doing so." *Procter & Gamble v. Teva Pharm.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quotation omitted). A claimed invention may, however, be obvious even when the prior art does not teach each claim limitation, so long as the record contains some reason that would cause one of skill in the art to modify the prior art to obtain the claimed invention. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 728 (Fed. Cir. 2002). A finding of obviousness cannot, however, be based on "the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002) (quoting *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 546 (Fed. Cir. 1998)).

"A person of ordinary skill at the time of the invention interprets the prior art using common sense and appropriate perspective." *Unigene*, 655 F.3d at 1361; *see generally KSR Int'l Co. v. Teleflex Inc.*,  550 U.S. 398, 420-421 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). In the same vein, although an analysis of the teaching, suggestion, or motivation to combine elements from different prior art references is helpful, this

Court's obviousness analysis requires an "expansive and flexible approach." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1360 (Fed. Cir. 2012).

Finally, Defendants, as the patent challengers, must prove obviousness by clear and convincing evidence. *Tokai Corp. v. Easton Enterprises, Inc*., 632 F.3d 1358, 1367 (Fed. Cir. 2011). Clear and convincing evidence is a higher burden of proof than preponderance of the evidence. *See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). To be clear and convincing, evidence must "place[ ] in the factfinder 'an abiding conviction that the truth of [the] factual contentions are highly probable.' " *Procter & Gamble,* 566 F.3d at 994 (quotation omitted).

Defendants assert that the claimed invention is invalid for obviousness because the claims of the patents-in-suit would have been obvious to a POSA inasmuch as the scope and content of the prior art teaches all claimed elements. At trial, Defendants, "like all those who seek to prove claims obvious, was required to show that 'the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 737 (Fed. Cir. 2013) (citing 35 U.S.C. § 103).

Plaintiffs' main response to Defendants' obviousness challenge is that the claimed invention was not obvious because the prior art does not disclose: 1) efficacious low doses of zolpidem; 2) non-prophylactic dosing; and 3) transmucosal delivery of zolpidem. Plaintiffs also argue that a POSA would not have been motivated to combine the prior art because some references teach away from the claimed invention, nor would a POSA have had a reasonable expectation of success with low doses or transmucosal delivery of zolpidem. Finally, Plaintiffs ask the Court to consider the objective indicia of nonobviousness: licensing, industry

acquiescence, long-felt need and skepticism.  While Plaintiffs as the party defending the patents-in-suit may offer evidence of secondary considerations of nonobviousness, these may not, by themselves, overcome a strong prima facie case of obviousness.  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).  For the reasons set forth below, the Court finds Defendants have proved a case of obviousness by clear and convincing evidence even after consideration of Plaintiffs' purported objective indicia of nonobviousness.

### 1. Person of Ordinary Skill in the Art

A person of ordinary skill in the art in the technology of the subject matter of the '131 patent is a person working in the field of sleep therapeutics and has: a least a Ph.D. in clinical psychology having at least one year of research experience in the field; or an MD having at least one year of clinical experience in the field.  (Tr. 7.90:14-7.91:3 (Winkelman)).  While Plaintiffs provided their own definition, both Parties' experts agree that none of their opinions concerning the '131 patent would change depending on which party's definition of a POSA is adopted.

On the other hand, a person of ordinary skill in the art to whom the '809 and '628 patent would be directed would have at least a bachelor's degree, and more likely a Master's or Ph.D. degree in pharmacy or a related science, and most likely several years of experience formulating active pharmaceutical ingredients, including some experience in transmucosal delivery. If this person of ordinary skill had a Bachelor's or Master's in pharmacy, or any other related subject, such a person would typically have more than five years of experience formulating active pharmaceutical ingredients. If they already had a Ph.D. in pharmacy, they would typically have fewer years of experience. If a person of ordinary skill in the art did not have actual experience with the developing transmucosal dosage forms, that person would at least have a deep knowledge

of the related scientific literature on the topic and be able to understand that scientific literature. (Tr. 6.31:1-24 (Michniak-Kohn)).   While the Court employs Defendants' proposed definition, Plaintiffs' formulation expert agrees that his opinions on these patents would not alter depending upon which definition of a POSA was adopted.  (Tr. 9.186:6-13 (Polli)).

## 2. Scope and Content of the Prior Art

In conducting the obviousness analysis, this Court views the claimed invention in light of the art that existed at the time the invention was made.   *See* 35 U.S.C. § 103(a); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050–51 (Fed. Cir. 1988).  "Prior art has been defined as follows: '[t]he existing state of knowledge in a particular art at the time an invention is made. It includes the issued patents * * *, publications, and all other knowledge deemed to be common thereto such as trade skills, trade practices, and the like,' " available a year or more before the patent filing date."  *Trio Process Corp. v. L. Goldstein's Sons, Inc*., 461 F.2d 66, 69 n. 3 (3d Cir. 1972) (quoting A. Smith, PATENT LAW, CASES, COMMENTS AND MATERIALS 2 (1964)).

As previously stated, the asserted '131 and '809 patents are analyzed according to the prior art as of May 2005, while the '628 patent is compared to the prior art as of February 2004.  The Court notes that none of the prior art described below is applicable to just one patent but not the others by virtue of its published date.  The Court considers all the teachings in the prior art in the obviousness determination, "including that which might lead away from the claimed invention." *In re Dow Chem. Co*., 837 F.2d 469, 473 (Fed. Cir. 1988).

It was well known by February 2004 that zolpidem was suitable for treating insomnia. Indeed, by that point in time, Ambien® (active ingredient being zolpidem tartrate) was the most popular sedative hypnotic for treating insomnia.  The Ambien® label indicates it is used to "treat

different types of sleep problems" including "waking up often during the night." (JTX 41). Thus, before the priority dates of the patents-in-suit, a POSA would have been motivated to develop a treatment for MOTN insomnia that would be better than or as good as Ambien®. The Parties do not dispute that, given Ambien®'s success, a POSA aiming to treat MOTN insomnia specifically (or in the case of the '628 patent, insomnia generally) would have carefully considered the disclosures of Ambien® before or in conjunction with research of any additional prior art.

**a. Ambien®**

Ambien®, comprising the single hypnotic agent, zolpidem, was commercially released in 1992 and approved by the FDA "for the short-term treatment of insomnia." (JTX 041 at DRL0013526). Ambien® was the most successful drug for treating insomnia in 2004 where physicians prescribed Ambien® to 24 million patients. (Tr. 8.21:4-17 (Winkelman)). At the time of the invention, the recommended dose of Ambien® was 10 mg for non-elderly adults, and 5 mg for elderly adults. The Ambien® label indicates it is also effective to treat MOTN insomnia stating Ambien® "is used to treat different types of sleep problems, such as: trouble falling asleep; waking up too early in the morning; and *waking up often during the night*." (JTX 041 at DRL0013528) (emphasis added).

While it is undisputed that Ambien® was indicated for MOTN insomnia, Ambien®'s label instructed patients to take Ambien® at bedtime, therefore treating MOTN insomnia through prophylactic dosing. Specifically, Ambien®'s label stated: "Do not take Ambien unless you are able to get a full night's sleep before you must be active again." (JTX 029 at 3195). Further, the Ambien® label explains "Daytime drowsiness is best avoided by taking the lowest dose possible that will still help you sleep at night. Your doctor will work with you to find the dose of Ambien that is best for you." To Dr. Winkelman, this established the two main goals of a sleep aid:

effective to help the sleep problem but avoid residual sedative effects. (Tr. 7.164:3-24 (Winkelman) *quoting* JTX 041). Dr. Winkelman's assessment is both reasonable and credible to this Court.

As a general premise, Ambien® and the patents-in-suit, collectively, differ in three overarching ways. It is no surprise that these three differences are also the limitations Plaintiffs argue are either absent from the prior art or were taught away from by the prior art. First, Ambien® is an oral swallow tablet while the asserted claims of the patents-in-suit each provide delivery of zolpidem across the patient's oral mucosa. (*See* '131 Patent, JTX 001 at Claims 10 and 19; '809 Patent, JTX 002 at Claims 1, 11, and 12; '628 Patent, JTX 003 at Claim 1). Next, Ambien® is available in higher doses of 10 mg (for non-elderly) and 5 mg (for elderly) while the patents-in-suit disclose either the range of dose being 0.5mg to 5.0 mg of zolpidem, (*See* '131 Patent, JTX 001 at Claims 1 and 12; '809 Patent, JTX 002 at Claims 1 and 12; '628 Patent, JTX 003 at Claims 16 and 17), or 3.5 mg (for non-elderly) and 1.75 mg (for elderly). (*See* '131 Patent, JTX 001 at Claims 8 and 18; '809 Patent, JTX 002 at Claims 17 and 18). Finally, Ambien® is indicated for prophylactic administration while the '131 patent is a method to be used at the time of need, not prophylactically administering zolpidem. (*See* JTX001 at Claims 1 and 12). The Court now turns to a determination of whether it was obvious to treat MOTN insomnia by delivering zolpidem transmucosally, in low doses, and non-prophylactically. Based on the totality of the evidence presented, the Court is of the abiding conviction that in light of the prior art, these differences between Ambien® and the patents-in-suit were obvious to a POSA.

## b. Prior Art Relevant to Transmucosal Delivery: *Tauber* and *Pinney*

Formulation for transmucosal delivery dates back to the 1902 treatment of angina. (Tr. 6.83:14-23 (Michniak-Kohn)). To formulate drugs for delivery across the oral mucosa, a POSA

would predict how much drug is available in its un-ionized form for a particular pH because "it is the un-ionized … that will actually cross membranes." (Tr. 6.84:12-15 (Michniak-Kohn)). In 1917, the Henderson-Hasselbach equation was established to aid in this function. Dr Michniak-Kohn described the Henderson-Hasselbach equation as "Chemistry 101," alerting the Court it was well within the knowledge of a POSA. (Tr. 6.84:22-25 (Michniak-Kohn)). This equation was used to provide a known pH range for un-ionized zolpidem based on a known p/k/a. (Tr. 6.161:2-10 (Michniak-Kohn)). Thus, the Court is convinced that once a POSA had the p/k/a, they could then conclude that most of the zolpidem will be unionized at pHs about above 7.8. (Id.).

In the same vein, the Court is also convinced that the efficiency of absorption of drugs in the oral cavity was explained by the prior art *Beckett* (1967), which disclosed raising the pH to promote absorption. (Tr. 6.85:8-20 (Michniak-Kohn)). Furthermore, the Parties do not dispute that sublingual tablets in general, were established well before 2003. (Tr. 6.73:22-24 (Michniak-Kohn)). However, the first disclosure of transmucosal delivery *in relation to the treatment of insomnia*, came in 1984. The 1984 *Tauber* study ("Plasma Levels of Lormetazepam After Sublingual and Oral Administration of 1 mg to Humans") measured plasma levels after oral administration of sublingual 1 mg lormetazepam ("sleeping wafer"). The results showed, on average, an earlier rise in the lormetazepam levels after sublingual administration as compared to oral, specifically, the sublingual dosage produced statistically higher levels between 7.5 and 25 minutes than the oral tablet. Therefore, *Tauber* ultimately concluded that "[i]t is anticipated that subligual administration of the new formulation will lead to 40-50% reduction of sleep latency." (Id. at 1587, 1591).

These findings aligned with the two requirements— according to *Tauber*—that from a pharmacokinetic point of view, a modern hypnotic should fulfill. These are the following: 1) "the

plasma levels of the active ingredient should increase immediately after administration to guarantee that the patient will fall asleep;" and 2) "after induction of sleep the plasma level of pharmacologically active substances should decay rapidly in order to reduce the possibility of hangover effects, drug accumulation and possible late interactions, e.g. with alcohol." (DTX 066 at 1587-1588). From a practical standpoint, *Tauber* described the clinical advantages of sublingual administration of hypnotics including: 1) convenient administration as "no glass of water is necessary;" 2) easy dissolution without leaving behind excess undissolved material; 3) rapid absorption through the oral mucosa, (avoiding the first-pass metabolism in the liver) resulting in "prompt onset." (Id. at 1596). These advantages to transmucosal delivery in the hypnotics context, continue to date. (*See also Zhang* (2002), JTX 038: "Oral transmucosal technology offers an alternative means for administering drugs. It allows more rapid absorption into the bloodstream than is possible with oral administration to the gastrointestinal tract. Oral transmucosal administration is noninvasive, nontechnical, and convenient for patients;" *see also* Tr. 9.70:11-21: (Moline), Agreeing with the conclusions of *Zhang*.)).

The prior art *Pinney* is a patent application dated November 29, 2001. The invention disclosed in *Pinney*, "Chewing Gums, Lozenges, Candies, Tablets, Liquids, and Sprays for Efficient Delivery of Medications and Dietary Supplements," is summarized as the following:

> A transmucosal delivery system according to the invention comprises a carrier suitable for oral administration. A buffer is dispersed within the carrier, and there is sufficient buffer to achieve a predetermined pH within the oral cavity of a user. An active ingredient is dispersed within the carrier, at least a portion of the active ingredient being unionized at the predetermined pH for transmucosal absorption within the oral cavity.

(DTX 062 at 4). *Pinney* confirms one advantage in *Tauber*, namely, that this system avoids the "first pass effect" through the liver of swallowed tablets which can lead to only a small fraction of

the amount of the active ingredient entering the bloodstream. (Id. at 1-2). Put differently, a higher bioavailability of active ingredients may be achieved by transmucosal delivery than by oral ingestion. (*See* Tr. 6.136:17-22 (Michniak-Kohn) Explaining that *Pinney* says you have to take into account the drug's bioavailability).

*Pinney* then goes on to describe ideal characteristics of active ingredients (acidic) and buffers (suggesting citric acid) but warns that "under pH conditions in the mouth (pH 6.0 to pH 7.0), many of the useful compounds would be highly ionized and would not be efficiently absorbed into the bloodstream by that transmucosal route." (Id. at 4, 6). *Pinney* denotes a pH of 7-10 in mouth conditions for "efficient absorption of most active ingredients." (Id. at 7). Specifically relevant, *Pinney* explains that "tablets" as in the patents-in-suit, are dosage delivery systems for medicants that are placed in the mouth or under the tongue for rapid dissolution of active ingredients and absorption through epithelial, where the "dissolution times" should be "preferably in the range of 5-15 minutes." (Id. at 8, 11). While *Pinney* lists zolpidem as a medicant suitable to transmucosal delivery, it does not specifically disclose how to formulate zolpidem nor is it targeted towards a method for treating insomnia. (Id. at 13).

### c. Prior Art Relevant to Low Doses

At the time of the inventions, the lowest recommended dose of Ambien® and therefore zolpidem, was 10 mg for non-elderly adults, and 5 mg for elderly adults. Ambien® undoubtedly taught a POSA that the elderly should receive half the dose of zolpidem than a non-elderly patient. (*See also* Tr. 7.186:12-14: "[I]n the elderly, we need to lower the dose;" *citing Olubodun* (2003), JTX 026). However, these doses was for a full night's sleep (not half a night's sleep), taken at bedtime. At bedtime a person's drive to sleep is at its peak, as opposed to the middle of the night, after some sleep has occurred. This distinction results from the interaction of two biological

processes, the circadian drive and homeostatic sleep drive.[12]  The *Borbély* model ("Figure 4"), published in *Borbély et al.,* "A two Process Model of Sleep Regulation," describes this interaction and its effect on a person's *overall* propensity to sleep.  (DTX 211 at Fig. 4) (emphasis added).  According to the *Borbély* model a person's drive for sleep—taking into account the homeostatic sleep drive and the circadian drive—is much greater at bedtime than in the middle of the night and therefore, it may be more difficult for a person to return to sleep.

As Ambien® was only prescribed for prophylactic dosing, one prior art reference suggested a way to combat MOTN insomnia even when one's sleep drive is lower.  That is, Jacob Teitelbaum, M.D., published the book "From Fatigued To Fantastic," in 2001 which included a chapter where zolpidem was explained as a prescription medication to aid in "A Good Night's Sleep."  (JTX 33 at 105, 115).  *Teitelbaum* explained:

> I like Ambien [Zolpidem] because it is short-acting (that is, less likely to leave you hungover)… Because it is short-acting, it may not keep you asleep all the way through the night but will likely give you four to six hours of good, solid sleep as a foundation. The normal dosage is one-half to one 10 milligram tablet, taken at bedtime. If you wake up in the middle of the night you can take an *extra* one-half to one tablet (leave it by your bedside with a glass of water) and any sedation is usually worn off by the time you are ready to wake up in the morning. One-half tablet is usually enough for the middle of the night.

(JTX 33 at 115-116) (emphasis added).  Thus, *Teitelbaum* suggests taking a total of 15 mg of zolpidem, 10 mg at bedtime and 5 mg in the middle of the night.  However, *Teitelbaum*'s further guidance that "[o]ne-half tablet is usually enough for the middle of the night," certainly suggests that 5 mg is effective even when overall propensity to sleep is decreased.  This is not surprising considering that the 1995 reference, *Roth et al.*, found 7.5 mg of zolpidem to be effective to treat

---

[12] Explained in "Background, V.," of this Opinion.

transient insomnia.  (JTX 30).

Transient insomnia is "occasional episodes of acute sleep disturbance."  (JTX 30 at 246). *Roth et al.*, "Zolpidem in the Treatment of Transient Insomnia: A Double-Blind, Randomized Comparison With Placebo," used a testing model known as the "first-night effect" to examine the effects of zolpidem (5, 7.5, 10, 15 and 20 mg) on transient insomnia in a large subject population. The "first-night effect" models transient insomnia in healthy subjects because subjects, on their first night in a sleep laboratory, will sleep less well.  (*See* Tr. 10.96:19-10.97:9 (Czeisler)). Subjects were dosed with zolpidem or placebo at bedtime and then awakened 8 hours later to perform various tests.  *Roth* only conducted statistical analysis of the 7.5 mg and 10 mg doses, but provided the resulting data related to sleep latency inclusive of the 5 mg dose in the table below:

TABLE 2 (JTX 30 AT 248) (OMITTED)

(JTX 30, "Table 2" at 248).  *Roth* concluded that 7.5 mg and 10 mg doses of zolpidem were effective in treatment of transient insomnia.  While *Roth* did not draw any conclusions related to the low 5 mg dose, in 1996, the *Walsh* article analyzed *Roth's* data stating: "Disregarding dose, zolpidem was highly effective in shortening latency to persist sleep and in reducing the number of

nighttime awakenings and time spent awake after sleep onset. These effects were highly significant in the groups that had received 7.5 of 10 mg zolpidem, but not in the 5 mg group (although numerical trends were evident at this dose." (PTX 282 at 130). Dr. Winkelman, however, concluded that the 5 mg dose in *Roth*, if a statistical analysis had been done, it would have been "statistically significant," and therefore, effective. (Tr. 7.221:18-7.222:10 (Winkelman)). Given the *Roth* (*see* "Table 2" above) data shows that 5 mg of zolpidem was shorter by 8 to 9 minutes than placebo in getting people to sleep, the Court agrees. (Tr. 7.220:18-20 (Winkelman)).

While intuitively a POSA may conclude from the *Borbély* model and *Roth* that higher doses may be needed in the middle of the night, this goal of efficacy must always be counterbalanced with the requirement of no residual effects in the morning. (*See* Tr. 7.145:11-19 (Winkelman) Part of being a physician is that with any drug "you always want the lowest effective dose," balancing a dose that is effective but also not giving a dose too high which results in side effects.). With this in mind, the relevant prior art as a whole,[13] including *Roth*, which Plaintiffs opine would lead a POSA away from low doses of zolpidem, was unconvincing to the Court. Thus, the Court finds that a POSA would undoubtedly attempt to find the lowest effective dose of zolpidem to avoid potential residual sedative effectives. Coincidently, the prior art reference *Merlotti*, set out to do just that.

*Merlotti* is titled: "The Dose Effects of Zolpidem on the Sleep of Healthy Normals." (DTX 063). In 1989, *Merlotti* performed a dose-ranging study for zolpidem in non-elderly, healthy

---

[13] A few redundant, unpersuasive, or disconnected references have been omitted from this Section for sake of brevity. The Court however, considered *all* the prior art admitted in evidence and explained by the experts at trial, prior to concluding.

(without insomnia) subjects.  Before bed, subjects received zolpidem (2.5, 5.0, 7.5, 10.0 or 20.0 mg) or placebo.  On the third night of each treatment, subjects always received placebo.  *Merlotti* specifically sets out to address "what is the lowest dose of zolpidem that consistently produces hypnotic activity in normal volunteers?"  (DTX-063 at 1).  The study analyzed two measurements of sleep induction: 1) "wake before sleep," which is minutes of wake before persistent sleep; and 2) "latency to persistent sleep," which is minutes from the beginning of the recording to the start of the first 10 consecutive sleep minutes.  (DTX-063 at 11).

As Dr. Winkelman explained, *Merlotti's* results showed the 5 mg dose of zolpidem was "statistically superior in getting people to sleep than placebo."  (Tr. 7.170:18-21 (Winkelman)). *Merlotti* ultimately concluded that zolpidem is hypnotically active at doses lower than previously tested including the 5.0 mg dose.  (*In contrast see Vogel* (1988): "[F]indings indicate that zolpidem was an efficacious hypnotic in the treatment of transient insomnia. Efficacy, defined as significant difference from placebo, usually occurred at doses of 7.5 mg and above. The drug improved both sleep latency and sleep maintenance. Its effect on sleep maintenance occurred only during the first 4 hours of bedtime."  (JTX 036 at 67)).

Although the *Merlotti* study was done at bedtime, when sleep drive is at its highest, the prior art reference *Kim* tackled the issue of whether doses of hypnotics are hindered by less sleep drive. The *Kim* reference is titled: "Dose and Time Dependent Discrimination of Daytime Sleepiness Measured by Multiple Sleep Latency Test (MSLT), Psychomotor Performances Tests (PPT), and Stanford Sleepiness Scale (SSS) after a Single AM Administration of a Sedative Hypnotic Drug."  (DTX 197).   *Kim* explained that MSLT, PPT, and SSS index physiological, manifest, and introspective factors of sleepiness, but assessing these tests at peak drug effect after nighttime administration is confounded by the subjects' natural circadian drowsiness.  Thus, in the

*Kim* study, MSLT, PPT, and SSS tests were performed to understand the dose and time dependent influence of zolpidem after AM administration in well-rested healthy volunteers. Zolpidem was administered in either a 5 mg or 10 mg doses (some received placebo) in the morning. The results showed that a significant decrease in sleep latency on the first four tests was found with zolpidem at both doses, so even the 5 mg dose of zolpidem was able to get subjects to sleep in statistically significantly shorter time than placebo. From these findings, the authors concluded: "In well-rested healthy volunteers, AM administration of zolpidem produced sedation as demonstrated by changes in physiological, manifest, and introspective measures of daytime sleepiness." (Id. at JNTDEF0006712).

Finally, because the patents-in-suit all differ from the aforementioned method of administration—*Teitelbaum, Roth* and *Merlotti* all observed zolpidem in its oral (swallow) form of administration—it is important to determine if a prior art reference would lead a POSA to understand an effective dose of systemic administration, specifically transmucosal administration. Defendants argue that this alternative route would be noted by a POSA to achieve the most rapid onset possible in the middle of the night and also avoiding residual sedative effects. Defendants assert that the change in administration can be reconciled by the prior art, *Patat*. (See Tr. 7.204:2-8 (Winkelman): Based on *Patat*, "[i]f you give systematic administration of zolpidem, you are going to get a more rapid appearance of indicators of sleep," as subligual is also one kind of systemic delivery). The *Patat* reference studied pharmacodynamics and pharmacokinetics of zolpidem after daytime administration both orally (swallow) and intravenous (IV). While *Patat* did not study transmucosal delivery, it did measure IV which is also systemic. Specifically, the *Patat* reference measured EEG (electroencephalogram) brain waves and results using the Stanford sleepiness scale (SSS). Appropriately, this 1993 prior art was titled "EEG profile of intravenous

zolpidem in healthy volunteers." (JTX 028).

As the method employed, subjects were given zolpidem in the morning (5 mg, 10 mg, or 20 mg) either by mouth to swallow (yielding 70% bioavailability) or intravenously (yielding 100% bioavailability) and required to stay awake throughout the study. *Patat* explained, "delta activity appeared rapidly 10 minutes after IV administration of zolpidem and between 20 and 45 minutes after oral administration of zolpidem." Delta waves are the slow waves that are present at the deepest stage of sleep (or delta activity). (Tr. 7.202:24-7.203:3 (Winkelman)). Thus, their slowing of the EEG showed significant sleepiness more quickly through IV administration. Additionally, the results of the SSS (describing how sleepy a person feels) show that at four hours after administration, the 5 mg dosage was no different from placebo indicating no expectation of residual sedative effects. In sum, the authors concluded that "EEG changes and scores of SSS were in good correlation with what has been observed with insomniac patients. Zolpidem has a rapid onset and a short duration of action, whatever the route and the dose." (Id. at JNTDEF0004144).

### d. Prior Art Relevant to Non-Prophylactic Dosing

As previously stated, Ambien® was indicated for prophylactic administration. Prophylactical administration in this context refers to taking Ambien® every single night at bedtime "whether or not you are going to have insomnia that night." (Tr. 10.180:1-10 (Kryger)). Alternatively, non-prophylactic administration is pro re nata or "as-needed" dosing. (Tr. 10.180:11-19 (Kryger)). Prior to the filing of the patents-in-suit, the prevailing approach for treating insomnia was prophylactic administration. (*See e.g. Teitelbaum*, JTX 033 at 115-116: "normal dosage is one-half to one 10 milligram tablet, *taken at bedtime*." (emphasis added)). Further, even though Ambien® was indicated for treatment of MOTN insomnia, it only instructed

use at bedtime, not in the middle of the night.   However, the disadvantages of prophylactic treatment and the need for flexibility in treating MOTN insomnia were well established in the prior art literature (*see below: Doghramji, Danjou, Hindmarch*) and clearly within the knowledge of a POSA.  (*See e.g.* (Tr. 7.143:7-12 (Winkelman): "[F]or people who only wake up in the middle of the night sometimes, you're giving them medication when they don't need it, because how can you predict when you're going to wake up in the middle of the night.").  But it remained clear that "as-needed" administration was in constant tension with lingering residual sedative effects.

### i. *Danjou* Reference

In 1999, *Danjou* purported to compare the duration of residual hypnotic and sedative effects of zaleplon with those of zolpidem (and placebo) following nocturnal administration at various times before morning awakening.  The study used a 10 mg dose of zaleplon as well as a 10 mg dose of zolpidem, each administered orally (or swallowed).  The subjects were then "gently" woken up—mimicking MOTN insomnia— at various times during the time and residual sedative effects were measured using the psychomotor performance and memory tests: digital symbol substitution test (DSST), critical flicker fusion (CFF) threshold, choice reaction time (CRT), memory test (word list), and Sternberg memory scanning.  The results showed that no residual effects were demonstrated after zaleplon 10mg was administered as little as 2 hours before waking.  Zolpidem 10 mg however, showed significant residual effects on DSST and memory after administration up to 5 hours before waking.   Residual effects were also shown using CFF threshold and Sternberg memory scanning after administration up to 4 hours before waking.  *Danjou* stated that the lack of residual sedative effects for zaleplon results are consistent with its pharmacokinetic profile featuring rapid absorption, distribution and clearance.   Therefore, the

conclusion was that zaleplon at the 10 mg dose (recommended) dose, would "seem to provide physicians with a hypnotic free of residual effects at least in normal volunteers." (JTX 015 at JNTDEF0003922).

### ii. *Hindmarch* Reference

Similar to *Danjou, Hindmarch* was a study in 2001 where the objective was to assess residual effects of zaleplon and zolpidem after a middle of the night administration. Subjects received placebo, 10 mg or 20 mg of zolpidem, or 10 mg or 20 mg of zaleplon. The results showed that zaleplon 10 mg had no or minimal residual effects when administered in the middle of the night as little as one hour before waking. Zolpidem 10 mg produced significant detrimental residual effects in various tests when administered 3-5 hours before waking with the exception of the CFF test. The conclusion hypothesized that the lack of clinically significant residual effects with zaleplon may be explained by its unique pharmacokinetic profile of rapid elimination half-life, "providing some advantages over existing treatments[] for the management of insomnia and sleep disturbance… even when administered in the middle of the night." (PTX 256 at 166).

### iii. *Doghramji* Reference

The 2000 reference *Doghramji* is titled "The Need for Flexibility in Dosing Hypnotic Agents." (JTX 016). This prior art was not a clinical study but rather an article specifically targeting MOTN insomnia. *Doghramji* describes non-prophylactic dosing, stating "[t]he intermittent occurrence of most insomnia suggests that treatment is best accomplished by using hypnotics on an 'as needed' basis." (JTX 016 at JNTDEF0000168). This is because "[e]pidemiologic studies suggest that insomnia does occur on a regular basis in most people." (Id.

at JNTDEF0000168).  Indeed, *Doghramji* touts the various advantages to "as needed dosing" to treat insomnia including: 1) optimal management while using the lowest amount of a drug; 2) providing a patient with a "sense of control" which prevents insomnia from being a "significant problem;" and 3) potentially reducing anticipatory anxiety prior to sleep.  (Id. at JNTDEF0000170) (*See also Scharf* (2001): "hypnotic therapy administered prior to bedtime, as is currently recommended for most compounds, is not appropriate for all insomnia patients" (PTX 477 at 20))

Doghramji* was limited to analyzing three hypnotics for flexible administration: triazolam, zolpidem, and zaleplon.  Triazolam was dismissed from the onset because it is an agent with "drawbacks that are not ideal from treatment of insomnia."  (Id. at JNTDEF0000169).  Ultimately, it was determined that zaleplon is best suited for MOTN administration because of its half-life of one hour (while admitting that zolpidem has a rapid onset and short half-life).  The article focuses on two trials conducted on zaleplon, (including *Danjou*), where a lack of residual sedative effects followed MOTN zaleplon administration.  On the basis of these two tests, *Doghramji* concluded that "zaleplon appears to be suited for flexible use on an as-needed basis."   (JTX 016 at JNTDEF0000171) (*See also Scharf*: "clinical trial data presented suggest zaleplon may represent an important breakthrough…Clinicians are now able to focus on a specific sleep disturbance by prescribing a medication that can be administered on intermittent nights only when symptoms occur—at bedtime or during the night—so long as 4 hours remain prior to a scheduled awakening." (PTX 477 at 23)).

**3. Differences between the Prior Art and Claimed Invention**

While it is clear that the prior art certainly fills in many of the prominent gaps between Ambien® and the patents-in-suit, some differences remain outstanding.  First, while *Pinney* and *Tauber* teach transmucosal delivery of hypnotics, they do not teach how (or if) zolpidem can be

delivered this way.  Next, while the Court is persuaded by clear and convincing evidence that *Merlotti* certainly concludes that lower doses of zolpidem such as 5 mg are effective, but the patents-in-suit specify even lower dose ranges and specific doses for non-elderly (3.5 mg) and elderly (1.75 mg). (*See e.g.* '131 Patent, JTX 001 at Claims 1 and 12; '809 Patent, JTX 002 at Claims 1 and 12; '628 Patent, JTX 003 at Claims 16 and 17).  Finally, while *Doghramji, Danjou,* and *Hindmarch* teach that MOTN insomnia is best treated non-prophylactically, each of these references ultimately concludes that zaleplon—not zolpidem—is best suited for MOTN insomnia. In addition to pointing out these differences, Plaintiffs argue that there was no reasonable expectation of success in either transmucosal delivery of zolpidem, claiming this formulation is "unpredictable," or low effective doses, as a POSA, with knowledge of the *Borbély* model, would have assumed the dose must be increased when sleep drive is lower in the middle of the night. Plaintiffs also assert that claim-by-claim, a few additional elements— relevant to the '809 and '628 patent exclusively — are lacking in the prior art.  The Court addresses each issue in turn.

### a. Transmucosal Delivery of Zolpidem was Obvious to a POSA.

The Court finds that a POSA would have been motivated to achieve the most rapid action possible when formulating a drug to be taken in the middle of the night, as any delay in onset necessarily results in less sleep.  When formulating a hypnotic, *Tauber* clearly explained that rapid onset is one of the main goals, stating, "the plasma levels of the active ingredient should increase immediately after administration to guarantee that the patient will fall asleep." (DTX 066 1587-1588).  *Pinney* taught a POSA that transmucosal delivery would achieve the drug in the bloodstream within minutes of application (yielding high initial plasma levels), rather than approximately 30 minutes with conventional oral (swallow).  (Tr. 6.139:16-20 (Michniak-Kohn)).

Indeed, Dr. Michniak-Kohn agrees that oral (swallow) administration results in the relief of symptoms being "substantially delayed," which would, in this Court's view, alert a POSA that transmucosal is faster. (Tr. 6.137:1-25 (Michniak-Kohn)). This evidence is clear and convincing to the Court.

At trial, Plaintiffs presented examples of different medicants—with the remarkable exclusion of zolpidem—which did not produce initially higher plasma concentrations in the sublingual dosage form. (*See e.g.* Tr. 9.110-9.112 (Drover) "[E]rgoloid mesylate[]… oral formulation generated a higher plasma concentration earlier than the sublingual formulation."). The Court finds this evidence unpersuasive as it fails to draw a parallel to zolpidem even though zolpidem tartrate's pharmacodynamics and pharmacokinetics were well understood, published and established by 2003. (Tr. 6.94:16-21 (Michniak-Kohn)). What is, however, most persuasive to the Court were the properties of zolpidem, as explained by Dr. Michniak-Kohn, that would indicate to a POSA that it can be delivered transmucosally. These include: 1)logP; 2) p/k/a; 3) solubility; and molecular weight. (Tr. 6.155:14-6.158:4 (Michniak-Kohn)).

The LogP, at 2.42, tells a POSA that zolpidem is lipophilic which means it passes more easily through membranes. (Tr. 6.156:9-23 (Michniak-Kohn)). P/k/a values of zolpidem were 6.9 and 6.16 which, when plugged into the Henderson-Hasselbach equation, calculate a value that predicts how much drug is available in its un-ionized form for a particular pH to cross membranes. (Tr. 6.157:1-23, 6.84:12-15 (Michniak-Kohn)). Zolpidem's molecular weight is 307.4 grams per mole which is a "suitable size for passing through mucosal membranes." (Tr. 6.158:4-12 (Michniak-Kohn)). Plaintiffs did not rebut this evidence. However, as it pertains to the final property, solubility, Plaintiffs suggest that a POSA would have not had a reasonable expectation of success in dissolving zolpidem tartrate in the mouth, which is required for delivery across the

oral mucosa. Defendants respond by pointing to the Material Safety and Database Sheet (MSDS) which shows that zolpidem solubility is "water solubility 23 mg per ml in water at 20 degrees centigrade." (DTX 302). Furthermore, Dr. Michniak-Kohn explains that there is at least 1 milliliter in the mouth and the mouth is warmer than 20 degrees centigrade so there "wouldn't be a problem to dissolve it." (Tr. 6.150:20-151:11 (Michniak-Kohn)). The Court finds these deductions rational and credible despite Plaintiffs' expert, Dr. Polli's vague criticism that Dr. Michniak-Kohn fails to take into account that zolpidem's solubility is going to be "pH dependent." (Tr. 9.1201:15-19 (Polli)).

In response to Plaintiffs' final objections to a finding that transmucosal delivery of zolpidem was reasonably expected by a POSA to be successful, the Court notes that the Federal Circuit has made clear that "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). For this reason, Dr. Drover's claims that: 1) reformulating zolpidem for sublingual delivery is not obvious because the change in bioavailability is "not easy to predict;" (Tr. 9.137:3-12 (Drover)); and 2) the formulation is not obvious because transmucosal products are "not always successful," (Tr. 9.78:20-25 (Drover), are properly rejected by the Court in light of the aforementioned evidence which the Court finds clear and convincing. (Tr. 9.78:20-25 (Drover).[14] Consequently, the Court holds that a POSA would have a reasonable expectation of success in formulating zolpidem for transmucosal delivery.

---

[14] "Obviousness does not require absolute predictability of success," but rather, requires "a reasonable expectation of success." *See Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed.Cir.2006) (quoting *In re O'Farrell,* 853 F.2d 894, 903–04 (Fed.Cir.1988)).

**b. A POSA would have Anticipated a Reasonable Expectation of Success with Low Doses of Zolpidem Based Upon Predictable Calculations.**

As an initial premise, the Court finds that in light of *Danjou* and *Hindmarch*, a POSA seeking to treat MOTN insomnia non-prophylactically with zolpidem, would have been motivated to lower the 10 mg dose to eliminate the residual sedative effects. (*See e.g.* (Tr. 7.198:1-3 (Winkelman) *Hindmarch* shows that if you want to give a dose in the middle of the night, "10 [mg] is too much…you should lower the dose." (Tr. 7.198:1-3 (Winkelman)). Further, as *Merlotti's* 5 mg dose of zolpidem (or a half dose of Ambien®) was shown to be effective, a POSA would begin their hunt for the lowest effective dose with 5 mg. (*See also* Tr. 7.146:14-15: Referring to Ambien® doses, Dr. Winkelman explained "full night, 10 milligrams. Half night, 5 milligrams. I mean, it is very simple math."). Plaintiffs however, are correct in their contention that there is no *single* prior art reference before the Court teaching a POSA that 3.5 mg and 1.75 mg doses are effective. In this context, the Court must therefore determine if these lower doses were obvious to a POSA. The Court finds that they were.

**i. Lowering the Dose from 5.0mg to 3.5mg and 2.5mg to 1.75mg**

In conjunction with the prior art references *Merlotti* and *Patat,* Defendants cite to a POSA's knowledge of dose optimization of zolpidem tartrate based on zolpidem's known physical and chemical properties, including linear pharmacokinetics and available dose information. (*See e.g.* Tr. at 8.23:5-8.25:10, 8.26:4-7 8.16:12-8.17:1, 8.25:15-8.26:10). In sum, a transmucosal dose of 3.5 mg of zolpidem is appropriately compared to a 5 mg oral dose of zolpidem because the bioavailability of zolpidem is 70%, and 70% of 5 mg is equal to 3.5 mg. (Tr. 6.112:15-6.113:4 (Michniak-Kohn)). Dr. Michniak-Kohn explained that from *Patat*, you would use the 70%

bioavailability figure of zolpidem and multiply it by the 5 mg dose (published in *Merlotti*) and it would yield 3.5 mg of zolpidem for non-elderly and then 70% multiplied by half of the 5 mg dose (2.5 mg) would yield 1.75 mg for elderly. (Tr. 6.129:7-21, 6.130:16-21 (Michniak-Kohn)). Thereafter, she concluded, and this Court agrees, that a POSA would have a "reasonable expectation that th[ese] [calculations] would succeed" in translating the known low dose from oral to transmucosal while maintaining efficacy. (Tr. 6.132:3-8 (Michniak-Kohn)). Indeed, even the inventor of the patents-in-suit referred to this as "*a simple calculation*." (Tr. 5.73:20-5.74:2 (Singh) (emphasis added)).[15]

Plaintiffs, nevertheless, argue that these calculations are misplaced as the bioavailability for sublingual zolpidem is actually around 75%, not 100% as calculated by Dr. Michniak-Kohn and Dr. Winkelman. The Court's conclusion is unfettered by this argument. The proper inquiry before the Court is not whether the calculations are correct, but rather whether they would have been obvious to apply and therefore yield the lowest doses. Dr. Winkelman explained that sublingual doses put the drug on the blood vessels and it gets absorbed right into the bloodstream so "[i]t is not the same as intravenous but it is quite close." (Tr. 7.204:9-12, 7.208:14-17 (Winkelman)). Knowing that intravenous would yield 100% bioavailability, it is credible and reasonable to find that it would be obvious to a POSA to use 100% to yield a predicted dose for sublingual form. Therefore, the Court is convinced that the lower doses of zolpidem are obvious.

[15] The Court notes that in this context, Dr. Singh's statement is taken into consideration to establish that the calculations were well within the knowledge of a POSA. The Court does not refer to Dr. Singh's statement without the proper anti-hindsight perspective.

**ii. Reasonable Expectation of Success**

Plaintiffs argue that a POSA would assume low doses of zolpidem would not be successful in effectively putting one back to sleep in the middle of the night.  Plaintiffs point the Court to *Teitelbaum* and the *Borbély* model for this premise claiming a POSA would expect that a subject would need *more,* not less zolpidem in the middle of the night because their sleep drive is less. Plaintiffs' expert, Dr. Czeisler concludes that a POSA "would have expected to use certainly at least the same dose [of 10 mg or 5 mg zolpidem], if not a higher dose [of zolpidem], in the middle of the night because of the decrease in homeostatic sleep drive and the muting of the circadian system." (Tr. 10.83:10-23 (Czeisler)).  *Teitelbaum* seems to suggest something similar in stating: "the normal dosage is one-half to one 10 milligram tablet, taken at bedtime. If you wake up in the middle of the night you can take an extra one-half to one tablet (leave it by your bedside with a glass of water) and any sedation is usually worn off by the time you are ready to wake up in the morning." (PTX 033).  However, *Teitelbaum* concludes this suggestion with, "one-half tablet is usually enough for the middle of the night." (Id.).  This runs contrary to Dr. Czeisler's suggestion that one would need higher or equal to a 10 mg dose in the MOTN and is plainly stated in the prior art.

Finally, the *Kim* reference tested zolpidem in the morning, when one's sleep drive would be at its very least and concluded that 5 mg zolpidem was able to get patients to sleep statistically significantly shorter than placebo, therefore demonstrating its efficacy regardless of sleep drive. The Court therefore is persuaded by Dr. Winkelman's "common sense" suggestion that if a subject "wanted to sleep for half a night, four hours, [they] would take half of the dose that [they] would for a full night." (Tr. 7.146:10-13 (Winkelman)).  In sum, there is, before this Court, clear and convincing evidence that there was a reasonable expectation of success in treating MOTN

insomnia by taking less amounts of zolpidem in the middle of the night.

### c. *Doghramji, Danjou,* and *Hindmarch* Do Not Teach Away from Zolpidem at the Doses Claimed.

Where, as here, the claim limitations are found in a combination of prior art references, this Court, as the factfinder, must determine "[w]hat the prior art teaches, whether it teaches away from the claimed invention, and whether it motivates a combination of teachings from different references." *In re Fulton,* 391 F.3d 1195, 1199–1200 (Fed.Cir.2004). While the Court is cognizant that as a "useful general rule," references that teach away cannot serve to create a prima facie case of obviousness, a POSA seeking to treat MOTN insomnia by a better means than Ambien® would inevitably use non-prophylactic dosing. *In re Gurley,* 27 F.3d 551, 553, 31 USPQ2d 1130 (Fed.Cir.1994). This is because MOTN insomnia as a "condition wherein a subject, after falling asleep, awakens and has difficulty returning to sleep," is so entangled with treatment "as-needed" as it is impossible to know, *until the middle of the night*, whether the insomnia will occur. (ECF No. 92 at 2). This principle, in and of itself, is convincing to the Court that non-prophylactic administration was obvious. Nevertheless, the Court also concludes that the relevant prior art references do not teach away from zolpidem.

The Court agrees with Defendants that *Doghramji, Danjou,* and *Hindmarch* all promote the benefits of taking a hypnotic agent on an "as needed" basis. The studies in *Danjou* and *Hindmarch* each dosed a subject in the MOTN, representative of non-prophylactic administration at bedtime. Specifically, *Danjou* is directed to "nocturnal administration" and *Hindmarch* to "middle of the night administration." (JTX 015 at 367, PTX 256 at 159). *Hindmarch* also references "[p]atients having sleep maintenance problems or difficulties falling asleep, especially after being awakened during the night." (PTX 256 at 160). Lastly, *Doghramji* explains that

hypnotic agents are typically given "prophylactically prior to going to bed," but now the "availability of a new hypnotic agent with a short half-life" (although, referencing zaleplon) suggests a patient may be able to take the agent during the night. (JTX 016 at JNTDEF0000171-172). However, as Plaintiffs correctly point out, the ultimate conclusion of each of these references was that zaleplon was better suited for MOTN administration due to the lingering residual sedative effects produced with zolpidem.

A reference "teaches away" when it "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165 (Fed.Cir.2006) (quoting *In re Gurley,* 27 F.3d 551, 553 (Fed.Cir.1994)). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley,* 27 F.3d 551, 553 (Fed.Cir.1994). Whether a prior art reference teaches away from the claimed invention is a question of fact. *Para–Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.,* 73 F.3d 1085, 1088 (Fed.Cir.1995).

The Court however, concludes that a POSA would not be deterred from these findings. The key basis for this conclusion is that *Danjou, Doghramji, and Hindmarch,* each tested the higher 10 mg dose of zolpidem for MOTN administration and their findings and subsequent recommendations were based solely on residual sedative effects. Even Plaintiffs' expert admits that a POSA would know that a lower dose of zolpidem would decrease the time that hypnotic effects would occur. (Tr. 10.54:19-24 (Czeisler)). Certainly, a POSA would not disregard the touted benefits of non-prophylactic dosing to achieve their ultimate goal simply because the final conclusion of a reference chooses zaleplon at a dose *more than double* that of the claimed

invention. (*See also* Tr. 6.108:2-9 (Michniak-Kohn) *Doghramji* leads a formulator to "decrease the dose" as they knew they wanted the drug to wear off in four hours.).   Additionally, both Parties' expert agree there are specific disadvantages to zaleplon, and Plaintiffs' experts have failed to offer persuasive evidence that a POSA would consider zaleplon over zolpidem given Ambien®'s success and known efficacy.   (*See* Tr. at 1.161:21-1.162:9 (Kryger), Tr. 7.156:18-157:6 (Winkelman)).   Viewed against the backdrop of the totality of collective teachings of the prior art and the common knowledge of a POSA that reducing the dose would reduce residual sedative effects, *Danjou, Doghramji, and Hindmarch* do not teach away from zolpidem in a manner that would deter a person of ordinary from combining these references with the low doses articulated in *Merlotti.*

### d. Buffer Claims of the '628 and '809 Patents

The Court refers to the "Buffer Claims," in its obviousness analysis with reference to: 1) Claim 1 of the '628 patent's limitation "wherein the buffer raises the pH of saliva to a pH of about 7.8 or greater;" 2) Claim 9 of the '628 patent identifying "the buffer comprises a carbonate buffer and bicarbonate buffer;" and 3) Claim 22 of the '809 patent requiring the composition to contain a "binary buffer system."   Plaintiffs assert that these Claims are not obvious for interrelated reasons.   Plaintiffs oppose a finding that Claim 1 of the '628 patent is obvious because of the requirement that the pH be elevated to above 7.8, which they maintain, was not established by clear and convincing evidence.   With reference to Claim 9, Plaintiffs argue that while *Pinney* identifies 13 individual buffering agents, it fails to disclose or render obvious zolpidem combined with a "carbonate buffer and bicarbonate buffer," as required by the Claim.

Similarly, pursuant to Claim 22 of the '809 patent, the composition must contain a "binary

buffer system that raises the pH of said subject's saliva to a pH greater than about 8.5, irrespective of the starting pH of saliva."   The Court construed a "binary buffer system," in Claim 22 of the '809 patent to mean "a system used to maintain and/or achieve an approximate pH range comprising at least one proton-donating component and at least one proton accepting component." (Opinion, ECF No. 185 at 26).  Plaintiffs purport that is was not obvious to "raise[] the pH of said subject's saliva to a pH greater than about 8.5."  The Court does not agree with Plaintiffs for the following reasons.

Pinney expressly teaches a specific pH range in the mouth—between 7 and 10—for efficient oral administration through the oral mucosa.  (Tr. 6.139:21-6.140:15 (Michniak-Kohn)).  Thus, the pH values of 7.8 and 8.5 are well within Pinney's claimed ranges.  The Federal Circuit has made clear that if the relevant comparison between disputed claim limitations and the prior art pertains to a range of overlapping values, "we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness."  In re Peterson, 315 F.3d 1325, 1329 (Fed.Cir.2003).  This Court follows suit.

Additionally, evidence before the Court established that the carbonate/bicarbonate buffer in Claim 9 of the '628 patent (or binary buffer for purpose of the '809 patent) was a well-known buffer as of 2003 and how to make a buffer to raise the oral cavity to a desired pH when administering a transmucosal drug was well within the knowledge of a POSA would know.  (Tr. 6.144:6-21 (Michniak-Kohn)).  Beckett for example, teaches a binary buffer used to raise the pH (while Beckett uses phosphate buffer, bicarbonates are very common in use).  (Tr. 6.145:14-24 (Michniak-Kohn)).  Pinney also teaches a formulator to use a pH-raising agent in the oral mucosa for transmucosal delivery.  (Tr. 6.133:1-11 (Michniak-Kohn)).   Even the inventor, Dr. Singh, cooreberates that Dr. Michniak-Kohn's understanding was within the knowledge of a POSA.  He

explains that changing the pH by way of a buffer for transmucosal delivery is "basic chemistry." (Tr. 5.64:10-18 (Singh)).   Moreover, the Court declines to ignore the *Pinney* disclosure of this specific buffer among just 13 options.   While the Federal Circuit has predicated a finding of nonobviousness on a sheer number of variable combinations, it did so in the face of a prior art disclosure of a "potentially infinite genus." *In re Baird,* 16 F.3d 380, 382 (Fed.Cir.1994) (quoting *In re Jones,* 958 F.2d 347, 350 (Fed.Cir.1992)). The case at bar does not remotely approach an infinite genus, as it is quantifiable in just 13.   The Court therefore finds the Buffer Claims were obvious in view of the above.

### e. '809 Patent: Outstanding Claim Elements of Claims 1, 12

The composition claimed in the '809 patent must contain, among other things, an effective amount of zolpidem "sufficient to produce a plasma concentration between about 25 ng/mL and about 50 ng/mL within 20 minutes of administration when evaluated in an appropriate patient population." (JTX 002 at Claims 1 and 12).  Plaintiffs argue that Dr. Michniak-Kohn's assertion that the 20-minute plasma concentrations are "inherent" in the doses (3.5 mg and 1.75 mg) is both incorrect and unsupported by data.  Plaintiffs scold Dr. Michniak-Kohn for failing to consider that pharmacokinetic parameters will depend on the specifics of the formulation, not just the dose of the drug. (Tr. 9.140:13-22 (Drover)).  Remarkably, however, Dr. Drover subsequently admits that he is not a formulation expert. (Tr. 9.140:20 (Drover)).

Regardless, a closer look at Dr. Michniak-Kohn's testimony reveals that based upon the linear pharmacokinetics, presented in a demonstrative graph in fact used by Dr. Drover, she opined that a POSA could easily predict offset blood concentrations for sublingual doses because when you "half the dose… that means half the plasma concentration at the same point." (Tr. 6.111:15-

19 (Michniak-Kohn)).  This is contrary to Plaintiffs' blanket assertion that the only evidence before the Court was inherency in the dose.  (*See also* Tr. 6.112:1-7: Predictions of offset blood concentrations can be done with zolpidem because a POSA the pharmacokinetics of zolpidem known by 2003 were "linear enough." (Michniak-Kohn)).    Dr. Michniak-Kohn further points to plasma concentrations for Ambien®, the *Merlotti* reference and *Patat* reference, to explain that a POSA would take into account the dose *as well as the bioavailability data*.  (*See e.g.* Tr. 7:46:1-17 (Michniak-Kohn)).  Specifically, Dr. Michniak-Kohn explains how a POSA would understand that *Patat* reported the blood concentration of 20 nanograms for a male as the onset and offset threshold for sedation of zolpidem (referring to the concentration at which zolpidem begins to start sedating or stop sedating a patient).  (Tr. 6.87:16-20 (Michniak-Kohn).  Indeed, the plain text of *Patat* states:

> [R]eturn to baseline also occurred at concentrations ranging from 20 (5 mg PO or IV) to 75 ng.ml (20 mg PO).  As the EEG effects are very rapid, whatever the dose or the route of administration, it can be suggested that the threshold concentration of zolpidem was already attained.

(JTX 028 at JNTDEF0004150).  Indeed, 20 nanograms, viewed in light of *Patat* as the lowest concentration cited for onset/offset sedation—with a total range of 20-75 ng/ml—the claimed range of between "about 25ng/ml and about 50ng/ml" naturally flows and is disclosed.  *See e.g., In re Woodruff,* 919 F.2d 1575, 1578 (Fed. Cir. 1990) (concluding that a claimed invention was rendered obvious by a prior art reference whose disclosed range ("about 1–5%" carbon monoxide) abutted the claimed range ("more than 5% to about 25%" carbon monoxide)).  This Court therefore finds Dr. Michniak-Kohn's reading of Patat—and determination that it renders this element of Claim 1 obvious—to be both credible and convincing.

It is important to also bolster this finding with a case where the Federal Circuit has even

previously upheld such an "inherent property" on similar facts.  In *Santarus, Inc. v. Par Pharm., Inc.,* 694 F.3d 1344 (Fed. Cir. 2012) the court identified that "an obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations." *Id.* at 1351; *see also In re Kao 639* F.3d 1057, 1070 (Fed. Cir. 2011) ("To hold otherwise would allow any formulation—no matter how obvious—to become patentable merely by testing and claiming an inherent property.").  Distinctly though, neither party disputed that the blood serum concentrations claimed in *Santarus* were expected in light of the dosages disclosed in the prior art.  *Id.*  However, here, the Court finds that in light of the dosages delineated in the '809 patent and *Patat*, the concentrations in the '809 patent are disclosed, if not inherent, and therefore obvious.

### 4. Motivation to Combine

As stated, MOTN insomnia was previously being treated the same way as other types of insomnia, prophylactically.  The uniqueness inherent in MOTN insomnia however, is that a person will not know at bedtime—when prophylactic doing occurs—if they are going to experience it.  Such prophylactic dosing therefore leads to overmedication and drug dependence. (*See e.g.* Tr. 1.52:9-24 (Kryger)).    Thus, the problem in the context of the patents-in-suit, was to develop a method and composition for treating MOTN insomnia exclusively while avoiding the downfalls of prophylactic administration.

The Court finds that a POSA would have been motivated to combine Ambien® with the prior art references to solve this problem.  The record at trial clearly established that a skilled person seeking to formulate a drug to treat MOTN insomnia had 4 well-known goals: 1) administer the drug on an as-needed basis (upon MOTN wakening); 2) employ an active ingredient that was known to deliver rapid onset of action to get one back to sleep as quickly as possible; 3) use the

lowest effective dose; and 4) avoid residual sedative effects upon awakening. (*See e.g.* Tr. at 8.11:6-22; 8.12:4-8.13:7 (Winkelman)).  In order to achieve the aforementioned goals, a POSA, at the time of the invention—armed with the knowledge of the prior art—would use low-dose zolpidem (*Merlotti* and Ambien®) administered in the middle of the night (*See e.g. Danjou* and *Doghramji*) in a formulation that is delivered across the oral mucosa (*Pinney* and *Tauber*).  (Tr. at 8.25:13-8.26:12 (Winkelman)).  This methodology suffices to establish a motivation to combine as such motivation does not have to be explicitly stated in the prior art, and can be supported by testimony of an expert witness regarding knowledge of a POSA at the time of invention.  *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1294 (Fed. Cir. 2006).

However, Plaintiffs' further claim that a POSA would not be motivated to combine low doses of zolpidem with a transmucosal delivery system because zolpidem was already known to have rapid action.  Contrary to this assertion, the record indicates a number of benefits to sublingual administration, particularly in the hypnotics context. To name a few, *Tauber* found a 40-50% decrease in sleep latency and *Pinney* found transmucosal delivery would achieve the drug in the bloodstream within minutes of application, rather than approximately 30 minutes with oral.  (*See also* Tr. 7.142:1 (Winkelman) After middle of the night awakening, the "clock is ticking" to fall back asleep.).  Viewed as a whole, a POSA would have been motivated to make a version of Ambien® that could be used solely for MOTN insomnia.  Organically, the combination of the pertinent prior art references did just that.

**5. Prima Facie Case of Obviousness**

As articulated above, the Court finds that Defendants have presented clear and convincing evidence that the asserted claims of each of the patents-in-suit are obvious and these patents as a

whole are obvious. Giving the elderly half the dose of the non-elderly was taught by Ambien® and substantiated by the knowledge of a POSA. The claims relating to transmucosal delivery are obvious in light of *Pinney, Tauber*, the *Henderson-Hasselbach* equation, and the known (and widely published) properties of zolpidem. Thus, the relevant elements of Claims 10 and 19 of the '131 patent, Claims 1, 11, and 12 of the '809 patent, and Claim 1 of the '628 patent are obvious. The claim ranges and specific low doses of zolpidem are obvious in view of *Merlotti, Patat* and a POSA's knowledge of dose optimization of zolpidem tartrate, (including linear pharmacokinetics and Dr. Michniak-Kohn's and Dr. Winkelman's calculations). Subsequently, these elements of Claims 1, 8 and 18 of the '131 patent, Claims 1, 18 and 17 of the '809 patent, and Claims 16 and 17 of the '628 patent are obvious.

The Court is cognizant that a claimed invention may be obvious even when the prior art does not teach each claim limitation, so long as the record contains some reason that would cause one of skill in the art to modify the prior art to obtain the claimed invention. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 728 (Fed. Cir. 2002). The record has convinced the Court of just that, grounded in the clear goals of targeting the specific insomnia occurring only in the middle of the night. Even so, the remaining elements and claims specific to each patent are also obvious. Non-prophylactic dosing in Claims 1 and 12 of the '131 patent are obvious based upon *Doghramji, Danjou* and *Hindmarch*, as well as the nature of MOTN insomnia. The Buffer Claims, in light of *Pinney* and *Beckett*, render Claim 22 of the '809 patent and Claims 1 and 9 of the '628 patent, invalid as obvious. Finally, the remaining element of Claim 1 of the '809 patent, namely, plasma concentration of 25 ng/ml to 50 ng/ml within 20 minutes, is invalid in light of *Patat*.

**6. Secondary Considerations**

With Defendants having met their burden to establish a *prima facie* case of obviousness, the Court will go on to consider the fourth *Graham* factor: facts regarding objective indicia of nonobviousness.  It is well-settled that "all evidence relevant to obviousness or nonobviousness be considered, and be considered collectively."  *In re Cyclobenzaprine Hydrochloride,* 676 F.3d at 1078.  As they can give "light to the circumstances surrounding the origin of the subject matter sought to be patented," *Graham,* 383 U.S. at 17–18, 86 S.Ct. 684, objective considerations serve as a check against hindsight bias and " 'may often be the most probative and cogent evidence in the record.' "  *In re Cyclobenzaprine Hydrochloride,* 676 F.3d at 1075–76, 1079 (quoting *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed.Cir.1983)).  Indeed, these considerations can have the force of " 'establish[ing] that an invention appearing to have been obvious in light of the prior art was not.' "  *Id.* at 1075–76 (quoting *Stratoflex,* 713 F.2d at 1538–39).  The Court will now consider each of the objective considerations raised by the Parties.

**a. Licensing, Industry Aquiescence, Commercial Success**

Plaintiffs rely on the license deal between Purdue and Transcept as well as other licensing "offers" and "interest" to support a finding of nonobviousness.  (PFOF ¶¶ 650-655).  Primarily, the Court notes that in accordance with *In re GPAC Inc.,* 57 F.3d 1573 (Fed.Cir.1995), licenses "may constitute evidence of nonobviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate a nexus between the merits of the invention and the licenses of record." *Id.* at 1580 (internal quotations and citations omitted).  Plaintiffs have failed to convince the Court of such nexus.  Moreover, whatever little significance the licenses may have is clearly outweighed by the strong evidence of obviousness found in the prior art. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,* 229 F.3d 1120, 1131 (Fed.Cir.2000).

When further viewed in conjunction with Intermezzo®'s lack of industry praise and lack of commercial success, the Court is not inclined to give one licensing deal much weight. Indeed, "'the mere existence of ... licenses is insufficient to overcome the conclusion of obviousness' when there is a strong prima facie case of obviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1324 (Fed.Cir.2004) (citing *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,* 225 F.3d 1349, 1358 (Fed.Cir.2000). Actual sales for Intermezzo® are under $10 million while the market projections suggested sales of Intermezzo® in 2015 of $495 million. (Tr. 2 .113:2-3 (Oclassen), 9.15:10-23 (Kraft)). This striking disparity is significant as the Federal Circuit has noted that commercial success " 'is usually shown by significant sales in a relevant market.' " *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,* 106 F.3d 1563, 1571 (Fed.Cir.1997). Needless to say, Intermezzo® is far from reaching a significant sales mark. Plaintiffs have also failed to point to credible evidence of industry praise, reassuring the Court that this factor, as a whole, weighs in favor of obviousness.

**b. Long-Felt Need and Failure of Others**

"Long-felt need is closely related to the failure of others. Evidence is particularly probative of obviousness when it demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1082 -1083 (Fed. Cir. 2012). Failure of others "to find a solution to the problem which the patent[ ] in question purport[s] to solve" is evidence of nonobviousness. *Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578 (Fed.Cir.1991) (internal quotation marks and citation omitted). The problem the patents-in-suit sought to solve is a targeted treatment for MOTN insomnia only, where treatment can be taken "as needed." At the outset, the Court notes that Plaintiffs have provided no evidence of failure of

others to solve this problem and therefore rely solely on their theory there was a long-felt and unmet need for treating MOTN insomnia.

Prior to the filing of the patents-in-suit, Ambien® was used to treat MOTN insomnia prophylactically. The Court admittedly observed a number of downsides to prophylactic treatment at trial, including overmedication. (Tr. 1.52:9-24 (Kryger)). Furthermore, the prior art references such as *Doghramji* (and *Scharf*), clearly articulated a need for flexibility to treat MOTN insomnia on an "as-needed" basis. (*See e.g.* JTX 016). However, while Plaintiffs point the Court to these references, *Doghramji* was published in 2000 and *Scharf* in 2001. This is just four years prior to the filing of the patents-in-suit. Thus, the Court concludes that the intervening time between the prior art's teaching of the "as needed" treatment and the eventual preparation of a successful composition, is hardly "long-felt." (*See Ecolochem, Inc. v. S. Cal. Edison Co.,* The length of the intervening time between the publication dates of the prior art and the claimed invention can also qualify as an objective indicator of nonobviousness. 227 F.3d 1361, 1376–77 (Fed.Cir.2000)).

### c. Skepticism

"General skepticism of those in the art ... is also 'relevant and persuasive' evidence of nonobviousness." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 885 (Fed.Cir.1998) (internal quotations and citation omitted). This is so because "[p]roceeding contrary to the accepted wisdom is ... strong evidence of unobviousness." *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 668 (Fed.Cir.2000) (internal quotation marks and citation omitted). In support of their skepticism argument, Plaintiffs direct the Court to: 1) the prior art which indicated zolpidem for treatment of MOTN insomnia would likely lead to residual sedative effects; (*See e.g. Danjou* JTX 015); and 2) the maker of Ambien®, Sanofi's, licensing discussions with Trancept expressing "very substantial skepticism" according to Mr. Oclassen, Trancept's former CEO. (Tr.

2.69:23-2.70:1 (Oclassen)).   The Court finds neither of these compelling.

As previously articulated, the prior art references indicating that zolpidem would produce residual sedative effects when administered in the middle of the night were only directed at the high doses of 10 mg (for non-elderly) and 5 mg (for elderly).  No reference convinced the Court that zolpidem at lower doses would result in residual sedative effects, or that a POSA would believe so.  Further, Mr. Oclassen's statement of "substantial skepticism" is rebutted by the record. (*See e.g.* Tr. at 2.219:1-14 (Garegnani) Explaining that the technology associated with making Intermezzo® "seemed very straightforward and kind of [] easy...;" Tr. 2.75:17-20 (Oclassen).  For instance, it was known prior to 2004 that avoiding the first-pass effect by going from an oral swallow administration to transmucosal administration would increase bioavailability and allow for lower doses.  (*See Pinney*).   The Court is therefore unconvinced that the literature or testimony predating the filing of the patents-in-suit should be credited for a finding of skepticism.

### 7. Conclusion of Obviousness

For the reasons set forth above, the Court concludes that Defendants have made a *prima facie* showing that the asserted claims of the patents-in-suit would have been obvious in view of the prior art, the clear motivation to combine the references, and a reasonable expectation of success in doing so.  The Court also finds that the Plaintiffs' evidence of secondary considerations is inadequate to raise any doubt as to the obviousness of these claims.  The objective indicia presented really lent more evidence towards obviousness and thus most certainly did not carry sufficient weight to override a determination of obviousness based on primary considerations. Each patent-in-suit, when viewed as a whole, it therefore invalid.

**B. Anticipation**

Defendants argue that Claim 9 of the '628 patent should be invalidated as anticipated by the prior art reference *Pinney*. Claim 9 of the '628 patent recites as follows: "The method of claim 1, wherein the buffer comprises a carbonate buffer and a bicarbonate buffer." (JTX 003, Claim 9). Claim 9 is also dependent on independent Claim 1 which states the following:

> Claim 1: A method for treating insomnia, comprising the steps of: administering a solid pharmaceutical composition comprising zolpidem or a pharmaceutically acceptable salt thereof to a subject prone to insomnia, the pharmaceutical composition further comprising a buffer, wherein the buffer raises the pH of saliva to a pH of about 7.8 or greater, wherein zolpidem is absorbed across a permeable membrane of the subject's oral mucosa, and wherein at least 75% of the solid pharmaceutical composition dissolves within 10 minutes or less within an oral cavity following administration.

(JTX 003, Claim 1). *Pinney* was published in 2001 and is undisputedly prior art to the patents-in-suit. *Pinney* is titled "Chewing gums, lozenges, candies, tablets, liquids, and sprays for efficient delivery of medications and dietary supplements." (DTX 062).

**1. Legal Standard**

Pursuant to 35 U.S.C. §§ 102, a claimed invention is "anticipated," and is therefore not novel if it "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant" or "was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. §§ 102(a)-(b). "A patent is invalid for anticipation if a single prior art reference

discloses each and every limitation of the claimed invention," and "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm.,* 339 F.3d 1373, 1377 (Fed.Cir.2003) (internal citation omitted). In order to demonstrate anticipation, the proponent must show "that the four corners of a single, prior art document describe every element of the claimed invention." *Xerox Corp. v. 3Com Corp.,,* 458 F.3d 1310 1322 (Fed. Cir. 2006)(quoting *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000)). Anticipation is a question of fact, *Sanofi–Synthelabo v. Apotex, Inc.,* 550 F.3d 1075, 1082 (Fed.Cir.2008) (internal citation omitted), that must be established at trial by clear and convincing evidence. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1365 (Fed. Cir. 2001).

### 2. *Pinney* Fails to Anticipate Each and Every Limitation of Independent Claim 1.

Defendants argue that *Pinney* enables the method of treatment claimed in the '628 patent. This is significant because a claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1354 (Fed. Cir. 2003). However, Defendants argument that the *Pinney* reference is anticipatory ignores a few key differences between the '628 patent and *Pinney*. Therefore, the Court concludes that Plaintiffs have demonstrated that the asserted claims survive the validity challenge posed by the *Pinney* reference.

While Plaintiffs concede that some of the elements of the '628 patent are in fact disclosed and therefore anticipated by *Pinney*, Plaintiffs persuasively argue that two elements are missing. First, Plaintiffs claim *Pinney* fails to indicate that that transmucosal absorption of zolpidem is even possible, let alone disclosing how to accomplish this function. Next, Plaintiffs contend that *Pinney*

fails to disclose any relation to "insomnia" and therefore does not disclose "methods of treating insomnia" in a subject "prone to insomnia," but rather, one would need to supplement *Pinney* with another reference, such as the Ambien® label, to arrive at the claimed invention. Because anticipation requires a more stringent finding than obviousness—by limiting the inquiry to one prior art reference—the Court agrees with Plaintiffs on these points in the limited context of anticipation.[16]

Plaintiffs argue that because the pharmacokinetics of transmucosal formulations are unpredictable to a POSA viewing *Pinney,* and therefore it fails anticipate Claim 1 of the '628 patent as it does not teach how zolpidem can be formulated for transmucosal absorption. This Court agrees. It cannot be disputed that zolpidem fails to appear as the forefront of *Pinney*. Zolpidem is merely mentioned in a long list of potential active ingredients for a composition. (DTX 062 at 17). Thus, while true that *Pinney* mentions zolpidem, it does not present any findings or guidance on how or if zolpidem can be absorbed transmucosally.

Dr. Drover explained that bioavailability is key to proper development of this type of transmucosal formulation, although he claims an increase in bioavailability will not always be achieved when switching from an oral swallow tablet to a transmucosal formulation. (Tr. 9.102:5–9.104:6, 9.106:16–9.110:3, 9.122:13–9.123:17 (Drover)). Dr. Michniak-Kohn agrees in part, stating *Pinney* tells a formulator to take into account the drug's bioavailability for transmucosal delivery. (Tr. 6.136:17-22 (Michniak-Kohn)). However, the only known bioavailability of

---

[16] *See e.g. In re Fracalossi,* 681 F.2d 792, 794 (CCPA 1982); Although a claimed invention can be obvious but not anticipated, it "*cannot have been anticipated and not have been obvious.*" (emphasis added).

zolpidem comes from another reference, *Patat*, which is impermissible for a finding of anticipation.

Similarly, Plaintiffs' formulation expert Dr. Polli explained that a POSA would not understand *Pinney* to teach that each of the 160 listed active ingredients can be delivered transmucosally, as acetaminophen, a medicant listed in *Pinney*, is therapeutically effective at a dose of hundreds of milligrams, far too large a dose to be considered a candidate for oral transmucosal delivery.  (DTX 062 at JNTDEF0004166; Tr. 9.193:22–9.194:2 (Polli)).  The Court is constrained to agree based on the legal standard for anticipation.  This is because Defendants' expert, Dr. Michniak-Kohn admits the need for additional information outside of *Pinney* to conclude zolpidem can be formulated for transmucosal delivery as *Pinney* provides "no data about zolpidem." (Tr. 9.198:19 (Polli); *See* Tr. 6.155:14-6.158:4 (Michniak-Kohn: Properties of zolpidem that would indicate to a POSA that it can be delivered transmucosally include: 1) logP; 2) p/k/a; 3) solubility; and molecular weight.).

In the same vein, *Pinney* cautions that "many active ingredients display chemical properties that prevent transmucosal absorption," yet, as Dr. Michniak-Kohn agreed, *Pinney* does not identify which of the actives display such chemical properties.  (DTX 062 at JNTDEF0004155).  The only formulation specifically disclosed in *Pinney* is a chewing gum for delivery of nicotine. (DTX 62 at JNTDEF0004167–69; Polli Tr. 9.195:18–20.)   The Federal Circuit explained in *In re Omeprazole Patent Litigation,* 483 F.3d 1364 (Fed.Cir.2007) that "anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation, [or the reference] cannot inherently anticipate the claims."  483 F.3d 1364, 1378 (Fed.Cir.2007).  This Court therefore agrees with Plaintiffs that transmucosal absorption of

zolpidem is not inherent in *Pinney* for Defendants have failed to convince the Court that this limitation would *necessarily* be recognized.

*Pinney* is also devoid of explicit instructions to treat insomnia. Indeed, during her analysis of obviousness, Dr. Michniak-Kohn admits that when designing the dosage for a formulation of a sedative hypnotic, the general method she would use would begin with reading up on the indication. (Tr. 6.81:6-22 (Michniak-Kohn)). Thus, a formulator would first need to be directed to insomnia literature before *Pinney*, as *Pinney* fails to give a POSA the indication of the '628 patent. With an established need to consult sources other than *Pinney* to find "each and every element as set forth in the claim[s]," no finding of anticipation shall issue. *Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628, 631 (Fed.Cir.1987).

In sum, *Pinney* does not anticipate the '628 patent because the prior art method did not dictate that zolpidem could be absorbed transmucosally nor the indications of insomnia. Here, Plaintiffs are claiming a method that consists of a new way of using a previously known process of delivery. While *Pinney* discloses the transmucosal delivery process, it fails to clearly indicate this process to treat insomnia or for delivery of *zolpidem*. The '628 patent required a POSA to exercise a combining of other prior art references to formulate zolpidem to absorption transmucosally and thus, for anticipation, "will not be denied the merit of patentability." *Quoting Ansonia Brass & Copper Co. v. Elec. Supply Co.,* 144 U.S. 11, 18, 12 S.Ct. 601, 36 L.Ed. 327 (1892).

**C. Indefiniteness**

Defendants claim "without residual sedative effects" is an indefinite claim term, therefore rendering the '131 patent invalid. As previously indicated, each of the claims of the '131 patent

asserted by Plaintiffs contain the limitation "without residual sedative effects," construed by this

Court to mean "with no or minimal subjective feelings of sedation, as evaluated by: (a) testing

acceptably in at least one test exploring psychomotor performance, attention, information

processing, and memory used by those of skill in the art (hereinafter "Part A"); and/or (b)

demonstrating plasma levels of zolpidem, at an appropriate time point, below about 20 ng/ml,"

(hereinafter "Part B").   (Opinion, ECF No. 185 at 5-7).   The '131 patent lists the following

psychomotor performance, attention, information processing, and memory tests (Part A tests):

> a Sleep Latency Test (SLT), a Visual Analog Test (VAT), a Digit
> Symbol Substitution Test (DSST), a Symbol Copying Test (SCT), a
> Critical Flicker Fusion threshold test (CFF), a Simple Reaction time
> test (visual or auditory; SRT), a Choice Reaction Time test (CRT),
> a Word Learning Test (WLT), a Critical Tracking Test (CTT), a
> Divided Attention Test (DAT), a digit or letter cancellation test,
> sleep staging through polysomnographic (PSG) measurements,
> Continuous Performance Task test (CPT), Multiple Sleep Latency
> Test (MSLT), a Rapid Visual Information Processing test (RVIP), a
> mental calculation test, a body sway test, a driving performance test,
> and others.

(JTX 3 at 6:45-60).   According to Defendants, at the zolpidem doses claimed in the '131 patent,

the presence or absence of infringement will depend on which of the various psychomotor

performance, attention, information processing, and memory tests are administered.   Defendants

therefore conclude that because these tests will prove "outcome-determinative" of the infringement

inquiry, the claim term is invalid as indefinite.   This Court is not convinced of same.


**1. Legal Standard**

35 U.S.C. § 112, ¶ 2 requires that the specification of a patent "conclude with one or more

claims particularly pointing out and distinctly claiming the subject matter which the applicant

regards as his invention."   The U.S. Supreme Court has held that courts should hold a claim to be

indefinite and therefore, invalid, "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments*, No. 13-369, 2014 U.S. LEXIS 3818, at *6 (June 2, 2014).

Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1581 (Fed.Cir.1996) ("[T]he primary purpose of the requirement is 'to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights.' ") (quoting *Gen. Elec. Co. v. Wabash Appliance Corp.,* 304 U.S. 364, (1938)). In other words,

> [a] patent holder should know what he owns, and the public should know what he does not. For this reason, the patent laws require inventors to describe their work in "full, clear, concise, and exact terms," 35 U.S.C. § 112, as part of the delicate balance the law attempts to maintain between inventors, who rely on the promise of the law to bring the invention forth, and the public, which should be encouraged to pursue innovations, creations, and new ideas beyond the inventor's exclusive rights.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 731, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).

The focus of indefiniteness rests on the meaning that claim terms would have to one of ordinary skill in the art. *Energizer Holdings, Inc. v. Int'l Trade Comm'n,* 435 F.3d 1366, 1370 (Fed.Cir.2006). However, "[e]ven if a claim term's definition can be reduced to words, it is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully

precise claim scope." *Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1251 (Fed.Cir.2008). Claims that are "insolubly ambiguous" are indefinite and therefore invalid. *Id.* at 1250 (quoting *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed.Cir.2005)). An issued patent is presumed valid and, therefore, invalidity must be proven by clear and convincing evidence. 35 U.S.C. § 282; *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1365 (Fed.Cir.2004).

**2. "Without Residual Sedative Effects" is Not Indefinite.**

Defendants present the Court with four somewhat interwoven arguments for indefiniteness. Each argument pertains to the potential for divergent results as to whether or not there are residual sedative effects at 4 hours after dosing. This conclusion, Defendants claim, is "outcome determinative" of the infringement inquiry under *Honeywell v. International Trade Commission,* 341 F.3d 1332 (Fed.Cir.2003) (hereinafter "*Honeywell*") and the claim term must be deemed indefinite. Specifically, Defendants argue: 1) that the Part A and Part B results may conflict; 2) there are "limitless" methods of testing for residual sedative effects under Part A; 3) the *Vermeeren* driving study exemplifies a test where results conflicted depending on the statistical method employed; and 4) the *Danjou* reference evidences divergent results between two Part A tests for the same dose of zolpidem. After Defendants' arguments and their factual underpinnings are analyzed by the Court, a review of the holding in *Honeywell* and its distinguishing facts is appropriate. Ultimately, the Court finds the evidence Defendants cite to for these propositions does not meet the clear and convincing standard.

**a. Part A vs. Part B**

Defendants first argue that the same formulation can test acceptably in a psychomotor performance test (claim construction Part A) and therefore infringe this limitation, while, at the same time, produce a blood plasma concentration (showing the amount of drug in the blood) higher than 20 ng/ml (claim construction Part B), therefore evidencing non-infringement. However, as previously articulated by the Court in its summary judgment Opinion on the same topic, this contradiction simply leads to a finding of infringement of the claim as the Court intentionally construed the claim with use of the conjunctive term "and/*or*," to allow for such. (emphasis added).

In line with this construction, the evidence produced at trial convinced the Court that 20 ng/ml is not a bright line test for residual sedative effects, but rather a safe harbor. Figures 1, 3, and 4 of the '131 patent itself depict the results of a DSST test and zolpidem blood levels following administration of a 3.5 mg dose of zolpidem and show that at four hours the blood level concentration of zolpidem was greater than 20 ng/mL but the results of the DSST test had returned to normal. Dr. Kryger explained that a return to baseline levels of impairment is possible despite an elevated blood level of zolpidem because the amount of impairment will depend on the level of zolpidem in the brain, *not in the blood*, due to the "blood-brain barrier." (emphasis added) (Tr. 1.227:3–1.229:22 (Kryger)). Indeed, Figure 4 of the patent shows that the change in DSST score had returned to baseline at four hours even though zolpidem blood levels remained above 20 ng/mL, therefore demonstrating that impairment will disappear even though zolpidem may remain in the blood. With this in mind, Defendants' indefiniteness argument must be confined to only Part A; psychomotor performance, attention, information processing, and memory tests.

### b. Part A Does Not Delineate Limitless Methods

The '131 patent lists many psychomotor performance, attention, information processing, and memory tests and concludes by stating "and others."  Defendants take issue with this phrase, claiming it establishes that there are "limitless" tests for infringement and thus, the term must be rendered invalid as indefinite.  (Defs.' Proposed Findings of Fact ("DFOF") ¶ 478).  Defendants cite to Dr. Winkelman's testimony specifying other "Part A" tests such as the Stanford Sleepiness Scale (as used in the *Patat* reference) and the Go/No Go Test. (Tr. at 7.97:1-17 (Winkelman); JTX 028 at 139).  However, having a wide number of tests is not the standard to render a claim indefinite as "[b]readth is not indefiniteness." *In re Gardner,* 57 427 F.2d 786, 788 (1970).  In any event, Defendants have not offered evidence that either of these tests, the Stanford Sleepiness Scale nor the Go/No Go Test, would produce divergent results from any of the other aforementioned tests. For this reason, Defendants' argument fails.

However, the crux of Defendants' position for indefiniteness rests on the notion that because "testing acceptably in at least one" of the Part A tests is sufficient to demonstrate that the patient will awaken at four hours after dosing "without residual sedative effects," a zolpidem composition may still infringe this limitation, despite failing one or more of the Part A tests, so long as the "possibility" exists of passing "at least one test" among the limitless set of Part A tests for residual sedative effects.  (DFOF ¶ 479).   In support, Defendants point the Court to the *Vermeeren* driving study and the *Danjou* reference at trial, claiming that in each of these, the tests exploring psychomotor performance, attention, information processing, and memory used by those of skill in the art, produced divergent results. While the Court finds the evidence at trial failed to demonstrate this proposition by clear and convincing evidence, the Court takes each of the references in turn.

#### c. *Vermeeren* Driving Study

As previously explained, a study called *Vermeeren* was conducted on Intermezzo® which, after MOTN administration, analyzed the driving performance of subjects to gage residual sedative effects that occurred the morning after. (PTX 252). It is undisputed that this type of driving study is one of the Part A tests used to measure residual sedative effects as set forth in the '131 patent itself. At trial, Plaintiffs presented the *Vermeeren* study to show that 4 hours after dosing, subjects were free from residual sedative effects. On the other hand, Defendants contend that the driving study in fact produced divergent results, evidencing the indefiniteness of the claim term "without residual sedative effects." More specifically, Defendants, through their expert Dr. Winkelman, purported that *Vermeeren* demonstrates both the existence and the absence of residual sedative effects, depending on the statistical measurement employed.

The two standards of measurement at issue are as follows: 1) determining whether the standard deviation of lateral position ("SDLP") (i.e. weaving) was statistically significantly different from placebo (i.e. there were residual sedative effects); and 2) driving impairment based on a McNemar symmetry analysis. Both Parties agree that the McNemar symmetry analysis conducted in the driving study demonstrates a lack of residual sedative effects. This means that the claim limitation "without residual sedative effects" is met, or, alternatively, would be infringed. However, Defendants argue that the SDLP data of the same study *does* show residual sedative effects, and therefore there are divergent results. Upon thorough review of *Vermeeren* as well as the testimony of Plaintiffs' relevant expert Dr. Kryger and Defendants' relevant expert Dr. Winkelman, the Court cannot agree with Defendants.

*Vermeeren* states the following:

> Results showed that when ZST (Intermezzo) was taken 4 h before driving, there was no statistically significant difference in the

> proportions of impaired and improved drivers. The mean SDLP at that time was significantly higher than PBO, but the overall increase was small (0.83 cm), and the 95% CI was well below the 2.5 cm threshold for impairment (95% CI, 0.1-1.15cm) … Overall, the data support that driving at least 4 h after taking ZST 3.5 mg, consistent with labeling instructions, does not negatively affect driving performance.

(PTX 252 at 494). To rebut the clear finding of *Vermeeren* that there were no residual sedative effects 4 hours after dosing, Defendants presented the testimony of Dr. Winkleman who explained the McNemar symmetry analysis is not the accepted standard in the industry and the SDLP measurement raw data showed statistically significant difference between Intermezzo and placebo at 4 hours. (*See e.g.* Tr. 7.115:18-22 (Winkelman)). Dr. Winkelman therefore concluded that *Vermeeren* showed Intermezzo® did not test acceptably in SDLP. (Tr. 7.109:1-7 (Winkelman)). However, the conclusion of *Vermeeren* found the opposite. *Vermeeren* used the mean SDLP data by applying a threshold of impairment of 2.5 cm (described as the standard in the art) and found no impairment. According to Dr. Kryger, *Vermeeren*'s conclusions are correct because the raw SDLP data is not determinative of clinically meaningful *impairment* in the patient population. The Court finds no reason not to analogize "impairment" with "residual sedative effects" in the driving study. All in all, Defendants' proposed discrepancy is not an inherent measurability problem, but rather a dispute between experts as to whether the measurements of *Vermeeren* were correctly performed, which certainly does not amount to indefiniteness.

### d. *Danjou* Reference

At trial, Defendants used the *Danjou* reference in an attempt to illustrate the point that depending on the chosen Part A test, the same dosage amount will result in two divergent results. To Defendants, these contrary results, if true, indicated the presence of residual sedative effects

(non-infringing) while also indicating an absence of residual sedative effects (infringing). Specifically, in *Danjou*, 10 mg oral zolpidem "tested acceptably" in the DSST test four hours after administration, but the same dosage amount did not "test acceptably" in the Critical Flicker Fusion and the Choice Reaction Tests.  (JTX 015 at Figs. 1, 2, 3).  At the summary judgment stage, this Court previously dismissed the use of *Danjou* as demonstrating outcome-determinative results because *Danjou* did not test residual sedative effects for the low doses of zolpidem at issue (3.5 mg and 1.75 mg), but rather 10 mg dose.  Because Defendants have failed to link the data in *Danjou* to the low doses of the '131 patent, the Court, again, rejects Defendants' argument as unpersuasive. The claim limitation "without residual sedative effects" of the '131 patent is not invalid for indefiniteness as Defendants have failed to meet their burden of proving invalidity, in this regard, by clear and convincing evidence.


### e. *Honeywell v. International Trade Commission*

The Court distinguishes *Honeywell* for purposes of completeness.  *Honeywell* involved a patent disclosing "a process for production of a particular multifilament polyester product called polyethylene terephthalate ("PET") yarn" used as a reinforcement for automobile tires.  341 F.3d at 1334.  All claims in the patent at issue in that case "require[d] that the yarn produced by the claimed process fall within a specified . . . [melting point elevation] at some point during the process." *Id.* at 1335.  The dispute in the case "focused on the method of measuring one claimed feature—the melting point elevation ("MPE")." *Id.*  Although there were four methods for preparing PET yarn that were well known to persons of ordinary skill in the art, "neither the claims, the written description [of the patent at issue], nor the prosecution history reference[d] any of the four sample preparation methods that can be used to measure the MPE." *Id.* at 1339.  In *Honeywell*,

the court noted that depending upon which method was used, "the calculated MPE for a given sample can vary greatly." *Id.* at 1336. With this in mind, the court held that the claims containing the disputed term "melting point elevation" were "insolubly ambiguous, and hence indefinite" because "the claims, the written description, and the prosecution history fail[ed] to give . . . any guidance as to what one of ordinary skill in the art would interpret the claim to require." *Id.* at 1340.

Contrary to the facts of this case, in *Honeywell* there was evidence that the method of preparation and testing was critical to the measurement, and that only one of the four methods produced a measurement within the claimed range; whereby the court concluded that the claims were "insolubly ambiguous, and hence indefinite." *Id.* at 1340. Here, the only credible and pertinent evidence before the Court showed consistent results. The Court will not appease Defendants and find indefiniteness based on a hypothetical possibility for inconsistent results. Such is far from the clear and convincing standard. As the Federal Circuit has previously held, "there is the potential for inconsistent results even within the same method of measurement, but that surely does not render a claim indefinite." *Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1367 (Fed. Cir. 2014). Finally, in *Honeywell* it was shown that persons in the field of polymer chemistry understood that polymer melting point determinations vary significantly with the method used, rendering the claims "insolubly ambiguous." In contrast, it was not credibly disputed that persons in the field of the '131 patent would fail to understand how to measure residual sedative effects by the Part A tests. *Honeywell* is therefore distinguishable.

## CONCLUSION

After a careful consideration of all the evidence presented at trial and for the reasons stated above, the Court concludes that Defendants have met their burden of proving the '131, '809, and '628 patents are invalid as obvious by clear and convincing evidence. The Court further finds that Defendants have failed to prove that the claim element "without residual sedative effects" of the '131 patent is invalid as indefinite. Defendants have also failed to prove the '628 patent is invalid as anticipated. The Court, however, finds that Plaintiffs have proved by a preponderance of the evidence that the asserted claims of the '131 patent are infringed by all Defendants, but also finds that Plaintiffs have failed to meet their burden of proving infringement of the '628 patent as to Defendants DRL and Actavis only. Novel is found to infringe the '628 patent. As to the '809 patent, Plaintiffs have met their burden of proving infringement as to Defendant, DRL and Defendant, Novel.

This Court's Opinion will be filed under temporary seal. The Opinion will be unsealed on Monday, April 20, 2015 unless an appropriate motion to seal same (pursuant to Local Civil Rule 5.3(c)) is filed by either of the Parties by April 17, 2015.

An appropriate Order accompanies this Opinion. Counsel are hereby directed to submit a proposed form of judgment consistent with this Opinion.

s/ Jose L. Linares
Jose L. Linares
United States District Judge

Date:   March 27, 2015

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PURDUE PHARMACEUTICAL PRODUCTS L.P., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ACTAVIS ELIZABETH LLC, *et al.*,<br><br>Defendants. | Consolidated Civil Action No. 12-cv-05311(JLL)(JAD) |

## FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated in the Court's March 27, 2015 Opinion and Order (D.I. 390, 391), the Court enters judgment as follows:

**IT IS ORDERED AND ADJUDGED** that:

1. Asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131 are invalid for obviousness;

2. Asserted claims 9, 16, and 17 of U.S. Patent No. 7,682,628 are invalid for obviousness;

3. Asserted claims 11, 17, 18, and 22 of U.S. Patent No. 8,252,809 are invalid for obviousness;

4. Asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131 are not invalid for indefiniteness;

- 1 -

5.     Asserted claim 9 of U.S. Patent No. 7,682,628 is not invalid for anticipation;

6.     Defendant Actavis Elizabeth LLC's proposed generic product that is the subject of ANDA No. 204-322 infringes asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131;

7.     Defendant Novel Laboratories, Inc.'s proposed generic product that is the subject of ANDA No. 204-299 infringes asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131;

8.     Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.'s proposed generic product that is the subject of ANDA No. 204-503 infringes asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131;

9.     Pursuant to the November 25, 2014 Stipulation and Order (D.I. 323, ¶ 4), Defendant Par Pharmaceutical, Inc.'s proposed generic product that is the subject of ANDA No. 204-229 infringes asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131;

10.     Pursuant to the December 1, 2014 Stipulation and Order (D.I. 332, ¶ 5), Defendant TWi Pharmaceuticals, Inc.'s proposed generic product that is the subject of ANDA No. 205-061 infringes asserted claims 8, 10, 18, and 19 of U.S. Patent No. 8,242,131;

11.     Defendant Actavis Elizabeth LLC's proposed generic product that is the subject of ANDA No. 204-322 does not infringe asserted claims 16 and 17 of U.S. Patent No. 7,682,628;

- 2 -

12.     Defendant Novel Laboratories, Inc.'s proposed generic product that is the subject of ANDA No. 204-299 infringes asserted claims 9, 16, and 17 of U.S. Patent No. 7,682,628;

13.     Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.'s proposed generic product that is the subject of ANDA No. 204-503 does not infringe asserted claims 16 and 17 of U.S. Patent No. 7,682,628;

14.     Defendant Novel Laboratories, Inc. 's proposed generic product that is the subject of ANDA No. 204-299  infringes asserted claims 11, 17, 18, and 22 of U.S. Patent No. 8,252,809;

15.     Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. 's proposed generic product that is the subject of ANDA No. 204-503 infringes asserted claims 11, 17, and 18 of U.S. Patent No. 8,252,809; and

16.     Pursuant to the November 25, 2014 Stipulation and Order (D.I. 323, ¶ 4), Defendant Par Pharmaceutical, Inc.'s proposed generic product that is the subject of ANDA No. 204-229 infringes asserted claims 11, 17, and 18 of U.S. Patent No. 8,252,809.

**IT IS FURTHER ORDERED AND ADJUDGED** that:

17.     Having found that all asserted claims of U.S. Patent Nos. 8,242,131 and 7,682,628 are invalid for obviousness, that Defendant Actavis Elizabeth LLC does not infringe any asserted claim of U.S. Patent No. 7,682,628, and that pursuant to the August 14, 2014 Consent Decree and Partial Final Judgment (D.I. 218), Plaintiffs and Defendant Actavis Elizabeth LLC have agreed that Defendant Actavis Elizabeth LLC

A000123

does not infringe any claim of U.S. Patent Nos. 8,252,809 and 7,658,945, final judgment is entered against Plaintiffs and in favor of Defendant Actavis Elizabeth LLC;

18. Having found that all asserted claims of U.S. Patent Nos. 8,242,131, 7,682,628, and 8,252,809 are invalid for obviousness, final judgment is entered against Plaintiffs and in favor of Defendant Novel Laboratories, Inc.;

19. Having found that all asserted claims of U.S. Patent Nos. 8,242,131, 7,682,628, and 8,252,809 are invalid for obviousness and that Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. do not infringe any asserted claim of U.S. Patent No. 7,682,628, final judgment is entered against Plaintiffs and in favor of Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.;

20. Having found that all asserted claims of U.S. Patent Nos. 8,242,131 and 8,252,809 are invalid for obviousness, final judgment is entered against Plaintiffs and in favor of Defendant Par Pharmaceutical, Inc.; and

21. Having found that all asserted claims of U.S. Patent No. 8,242,131 are invalid for obviousness, and that pursuant to the July 22, 2014 Consent Decree and Partial Final Judgment (D.I. 204), Plaintiffs and Defendant TWi Pharmaceuticals, Inc. have agreed that TWi Pharmaceuticals, Inc. does not infringe any claim of U.S. Patent Nos. 7,658,945, 7,682,628, and 8,252,809, final judgment is entered against Plaintiffs and in favor of Defendant TWi Pharmaceuticals, Inc. on Count I of Plaintiffs' Complaint and Count III of TWi's Counterclaims.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Court's March 27, 2015 Opinion (D.I. 390) will be unsealed on Monday, April 20, 2015, unless an appropriate motion to seal same pursuant to L. Civ. R. 5.2(c) is filed by any Party by April 17, 2015.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' claims for exceptional case, attorneys' fees and/or costs are expressly preserved and may be presented to the Court upon the conclusion of any appeal, following remand to this Court, or if there is no appeal taken, then 60 days from the entry of Final Judgment in this matter, or upon such schedule as the Court may approve. Defendant Par Pharmaceutical, Inc. (D.I. 323 ¶ 8) and Defendant TWi Pharmaceuticals, Inc. (D.I. 332 ¶ 8) have waived claims for attorneys' fees and costs in this action.

**IT IS FURTHER ORDERED AND ADJUDGED** that this Final Judgment order is final and appealable, as all other claims, counterclaims and defenses have been finally adjudicated.

This ___9___ day of April, 2015

_____

Honorable Jose L. Linares, U.S. District Judge

- 5 -

(12) **United States Patent**     (10) Patent No.: **US 8,242,131 B2**
Singh et al.                      (45) Date of Patent:     **Aug. 14, 2012**

(54) **METHODS OF TREATING MIDDLE-OF-THE-NIGHT INSOMNIA**

(75) Inventors: **Nikhilesh Singh**, Mill Valley, CA (US);
              **Sathasivan Indiran Pather**, Greenbrae, CA (US)

(73) Assignee: **Transcept Pharmaceuticals, Inc.**, Pt. Richmond, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1185 days.

(21) Appl. No.: **11/439,874**

(22) Filed: **May 23, 2006**

(65) **Prior Publication Data**
US 2007/0066643 A1     Mar. 22, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/684,842, filed on May 25, 2005, provisional application No. 60/741,673, filed on Dec. 1, 2005, provisional application No. 60/788,340, filed on Mar. 31, 2006, provisional application No. 60/788,249, filed on Mar. 31, 2006.

(51) **Int. Cl.**
**A61K 31/44** (2006.01)

(52) **U.S. Cl.** ........................ 514/294; 514/923

(58) **Field of Classification Search** ................. 514/294, 514/923
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,382,938 A | 5/1983 | Kaplan et al. |
| 4,405,647 A | 9/1983 | Fisher et al. |
| 4,460,592 A | 7/1984 | Kaplan et al. |
| 4,808,594 A | 2/1989 | George et al. |
| 4,863,737 A | 9/1989 | Stanley et al. |
| 5,178,867 A | 1/1993 | Guittard et al. |
| 5,178,878 A | 1/1993 | Wehling et al. |
| 5,223,264 A | 6/1993 | Wehling et al. |
| 5,284,659 A | 2/1994 | Cherukuri et al. |
| 5,288,497 A | 2/1994 | Stanley et al. |
| 5,288,498 A | 2/1994 | Stanley et al. |
| 5,503,846 A | 4/1996 | Wehling et al. |
| 5,576,014 A | 11/1996 | Mizumoto |
| 5,686,094 A | 11/1997 | Acharya |
| 5,719,197 A | 2/1998 | Kanios et al. |
| 5,785,989 A | 7/1998 | Stanley et al. |
| 5,855,908 A | 1/1999 | Stanley et al. |
| 5,869,082 A | 2/1999 | Dugger, III |
| 5,895,664 A | 4/1999 | Cherukuri et al. |
| 5,955,098 A | 9/1999 | Dugger, III |
| 5,965,162 A | 10/1999 | Fuisz et al. |
| 6,024,981 A | 2/2000 | Khankari et al. |
| 6,110,486 A | 8/2000 | Dugger, III |
| 6,197,334 B1 | 3/2001 | Renda |
| 6,200,604 B1 | 3/2001 | Pather et al. |
| 6,210,699 B1 | 4/2001 | Acharya et al. |
| 6,211,392 B1 | 4/2001 | Fang et al. |
| 6,218,397 B1 | 4/2001 | Chen |
| 6,242,460 B1 | 6/2001 | Ettema et al. |
| 6,264,981 B1 | 7/2001 | Zhang et al. |

| | | | |
|---|---|---|---|
| 6,264,987 B1 | 7/2001 | Wright et al. |
| 6,280,770 B1 | 8/2001 | Pather et al. |
| 6,344,222 B1 | 2/2002 | Cherukuri et al. |
| 6,348,485 B1 | 2/2002 | Ohkawa et al. |
| 6,350,470 B1 | 2/2002 | Pather et al. |
| 6,358,060 B2 | 3/2002 | Pinney et al. |
| 6,368,625 B1 | 4/2002 | Siebert et al. |
| 6,383,471 B1 | 5/2002 | Chen et al. |
| 6,391,335 B1 | 5/2002 | Pather et al. |
| 6,441,018 B2 | 8/2002 | Faraci et al. |
| 6,509,036 B2 | 1/2003 | Pather et al. |
| 6,514,531 B1 | 2/2003 | Alaux et al. |
| 6,569,463 B2 | 5/2003 | Patel et al. |
| 6,576,250 B1 | 6/2003 | Pather et al. |
| 6,586,478 B2 | 7/2003 | Ackman et al. |
| 6,589,556 B2 | 7/2003 | Cherukuri |
| 6,624,162 B2 | 9/2003 | Uchida et al. |
| 6,638,535 B2 | 10/2003 | Lemmens et al. |
| 6,645,528 B1 | 11/2003 | Straub |
| 6,656,492 B2 | 12/2003 | Kajiyama |
| 6,676,931 B2 | 1/2004 | Dugger, III |
| 6,692,771 B2 | 2/2004 | Pather et al. |
| 6,720,001 B2 | 4/2004 | Chen et al. |
| 6,733,781 B2 | 5/2004 | Abu-Izza |
| 6,753,011 B2 | 6/2004 | Faour |
| 6,759,059 B1 | 7/2004 | Pettersson et al. |
| 6,761,901 B1 | 7/2004 | Pettersson et al. |
| 6,893,654 B2 | 5/2005 | Pinney et al. |
| 6,923,988 B2 | 8/2005 | Patel |
| 6,969,508 B2 | 11/2005 | Dugger, III |
| 6,977,070 B2 | 12/2005 | Dugger, III |
| 6,998,110 B2 | 2/2006 | Dugger, III |
| 7,118,765 B2 | 10/2006 | Norman |

(Continued)

FOREIGN PATENT DOCUMENTS

WO     WO 99/16417     4/1999

(Continued)

OTHER PUBLICATIONS

Rouhi et al. The Right Stuff. Chemical Engineering and News. Feb. 2003. pp. 32-35.*
"Ambien® (zolpidem tartrate)" Sanofi-Synthelabo, Inc. ZPSS-5A (Jun. 2002).
Avdeef, A. "Physiochemical Profiling (Solubility, Permeability and Charge State)." Current Topics in Medicinal Chemistry vol. 1 No. 4: 277-351 (2001).
Danjou, P. et al., "A comparison of the residual effects of zaleplon and zolpidem following administration 5 to 2 hours before awakening." Br. J. Clin. Pharmacology 48:367-374 (Jun. 1999).
Doghramji, K. "The Need for Flexibility in Dosing of Hypnotic Agents." Sleep 23 (Supplement 1): S16-S20 (2000).
Fry, J. et al., "Zaleplon improves sleep without producing rebound effects in outpatients with insomnia." International Clinical Pharmacology 15(3): 141-152 (2000).

(Continued)

*Primary Examiner* — Renee Claytor
(74) *Attorney, Agent, or Firm* — O'Melveny & Myers LLP

(57) **ABSTRACT**

The present invention provides compositions and methods for treating middle-of-the-night insomnia without residual sedative effects upon awakening by administering low doses (about 5 mg or less) of zolpidem or a salt thereof.

**25 Claims, 7 Drawing Sheets**



Purdue Pharma et al. v. Actavis Elizabeth et al. C.A. 12-5311 (JLL)(JAD)
**JTX 1**

## US 8,242,131 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,163,705 | B2 | 1/2007 | Johnson et al. |
| 7,658,945 | B2 | 2/2010 | Singh |
| 7,682,628 | B2 | 3/2010 | Singh |
| 2001/0051186 | A1 | 12/2001 | Acharya et al. |
| 2002/0077332 | A1 | 6/2002 | Aronhime |
| 2002/0098264 | A1 | 7/2002 | Cherukuri et al. |
| 2003/0077227 | A1 | 4/2003 | Dugger |
| 2003/0077228 | A1 | 4/2003 | Dugger, III |
| 2003/0077229 | A1 | 4/2003 | Dugger, III |
| 2003/0082107 | A1 | 5/2003 | Dugger, III |
| 2003/0091629 | A1 | 5/2003 | Pather et al. |
| 2003/0095925 | A1 | 5/2003 | Dugger, III |
| 2003/0095926 | A1 | 5/2003 | Dugger, III |
| 2003/0095927 | A1 | 5/2003 | Dugger, III |
| 2003/0124184 | A1 | 7/2003 | Mezaache et al. |
| 2003/0185761 | A1 | 10/2003 | Singh et al. |
| 2003/0185884 | A1 | 10/2003 | Singh et al. |
| 2003/0190286 | A1 | 10/2003 | Dugger et al. |
| 2003/0211047 | A1 | 11/2003 | Dugger, III |
| 2003/0232080 | A1 | 12/2003 | Pather et al. |
| 2004/0062716 | A1 | 4/2004 | Dugger, III |
| 2004/0089890 | A1 | 6/2004 | Sugimoto |
| 2004/0120895 | A1 | 6/2004 | Dugger |
| 2004/0136914 | A1 | 7/2004 | Dugger, III |
| 2004/0136915 | A1 | 7/2004 | Dugger, III |
| 2004/0141923 | A1 | 7/2004 | Dugger et al. |
| 2004/0185097 | A1 | 9/2004 | Kannan et al. |
| 2004/0213855 | A1 | 10/2004 | Pettersson |
| 2004/0258750 | A1 | 12/2004 | Alaux et al. |
| 2004/0265239 | A1 | 12/2004 | Dugger et al. |
| 2004/0265375 | A1 | 12/2004 | Platteeuw et al. |
| 2005/0002867 | A1 | 1/2005 | Dugger et al. |
| 2005/0031677 | A1 | 2/2005 | Pather et al. |
| 2005/0037072 | A1 | 2/2005 | Pather et al. |
| 2005/0038042 | A1 | 2/2005 | Codd et al. |
| 2005/0142197 | A1 | 6/2005 | Moe |
| 2005/0142198 | A1 | 6/2005 | Moe |
| 2005/0147666 | A1 | 7/2005 | Ohta |
| 2005/0164987 | A1 | 7/2005 | Barberich |
| 2005/0226925 | A1 | 10/2005 | Singh |
| 2005/0281752 | A1 | 12/2005 | Dugger, III |
| 2006/0024365 | A1 | 2/2006 | Vaya et al. |
| 2006/0216352 | A1 | 9/2006 | Nystrom et al. |
| 2006/0276501 | A1 | 12/2006 | Singh |
| 2006/0281783 | A1 | 12/2006 | Singh |
| 2007/0037843 | A1 | 2/2007 | Aronhime |
| 2007/0066643 | A1 | 3/2007 | Singh |
| 2007/0123562 | A1 | 5/2007 | Singh |
| 2007/0225322 | A1 | 9/2007 | Singh |
| 2007/0287740 | A1 | 12/2007 | Singh |
| 2008/0008753 | A1 | 1/2008 | Singh et al. |
| 2008/0057119 | A1 | 3/2008 | Singh |
| 2008/0132517 | A1 | 6/2008 | Chow |
| 2008/0132535 | A1 | 6/2008 | Singh |
| 2008/0145425 | A1 | 6/2008 | Marija |
| 2008/0262025 | A1 | 10/2008 | Kumar |
| 2008/0287456 | A1 | 11/2008 | Roberts |
| 2008/0311208 | A1 | 12/2008 | Pettersson |
| 2010/0143486 | A1 | 6/2010 | Davar |
| 2010/0240695 | A1 | 9/2010 | Singh |
| 2010/0249178 | A1 | 9/2010 | Singh |
| 2010/0266682 | A1 | 10/2010 | Davar |
| 2010/0291004 | A1 | 11/2010 | Singh |
| 2011/0039881 | A1 | 2/2011 | Singh |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 99/63977 | 12/1999 |
| WO | WO 00/16750 | 3/2000 |
| WO | WO 00/33835 | 6/2000 |
| WO | WO 00/38649 | 7/2000 |
| WO | WO 01/89476 | 11/2001 |
| WO | WO 2004/091585 | 10/2004 |
| WO | WO 2005/010002 | 2/2005 |
| WO | WO 2005/032519 | 4/2005 |
| WO | WO 2005/079761 | 9/2005 |
| WO | WO 2006/046041 | 5/2006 |

### OTHER PUBLICATIONS

Galey, W. et al., "The In Vitro Permeability of Skin and Buccal Mucosa to Selected Drugs and Tritiated Water." The Journal of Investigative Dermatology vol. 67, No. 6: 713-717 (1976).

Gandhi, R. et al., "Bioadhesion in Drug Delivery." Indian Journal of Pharmaceutical Sciences 50(3): 145-152 (May-Jun. 1988).

Greenblatt, D. et al., "Comparative kinetics and dynamics of zalepon. zolpidem, and placebo." Clinical Pharmacology & Therapeutics vol. 64, No. 5: 553-561 (Nov. 1998).

Greenblatt, D. et al., "Kinetic and dynamic interaction study of zolpidem with ketoconazole, itraconazole, and fluconazole." Clinical Pharmacology & Therapeutics vol. 64, No. 661-671 (Dec. 1998).

Harris, D. et al., "Drug Delivery via the Mucous Membranes of the Oral Cavity." Journal of Pharmaceutical Sciences vol. 81, No. 1: 1-10 (Jan. 1992).

Hindmarch et al., "Comparison of the residual effects of zaleplon and zolpidem after administration during the night." European Neuropsychopharmacology 10(suppl. 3): s394 Abstract No. P.6.026 (Sep. 2000).

Hindmarch et al., "Residual effects of zaleplon and zolpidem following middle of the night administration five hours to one hour before awakening." Human Psychopharmacology 16:159-167 (2001).

Hoehns and Perry. "Zolpidem: A nonbenzodiazepine hypnotic for treatment of insomnia." Clin. Pharmacy 12: 814-28 (Nov. 1993).

Holm, K. et al., "Zolpidem: An update of its Pharmacology, Therapeutic Efficacy and Tolerabilty in the Treatment of Insomnia." Adis Drug Evaluation 59(4): 865-889 (Apr. 2000).

Kansy, M. et al., "Physiochemical High Throughput Screening: Parallel Artificial Membrane Permeation Assay in the Description of Passive Absorption Processes." Journal of Medicinal Chemistry vol. 41, No. 7: 1007-1010 (Mar. 1998).

Lader, M.H. "Implications of hypnotic flexibility on patterns of clinical use." UCP Supplement 116: 14-19 (Jan. 2001).

Merlotti, L. et al. "The Dose Effects of Zolpidem on the Sleep of Healthy Normals." J. Clinical Psychopharmacology 9(1): 9-14 (Feb. 1989).

Nail, S. et al., "Fundamentals of Freeze-Drying." in Development and Manufacture of Protein Pharmaceuticals. Ed. Steven L. Nail and Michael J. Akers, New York: Kluwer Academic/Plenum Publishers 281-360 (2002).

Patat et al., "EEG profile of intravenous zolpidem in healthy volunteers." Psychopharmacology 114:138-146 (1994).

Rathbone, M. et al., "The oral cavity as a site for systemic drug delivery." Advanced Drug Delivery Reviews 13: 1-22 (1994).

Roth et al., "Daytime pharmacodynamic and pharmacokinetic evaluation of low-dose sublingual transmucosal zolpidem hemitartrate." Hum. Psychopharmacol. Clin. Exp. 23: 13-20 (2008).

Roth et al., "Low-Dose Sublingual Zolpidem Tartrate is Associated with Dose-Related Improvement in Sleep Onset and Duration in Insomnia Characterized by Middle-of-the-Night (MOTN) Awakenings." Sleep, 31(9):1277-1284(2008).

Scharf, M.B. "Individualizing therapy for early, middle-of-the-night and late-night insomnia." UCP Supplement 116: 20-24 (Jan. 2001).

Shangoli, G. et al. "NovaDel NDA for Nitroglycerin Lingual Spray Is Accepted For Review by FDA." Khandaker Analytical Review 3(5): 28-30 (2004).

Singh et al., "Transmucosal Zolpidem: Pharmacokinetic and Pharmacodynamic Profile Supports Possible Middle-of-the-Night Dosing." American Psychiatric Association Meeting Abstract; May 20-25, 2006; Toronto Canada.

Squier, C. et al., "Lipid Content and Water Permeability of Skin and Oral Mucosa." The Journal of Investigative Dermatology 96(1):123-126 (1991).

Squier, C. et al., "Structure and Function of the Oral Mucosa and Implications for Drug Delivery." Oral Mucosa Drug Deliver. Ed. Michael J. Rathbone, New York: Marcel Dekker 1-26 (1996).

Tabak, L. et al., "Role of salivary mucins in the protection of the oral cavity." Journal of Oral Pathology 11: 1-17 (1982).

Thapa, P. et al., "Lyophilization of Unit Dose Pharmaceutical Dosage Forms." Drug Development and Industrial Pharmacy vol. 29, No. 5: 595-602 (2003).

TRANSIZ00131402

Werth, E. et al., "Dynamics of the Sleep EEG after an early evening nap: experimental data and simulations." American Physiological Society R501-510 (1996).

Wertz, P.W. et al., "Cellular and Molecular Basis of Barrier Function in Oral Epithelium." Critical Reviews in Therapeutic Drug Carrier Systems 8(3): 237-269 (1991).

Zhang et al. "Oral Mucosal Drug Delivery—Clinical Pharmacokinetics and Therapeutic Applications." Drug Delivery Systems 41(9): 661-80 (2002).

U.S. Appl. No. 11/439,873, Singh et al.

U.S. Appl. No. 11/439,884, Singh et al.

U.S. Appl. No. 11/440,410, Singh et al.

Danjou et al., "A comparison of the residual effects of zaleplon and zolpidem following administration 5 to 2 h before awakening." Br. J. Clin. Pharmacol., 48:367-374 (1999).

Doghramji, "The need for flexibility in dosing of hypnotic agents." Sleep, 23 Suppl. 1:S16-20 (2000).

Greenblatt et al., "Comparative kinetics and dynamics of zaleplon, zolpidem, and placebo." Clin. Pharmacol. Therap., 64:553-561 (1998).

Greenblatt et al., "Kinetic and dynamic interaction study of zolpidem with ketoconazole, itraconazole, and fluconazole." Clin. Pharmacol. Therap., 64:661-671 (1998).

Hindmarch et al., "Residual effects of zaleplon and zolpidem following middle of the night administration five hours to one hour before awakening." Hum. Psychopharmacol., 16:159-167 (2001).

Lader, "Implications of hypnotic flexibility on patterns of clinical use." Int. J. Clin. Pract. Suppl., 116:14-19 (2001).

Merlotti et al., "The dose effects of zolpidem on the sleep of healthy normals." J. Clin. Psychopharmacol., 9:9-14 (1989).

Roth et al., "Transmucosal zolpidem (TMZ): pharmacokinetic (PK) and pharmacodynamic (PD) profile supports possible middle-of-the-night dosing." Amer. Psych. Assoc. Meeting Abstract; May 20-25, 2006; Toronto, Canada.

Khandakar Analytical Review, "NovaDel NDA for Nitroglycerin Lingual Spray is Accepted for Review by FDA", vol. 3, Issue 5, Aug. 2004, pp. 27-30.

Ambien® Package Insert, Sanfoi-Aventis, Bridgewater, NJ (Jun. 2008).

Borbely, A. et al., "Sleep Homeostasis and Models of Sleep Regulation." Principles and Practice of Sleep Medicine. Ed, Kryger, Roth and Dement. Saunders 3rd edition. 377-390 (2000).

Borbely, A., "A Two Process Model of Sleep Regulation." Human Neurobiology. 1:195-204 (1982).

Cziesler, C. et al., "The Human Circadian Timing System and Sleep Wake Regulation." Principles and Practice of Sleep Medicine. Ed. Kryger, Roth and Dement. Saunders 3rd edition. 353-375 (2000).

Hajak, G. et al., "'As needed' pharmacotherapy combined with stimulus control treatment in chronic insomnia—assessment of a novel intervention strategy in a primary care setting." Annals of Clinical Psychiatry. vol. 14, No. 1, 1-7 (Mar 2002).

Hermann. W. et al., "Pilot Controlled Double-blind Study of Hypnotic Effects of Zolpidem in Patients with Chronic 'Learned' Insomnia: Psychometric and Polysomnographic Evaluation," J. Intl. Med. Research. vol. 21, 306-322 (1993).

Kudo, Y., "A dose finding study of zolpidem in chronic insomnia patients in multi-center cooperation" Clinical Pharmacology. vol. 15, Supplement 1, Part B. 76B (1992).

Priest, R. et al,, "Efficacy of zolpidem in insomnia." European Psychiatry. vol. 12, Suppl. 1. 5S-14S (1997).

Richardson, G., "The Human Circadian System in Normal and Disordered Sleep." Journal of Clinical Psychiatry. 66 (Suppl 9). 3-9 (2005).

Roth, T. et al., As-needed Treatment of Insomnia Following MOTN Awakening: Clinical Efficacy of Low-Dose Zolpidem Tartrate Sublingual Lozenge. Sleep. vol. 32, A282, Abstract 0864 (2009).

Scharf, M. et al., "Safety and Efficacy of Long-Term Zolpidem Treatment in Insomniacs." Sleep Research, p. 87 (1990).

Shah, N. H. et al. "Evaluation of two new tablet lubricants—sodium stearyl fumarate and glyceryl behenate." Drug Development and Industrial Pharmacy. 12(8&9): 1329-1346 (1986).

Teitelbaum, J., "From Fatigued Fantastic! A proven program to regain vibrant health, based on a new scientific study showing effective treatment for chronic fatigue and fibromyalgia." New York: Avery. 112-119 (2001).

Verster, J. et al. "Residual Effects of Middle-of-the-Night Administration of Zaleplon and Zolpidem on Driving Ability, Memory Functions, and Psychomotor Performance." J. Clinical Psychopharmacology 22(6): 576-583 (2002).

Zanutti, G. "Zalepion vs. Zolpidem: Differences in Next-Day Residual Sedation After Middle-of-the-Night Administration." 214 J. Sleep Res. vol. 9, Suppl. 1, Abstract 427 (2000).

AMBIEN® Prescribing Information. Physician's Desk Reference 2710-14 (1998).

Berge et al., "Pharmaceutical Salts." Journal of Pharmaceutical Sciences 66(1):1-19 (Jan. 1977).

Borbely et al., "Sleep Initiation and Initial Sleep Intensity: Interactions of Homeostatic and Circadian Mechanism." Journal of Biological Rhythms 4: 37-39 (1989).

Kosherek et al., "Dose effects of zolpidem in transient insomnia." Sleep Research 17:47 (1998).

Lahmeyer et al., "Subjective Efficacy of Zolpidem in Outpatients with Chronic Insomnia, A Double-Blind Comparison with Placebo." Clinical Drug Invest 13(3): 134-144 (1997).

Monti, "Effect of Zolpidem on Sleep in Insomniac Patients." European Journal of Clinical Pharmacology 36:461-466 (1989).

Declaration of Thomas Roth, Ph.D., filed in Inter Partes Reexamination of Alaux et al., USP 6,514,531 (extended Jan. 18, 2008).

Second Declaration of Thomas Roth, Ph.D., filed in Inter Partes Reexamination of Alaux et al., USP 6,514,531 (executed Oct. 28, 2009).

Roth et al., "Consensus for the Pharmacological Management of Insomnia in the New Millennium." IJCP 55(1): 42-52 (Jan./Feb. 2001).

Roth et al., "The Effects of Midazolam and Temazepan on Sleep and Performance when Administer in the Middle of the Night." 5(2): 66-69 (1985).

Roth et al., "Efficacy and safety of zolpidem-MR: A double-blind, placebo-controlled study in adults with primary insomnia." Sleep Medicine 7: 397-406 (2006).

Roth et al., "Zolpidem in the Treatment of Transient Insomnia: A Double-Blind, Randomized Comparison with Placebo." Sleep 18(4):246-251 (1995).

Roth et al., "Zolpidem—place in therapy," European Psychiatry 215-230 (1996).

Salva, P. and Costa, J., "Clinical Pharmacokinetics and Pharmacodynamic of Zolpidem." Clinical Pharmacokinetics 29(3):142-153 (1995).

Scharf et al., "Dose Response Effects of Zolpidem in Normal Geriatric Subjects." Journal of Clinical Psychiatry 52(2): 77-83 (Feb. 1991).

Scharf et al., "A Multicenter, Placebo-Controlled Study Evaluating Zolpidem in the Treatment of Chronic Insomnia." Journal of Clinical Psychiatry 55(5): 192-199 (May 1994).

Verbeeck et al., "Generic substitution: the use of medicinal products containing different salts and implications for safety and efficacy." European Journal of Pharmacological Sciences 28:1-6 (2006).

Walsh et al., "Eight Weeks of Non-Nightly Use of Zolpidem for Primary Insomnia." Sleep 23(8): 1-10 (2000).

Walsh et al., "Transient Insomnia Associate with a 3-Hour Phase Advance of Sleep Time and Treatment with Zolpidem," Journal of Clinical Psychopharmacology 10(3)184-189 (1990).

Walsh et al., Polysomnographic Studies of the Effects of Zolpidem in Patients with Insomnia in Zolpidem: An Update of its Pharmacological Properties and Therapeutic Place in the Management of Insomnia, Freeman et al., eds., Elsevier, publ. 1996, 137:128-139 (1996).

Greenblatt et al., "Dynamics and Kinetics of a Modified-Release Formulation of Zolpidem: Comparison with Immediate-Release Standard Zolpidem and Placebo." The Journal of Clinical Pharmacology 46: pp. 1469-1480 (2006) www.jclinpharm.org/cgi/content/adbstract/46/12/1469.

Mitler, M.M. "Nonselective and Selective Benzodiazepine Receptor Agonists—Where Are We Today?" Sleep vol. 23 (Supplement 1): S39-S47 (2000).

US 8,242,131 B2

Page 4

Walsh, J.K. et al. "Lack of Residual Sedation Following Middle-of-the-Night Zaleplon Administration in Sleep Maintenance Insomnia." Clinical Neuropharmacology vol. 3, No. 1: 17-21 (2000).
Zammit et al., "Sleep and Residual Sedation After Administration of Zalepon, Zolpidem, and Placebo during Experimental Middle-of-the-Night Awakening." Journal of Clinical Sleep Medicine vol. 2, No. 4: pp. 417-423 (2006).
U.S. Appl. No. 12/813,429, Singh.
U.S. Appl. No. 13/078,731, Singh.

"Treatment of Middle of the Night Insomnia: Current Therapeutic Approaches." 10th International Forum on Mood and Anxiety Disorders (IFMAD); Nov. 17-19, 2010; Vienna, Austria.
"The Nature and Prevalence of Middle-of-the-Night Hypnotic Use," Society of Biological Psychiatry 66th Annual Meeting; May 12-14, 2011; San Francisco, California.

* cited by examiner

TRANSIZ00131404



*FIG. 1*

TRANSIZ00131405



**FIG. 2**

TRANSIZ00131406



*FIG. 3*



**FIG. 4**



*FIG. 5*



**FIG. 6**



*FIG. 7*

TRANSIZ00131411

US 8,242,131 B2

1

# METHODS OF TREATING MIDDLE-OF-THE-NIGHT INSOMNIA

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/684,842, filed May 25, 2005, U.S. Provisional Application No. 60/741,673, filed Dec. 1, 2005, U.S. Provisional Application No. 60/788,340, filed Mar. 31, 2006, and U.S. Provisional Application No. 60/788,249, filed Mar. 31, 2006, the disclosures of which are hereby incorporated by reference in their entirety for all purposes.

## BACKGROUND OF THE INVENTION

Until recently, medical literature has recognized four types of insomnia, including sleep onset insomnia (e.g., trouble falling asleep at bedtime), sleep maintenance insomnia (e.g., disturbed sleep during the night), early morning awakening, and transient insomnia (e.g., new environment, first night in hotel syndrome). However, according to the National Sleep Foundation's 2005 "Sleep in America" poll, about 20% of total respondents and about 50% of respondents reporting insomnia symptoms complained of waking up too early and having difficulty returning to sleep at least a few nights a week (results available on the worldwide web at sleepfoundation-.org). This type of insomnia includes "middle-of-the-night" insomnia, "late night" insomnia, "prolonged awakening after sleep onset" insomnia, "sleep maintenance" insomnia, and insomnia that follows after "middle-of-the-night" awakening, each of which has a component of interrupted sleep.

More particularly, patients with "middle-of-the-night" (MOTN) insomnia generally do not have problems initially falling asleep, but wake up prior to their intended wake time (during their normal sleep time), usually with about 3 to 4 hours of sleep time remaining. These patients require a treatment intervention that would reduce their wake time during their sleep time after awakening without leaving residual sedative effects in the morning. Unfortunately, currently available hypnotic medications are unsuitable for treating MOTN insomnia because they are slow to induce sleep (e.g., zaleplon) and/or require administration prior to about 7 to 9 hours in bed to avoid residual sleepiness in the morning (e.g., available dosage forms of zolpidem, eszopiclone, and zopiclone). Also, administration of most presently available hypnotics is prophylactic, resulting in unnecessary medication and overmedication of persons who require treatment for their MOTN insomnia a few nights a week.

Clearly, there remains a need for appropriate treatments for persons with MOTN insomnia. The present invention fulfills this and other needs.

## BRIEF SUMMARY OF THE INVENTION

The present invention provides compositions and methods for treating MOTN insomnia with zolpidem or a salt thereof.

In one aspect, the present invention provides a solid unit dosage composition for the treatment of MOTN insomnia, the composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across a subject's oral mucosa, wherein the effective amount is an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem, and is an amount sufficient to produce a plasma concentration between about 25 ng/ml and about 50 ng/ml within 20 minutes of administration, when evaluated in an appropriate patient population.

2

In another aspect, the present invention provides a solid unit dosage composition for the treatment of MOTN insomnia, the composition comprising an amount of zolpidem or a salt thereof effective to produce sleep within 30 minutes of dosing a subject, but does not produce residual sedative effects when the subject is awakened at a time about 4 hours after dosing, when the composition is evaluated in an appropriate patient population.

In yet another aspect, the present invention provides a pharmaceutical composition suitable for absorption by the oral mucosa in the treatment of MOTN insomnia, the composition comprising from about 0.5 mg to about 4.0 mg of zolpidem or a salt thereof and a pharmaceutically acceptable excipient.

In a further aspect, the present invention provides a solid pharmaceutical composition for delivery across the oral mucosa for treating insomnia comprising zolpidem in an amount less than 5 mg and a buffer.

In a related aspect, the present invention provides a solid pharmaceutical composition for delivery across the oral mucosa for treating insomnia comprising zolpidem in an amount less than 5 mg and a binary buffer.

In another related aspect, the present invention provides a solid unit dosage pharmaceutical composition comprising a dose of zolpidem hemitartrate in an amount of less than 5 mg and a binary buffer system capable of raising the pH of a subject's saliva to a pH greater than about 8.5, irrespective of the starting pH of saliva, wherein the composition is formulated for delivery of zolpidem across the subject's oral mucosa.

In an additional aspect, the present invention provides a pharmaceutical composition for treating insomnia comprising zolpidem in an amount less than 5 mg and a binary buffer.

In a related aspect, the present invention provides a pharmaceutical composition for treating insomnia comprising zolpidem in an amount less than 5 mg and a binary buffer, wherein the composition is formulated for delivery of zolpidem across the oral mucosa and the binary buffer produces a saliva pH of at least 8.5, irrespective of the starting saliva pH.

In another aspect, the present invention provides a method of treating insomnia, the method comprising:

administering to a subject who awakens from sleep and desires to return to sleep within 30 minutes and sleep for less than 5 hours, a single unit dosage composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across the subject's oral mucosa,

wherein the effective amount is an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem, and is an amount sufficient to produce a plasma concentration between about 25 ng/ml and about 50 ng/ml within 20 minutes of administration, when evaluated in an appropriate patient population.

In a related aspect, the present invention provides a method of treating MOTN insomnia in a subject, the method comprising:

administering to the subject a pharmaceutical composition comprising zolpidem or a salt thereof in an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem,

wherein the administering is on an as-needed basis, and wherein delivery of zolpidem occurs across the subject's oral mucosa to produce a blood level of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration and less than 20 ng/ml at a time 4 hours after administration.

A000221

US 8,242,131 B2

3

In yet another aspect, the present invention provides a method of treating insomnia in a subject, the method comprising:

administering to the subject a pharmaceutical composition comprising zolpidem or a salt thereof,

wherein the composition provides delivery of zolpidem across the subject's oral mucosa, wherein the subject is a subject who awakens from sleep and desires to resume sleep for less than 5 hours, and wherein the composition produces sleep within 30 minutes of dosing and the dose is such that it does not produce residual sedative effects when the subject is awakened at a time 4 hours after dosing.

In a further aspect, the present invention provides a method of treating insomnia in a subject, the method comprising:

administering a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a buffer, to a subject who awakens from sleep and desires to resume sleep for less than 5 hours,

wherein the solid pharmaceutical composition provides delivery of zolpidem across the subject's oral mucosa, and wherein a blood level of zolpidem is achieved in the subject of between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration.

In a related aspect, the present invention provides a method of treating insomnia, the method comprising the steps of:

providing a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a buffer to a patient who awakens from sleep and desires to resume sleep for less than 5 hours; and

administering the solid pharmaceutical composition to the patient for delivery of the zolpidem across the patient's oral mucosa,

wherein a blood level of zolpidem in the patient is between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration.

In an additional aspect, the present invention provides a method of treating insomnia, the method comprising:

administering a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a binary buffer, to a subject who awakens from sleep and desires to resume sleep for less than 5 hours,

wherein the solid pharmaceutical composition provides delivery of zolpidem across the subject's oral mucosa, wherein the solid pharmaceutical composition dissolves or disintegrates in about 2 minutes or less in the subject's mouth, and wherein the binary buffer raises the pH of saliva in the subject's mouth to a pH greater than about 9.0.

In a related aspect, the present invention provides a method of treating insomnia, the method comprising the steps of:

providing a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a binary buffer to a patient who awakens from sleep and desires to resume sleep for less than 5 hours; and

administering the solid pharmaceutical composition to the patient for delivery of the zolpidem across the patient's oral mucosa,

wherein the solid pharmaceutical composition dissolves or disintegrates in about 2 minutes or less in the patient's mouth, and wherein the binary buffer raises the pH of saliva in the patient's mouth to a pH greater than about 9.0.

Other objects, features, and advantages of the present invention will be apparent to one of skill in the art from the following detailed description and figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the mean (SEM) plasma concentration time profiles of a 1.0 mg, 1.75 mg, and 3.5 mg sublingual zolpidem lozenge of the present invention.

4

FIG. 2 shows the predicted versus observed plasma profiles of a 1.0 mg, 1.75 mg, and 3.5 mg sublingual zolpidem lozenge of the present invention.

FIG. 3 shows the Digit Symbol Substitution Test (DSST) scores of a 1.0 mg, 1.75 mg, and 3.5 mg sublingual zolpidem lozenge of the present invention as a function of time.

FIG. 4 shows the DSST scores of a 1.0 mg, 1.75 mg, and 3.5 mg sublingual zolpidem lozenge of the present invention as a function of plasma concentration.

FIG. 5 shows a comparison of DSST scores of a 3.5 mg sublingual zolpidem lozenge of the present invention and 5 mg and 10 mg peroral (PO) Ambien® as reported in the literature.

FIG. 6 shows the Visual Analog Scale (VAS) scores of a 1.0 mg, 1.75 mg and 3.5 mg sublingual zolpidem lozenge of the present invention.

FIG. 7 shows the change in reaction time scores as measured by a Psychomotor Vigilance Test (PVT) of a 1.0 mg, 1.75 mg, and 3.5 mg sublingual zolpidem lozenge of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

I. General

The present invention provides compositions and methods for treating insomnia, particularly MOTN insomnia, using therapeutically effective low doses of zolpidem or a salt thereof by delivering zolpidem across the oral mucosa. The present invention is based, in part, upon the surprising discovery that low doses of zolpidem, when formulated for delivery across the oral mucosa, can induce rapid onset of sleep without residual sedative effects upon awakening 2-4 hours later. Advantages of taking a low dose amount of zolpidem (e.g., less than 5 mg or $1.30 \times 10^{-5}$ moles) to counteract MOTN insomnia include rapid action to induce sleep, treatment on an as-needed basis to avoid excessive and unnecessary medication, and no or minimal residual sedative effects upon awakening.

While there are various types of dosage forms, solid dosage forms for oral administration are perhaps among the most preferred by patients, and among the most prevalently used. Many of the dosage forms are medicaments formulated as tablets or capsules, which are swallowed. However, swallowed formulations have several disadvantages, including drug losses during hepatic first pass metabolism, during enzymatic degradation within the gastrointestinal tract, and during absorption to non-targeted tissues. These drug losses not only increase the variability in drug response, but also often require that the medicament be given in greater initial doses. Still further, as the drug has to pass through the gastrointestinal system in order to enter the blood stream, the time to reach a therapeutic effect may be quite long, typically around forty-five minutes or longer.

Drug delivery via the mucous membranes of the oral cavity has certain advantages, due to the properties of the oral mucosa itself. For example, the mucous membranes of the oral cavity are highly vascularized and well supplied with lymphatic drainage sites. In general, the mucous membranes of the oral cavity can be divided into five main regions: the floor of the mouth (sublingual), the cheeks (buccal), the gums (gingival), the roof of the mouth (palatal), and the lining of the lips. These regions differ from each other with respect to their anatomy, drug permeability, and physiological response to drugs. For example, in terms of permeability, sublingual is more permeable than buccal, which is more permeable than palatal. This permeability is generally based on the relative

TRANSIZ00131413

5

thickness and degree of keratinization of these membranes, with the sublingual mucosa being relatively thin and non-keratinized, the buccal mucosa being thicker and non-keratinized, and the palatal mucosa being intermediate in thickness, but keratinized.

Accordingly, in certain aspects, the present invention provides solid dosage forms containing low doses of zolpidem (e.g., dissolving tablets, lozenges, etc.) and methods for treating MOTN insomnia by administering such compositions to the oral mucosa to deliver and facilitate absorption of a substantial portion of the dose through the tissues of the buccal and/or sublingual cavity. In some embodiments, the solid dosage forms described herein facilitate buccal and/or sublingual absorption due to the presence of a buffer system (e.g., a bicarbonate/carbonate buffer system). Without being bound to any particular theory, the buffer system can promote the in situ conversion of a hydrophilic (i.e., charged) form of zolpidem (e.g., zolpidem hemitartrate) into its lipophilic free-base (i.e., neutral) form, which penetrates the lipid membranes in the oral mucosa more readily than the salt form. As a result, both non-elderly and elderly patients can benefit from taking a substantially lower dose of zolpidem (e.g., about 3.5 mg for non-elderly; about 1.75 mg for elderly) as compared to the lowest currently approved dose of 5 mg, thereby rapidly inducing sleep without residual sedative effects upon awakening.

It is also desirable to reduce variability in drug delivery. Surprisingly, this can be achieved by utilizing a binary buffer system capable of achieving and sustaining a final pH in the oral cavity, independent of the initial pH. Accordingly, compositions for delivering zolpidem or a salt thereof across the oral mucosa having a buffer system that produces a final pH, independent of the initial pH, and which sustains that final pH for a given period of time, are particularly desirable, and are provided herein.

## II. Definitions

As used herein, the following terms have the meanings ascribed to them unless specified otherwise.

The term "sleep disorder" refers to a disruptive pattern of sleep arising from many causes including, without limitation, dysfunctional sleep mechanisms, abnormalities in physiological functions during sleep, abnormalities of the biological clock, and sleep disturbances that are induced by factors extrinsic to the sleep process. In particular, the term encompasses disorders associated with difficulties in staying awake and/or falling asleep such as insomnia (e.g., transient, short-term, and chronic), delayed sleep phase syndrome, hypnotic-dependent sleep disorder, and stimulant-dependent sleep disorder; disorders associated with difficulties in staying awake such as sleep apnea, narcolepsy, restless leg syndrome, obstructive sleep apnea, central sleep apnea, idiopathic hypersomnia, respiratory muscle weakness-associated sleep disorder; disorders associated with difficulties in adhering to a regular sleep schedule such as sleep state misperception, shift work sleep disorder, chronic time zone change syndrome, and irregular sleep-wake syndrome; disorders associated with abnormal behaviors such as sleep terror disorder (i.e., parasomnia) and sleepwalking (i.e., somnambulism); and other disorders such as sleep bruxism, fibromyalgia, and nightmares.

The term "insomnia" refers to a sleep disorder characterized by symptoms including, without limitation, difficulty in falling asleep, difficulty in staying asleep, intermittent wakefulness, and/or waking up too early. The term also encompasses daytime symptoms such as sleepiness, anxiety,

6

impaired concentration, impaired memory, and irritability. Types of insomnia suitable for treatment with the compositions of the present invention include, without limitation, transient, short-term, and chronic insomnia. The term "transient insomnia" refers to insomnia lasting for a few nights. The term "short-term insomnia" refers to insomnia lasting for about two to about four weeks. The term "chronic insomnia" refers to insomnia lasting for at least one month.

The phrase "prolonged awakening after sleep onset insomnia" refers to the condition wherein a subject, after falling asleep, awakens and has difficulty returning to sleep, regardless of the number of hours of time in bed remaining. "Prolonged awakening after sleep onset insomnia" includes middle-of-the-night insomnia, late night insomnia, and insomnia after early night awakening.

As used herein, the term "middle-of-the-night insomnia" or "MOTN insomnia" refers to the condition wherein a subject, after falling asleep, awakens and has difficulty returning to sleep. Typically, the subject has about 5 hours of sleep time or time in bed remaining, although in some subjects only 4 hours, 3 hours, or 2 hours of sleep time may remain. One of skill in the art will appreciate that the term middle-of-the-night refers to a middle portion of the subject's sleep time in any sleep period, rather than a specific time of a time zone, day or night. For example, a shift worker who would normally sleep from 8 am until 3 pm or 4 pm can still exhibit MOTN insomnia, when their sleep time is interrupted during normal daylight hours. MOTN insomnia can be transient, short-term, or chronic.

The term "time in bed" refers to the amount of time a subject spends in a recumbent position (e.g., lying down in bed or reclining in a chair) intending to sleep.

The term "sleep time" refers to the time that a subject spends sleeping. Sleep time can be continuous or discontinuous.

"Sleep efficiency" refers to the total sleep time a subject receives during their time in bed. Sleep efficiency is measured by the following equation:

$$100*(total\ sleep\ time\ (TST)/total\ time\ in\ bed).$$

The phrase "residual sedative effects" refers to a patient's subjective feeling of sedation upon awakening. Additionally, the term is meant to refer to a patient population as found in, for example, a clinical trial, rather than a single patient example. Residual sedative effects also can be evaluated using one or more of any of a number of tests exploring psychomotor performance, attention, information processing, and memory used by those of skill in the art including, for example, a Sleep Latency Test (SLT), a Visual Analog Test (VAT), a Digit Symbol Substitution Test (DSST), a Symbol Copying Test (SCT), a Critical Flicker Fusion threshold test (CFF), a Simple Reaction time test (visual or auditory; SRT), a Choice Reaction Time test (CRT), a Word Learning Test (WLT), a Critical Tracking Test (CTT), a Divided Attention Test (DAT), a digit or letter cancellation test, sleep staging through polysomnographic (PSG) measurements, Continuous Performance Task test (CPT), Multiple Sleep Latency Test (MSLT), a Rapid Visual Information Processing test (RVIP), a mental calculation test, a body sway test, a driving performance test, and others. Guidelines for a Sleep Latency Test are published in *Sleep* (1986) 9:519-24. The above-listed tests are described, for example, in Walsh, et al., (2000) *Clin Neuropharm* 23:17-21; Verster, et al., (2002) *J Clin Psychopharm* 22:576-583; Patat, et al., (2001) *Human Psychopharm* 16:369-392; and Hindmarch, et al., (2001) *Human Pshychopharm* 16:159-167. As a result, an amount that substantially avoids or does not produce residual sedative effects is an

A000223

7

amount that allows a subject, upon awakening following sleep time, to test acceptably in at least one of the above tests, preferably at least two or three of the above tests, and most preferably in at least four of the above tests.

Alternatively, an amount that substantially avoids or does not produce residual sedative effects can be objectively measured by determining the plasma or serum levels of zolpidem at an appropriate time point. In particular, residual sedative effects will be essentially extinguished when a subject's plasma levels of zolpidem fall below about 20 ng/ml. Again, this objective test refers to an average zolpidem plasma or serum concentration in a patient population. Because some variability between patients is expected, a number of patients may respond as having residual sedative effects even at low plasma or serum concentrations of zolpidem.

The term "therapeutically effective amount" or "effective amount" refers to the amount of zolpidem that is capable of achieving a therapeutic effect in a subject in need thereof. For example, an effective amount of zolpidem can be the amount that is capable of preventing or relieving one or more symptoms associated with MOTN insomnia. It is important to note that a plasma concentration time curve for any given drug is illustrative of four, very often overlapping, kinetic events that decide the fate of the drug inside the body after the drug is administered. The four events are absorption, distribution, metabolism, and excretion. The absorption phase dominates in the beginning, while the distribution phase dominates at peak concentration time, and metabolism and excretion phases dominate the remaining disappearing stages of the drug. The sedative-hypnotic activity profile of zolpidem can be predicted from its plasma concentration time curve (Greenblatt et al., *Clin. Pharmacol. Therap.* 64:553 (1998)). In general, plasma concentrations between about 25 ng/ml and about 50 ng/ml, which are sufficient for inducing sleep, occur during the absorption phase of the drug, but this is not necessarily the peak concentration. Once the zolpidem is absorbed and distributed, the plasma concentrations will fall off with time. When the latter phase of drug distribution, metabolism, and excretion results in concentrations of zolpidem below about 20 ng/ml, the residual sedative effects of the drug will be essentially extinguished. This level will depend, to some extent, on the patient's age, hepatic efficiency, and initial dose. Generally, for the compositions and methods described herein, the sedative-hypnotic activity does not persist once the plasma levels have dropped below about 20 ng/ml, due to concurrence of continuous depletion of drug in the body and fulfillment of sleep requirement of the sleep-wake cycle of the body.

The term "bioavailability" refers to the rate and/or extent to which a drug is absorbed or becomes available to the treatment site in the body. The MOTN efficacy of zolpidem can also be improved by improving the bioavailability or the absorption of zolpidem, e.g., at rate of about 0.1 ng/ml per minute.

The term "dissolves" or "dissolution" refers to the conversion of a portion of the solid dosage form to a solution or slurry form. The amount of the solid dosage form that dissolves over a period of time will vary depending on the components of the dosage form (e.g., the form of zolpidem used as well as the excipients used). Some solid dosage forms will completely dissolve in a patient's mouth over a time period of about 15 minutes or less. Still other solid dosage forms will completely dissolve in the mouth over a time period of about 6 minutes or less. Generally, at least about 25% by weight of the solid dosage form will dissolve within about 5 minutes of administration. Suitable methods known

8

in the art for determining the dissolution profile of a solid dosage form include, e.g., United States Pharmacopeia (USP) dissolution tests such as USP <711> Apparatus 1 or USP <711> Apparatus 2.

The term "disintegrates" or "disintegration" refers to the breakdown of, for example, a tablet or lozenge, into small pieces accompanied by complete dissolution of a substantial portion of the solid dosage form to a liquid form. More particularly, disintegration of a solid dosage form refers to less than about 25% by weight of the solid dosage form remaining in the mouth following an appropriate time period, e.g., about 5 minutes after administration. Suitable methods known in the art for determining the disintegration profile of a solid dosage form include, e.g., the USP disintegration test.

As used herein, the phrase "substantially complete conversion of zolpidem from its ionized to its un-ionized form" refers to greater than about 50% conversion of zolpidem from its ionized form into its un-ionized form. For example, a buffer system may favor at least about 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85%, 90%, 95%, or 99% conversion of zolpidem from its ionized form into its un-ionized form. In some embodiments, the conversion occurs within about 10 minutes following administration.

The term "variability" refers to inter-subject variability in terms of the percent of relative standard deviation (RSD) for the maximum plasma concentration ($C_{max}$) and the time to reach the maximum plasma concentration ($T_{max}$). Notably, the preferred compositions of the present invention have an RSD for $C_{max}$ of about 33% versus about 45% for commercial oral tablets such as Ambien® tablets. Further, the compositions of the present invention have an RSD for $T_{max}$ of about 50% or less versus about 100% for commercial oral tablets such as Ambien® tablets.

The term "subject" or "patient" refers to humans.

The term "administering" refers to administration of the compositions of the present invention to the mucous membranes of the oral cavity (i.e., oral mucosa). Examples of suitable sites of administration within the oral mucosa include, without limitation, the mucous membranes of the floor of the mouth (sublingual mucosa), the cheeks (buccal mucosa), the gums (gingival mucosa), the roof of the mouth (palatal mucosa), the lining of the lips, and combinations thereof. Preferably, the compositions of the present invention are administered to the sublingual mucosa, buccal mucosa, or a combination thereof.

### III. Description of the Embodiments

In one aspect, the present invention provides a solid unit dosage composition for the treatment of MOTN insomnia, the composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across a subject's oral mucosa, wherein the effective amount is an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem, and is an amount sufficient to produce a plasma concentration between about 25 ng/ml and about 50 ng/ml within 20 minutes of administration, when evaluated in an appropriate patient population.

In one embodiment, the solid unit dosage composition provides about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem in about 30 minutes or less, alternatively in about 20 minutes or less, or alternatively in about 10 minutes or less. In another embodiment, the solid unit dosage composition provides blood (e.g., plasma) levels of zolpidem that are less than about 20 ng/ml at a time about 2, 3, or 4 hours after dosing. The zolpidem is typically delivered across the subject's sublingual and/or buccal mucosa.

A000224

US 8,242,131 B2

9

In some embodiments, the solid unit dosage composition comprises at least one pH-adjusting agent selected from the group consisting of a carbonate salt and a bicarbonate salt. In other embodiments, the solid unit dosage composition comprises a binary buffer system that raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva. For example, the binary buffer system can comprise sodium carbonate and sodium bicarbonate. Alternatively, the binary buffer system can comprise any combination of carbonate salt and bicarbonate salt known in the art.

The solid unit dosage composition is typically in the form of a lozenge, a chewing gum, a chewable tablet, or a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet. Preferably, the solid unit dosage composition is a lozenge or a quick-dissolving tablet. A quick-dissolving tablet usually provides complete dissolution in the subject's mouth in less than about 0.5 minutes, alternatively in less than about 1 minute, alternatively in less than about 1.5 minutes, alternatively in less than about 2 minutes, alternatively in less than about 2.5 minutes, alternatively in less than about 3 minutes, alternatively in less than about 4 minutes, alternatively in less than about 5 minutes, or alternatively in less than about 6 minutes. A description of low dose zolpidem lozenge and tablet dosage forms is provided in Examples 1 and 3, respectively.

In another embodiment, the solid unit dosage composition contains less than about 5 mg of zolpidem hemitartrate. Preferably, the solid unit dosage composition contains from about 0.5 to about 4.75 mg of zolpidem hemitartrate, alternatively from about 1.5 to about 2.5 mg of zolpidem hemitartrate, or alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate.

The effective amount of zolpidem is generally evaluated in an appropriate patient population (e.g., a patient population used for a clinical study) based on factors such as age, weight, the number of hours of time in bed remaining, and/or the ability of a subject to metabolize zolpidem. Accordingly, effective amounts of zolpidem for delivery across the oral mucosa may be different for selected patient populations. For example, the effective amount of zolpidem in an elderly patient population (i.e., subjects 65 years of age and older) is usually from about 1.5 mg to about 2.5 mg of zolpidem, alternatively about 1.75 mg, alternatively about 2.0 mg, or alternatively about 2.5 mg. Similarly, the effective amount of zolpidem in a population of subjects with a diminished capacity to metabolize zolpidem can be from about 1.5 mg to about 2.5 mg of zolpidem, alternatively about 1.75 mg, alternatively about 2.0 mg, or alternatively about 2.5 mg. The effective amount of zolpidem in a non-elderly patient population (i.e., subjects younger than 65 years of age) is usually from about 3.0 mg to about 3.75 mg zolpidem, alternatively about 3.25 mg, alternatively about 3.5 mg, or alternatively about 3.75 mg. The effective amount of zolpidem in subjects who have awakened but still have about 4 or 5 hours of time in bed remaining can be from about 2 mg to about 5 mg of zolpidem. A lower amount of zolpidem (e.g., from about 0.5 mg to about 2.5 mg, alternatively about 0.5 mg, alternatively about 1.0 mg, alternatively about 1.5 mg, alternatively about 2.0 mg, or alternatively about 2.5 mg) can be administered to subjects who have awakened but still have about 2 to 4 hours of time in bed remaining.

Any method known in the art can be used to determine the plasma concentration of zolpidem in a subject. As a non-

10

limiting example, the plasma from a blood sample collected from the subject can be assayed for zolpidem levels using high pressure liquid chromatography (HPLC) followed by tandem mass spectrometry (MS) or fluorescence detection. Chromatographic methods for measuring plasma levels of zolpidem are described in, for example, Ascalone et al., *J. Chromatogr.,* 581:237-250 (1992); Tracqui et al., *J. Chromatogr.,* 616:95-103 (1993); Durol et al., *J. Anal. Toxicol.,* 215:388-392 (1997); Ptacek et al., *J. Chromatogr. B Biomed. Sci. Appl.,* 694:409-413 (1997); and Ring et al., *J. Pharm. Biomed. Anal.,* 22:495-504 (2000).

In another aspect, the present invention provides a solid unit dosage composition for the treatment of MOTN insomnia, the composition comprising an amount of zolpidem or a salt thereof effective to produce sleep within 30 minutes of dosing a subject, but does not produce residual sedative effects when the subject is awakened at a time about 4 hours after dosing, when the composition is evaluated in an appropriate patient population.

In some embodiments, the solid unit dosage composition further comprises at least one pH-adjusting agent. Examples of pH-adjusting agents include, but are not limited to, carbonate salts, bicarbonate salts, and mixtures thereof. In other embodiments, the solid unit dosage composition comprises a binary buffer system. As a non-limiting example, the binary buffer system can comprise a carbonate salt (e.g., sodium carbonate) and a bicarbonate salt (e.g., sodium bicarbonate). In a preferred embodiment, the solid unit dosage composition is in a dosage form suitable for delivery of zolpidem across the subject's oral mucosa (e.g., buccal and/or sublingual delivery), wherein the binary buffer system raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva.

In certain embodiments, the solid unit dosage composition produces polysomnography stage 1 sleep at the onset of sleep. Polysomnography stage 1 sleep typically refers to a non-REM stage of sleep where a polysomnogram shows about a 50% reduction in activity from wakefulness. The eyes are usually closed during polysomnography stage 1 sleep, but if aroused from it, a subject may feel as if he or she has not slept. Polysomnography stage 1 sleep may last for about 5 to about 10 minutes.

In another embodiment, the solid unit dosage composition contains less than about 5 mg of zolpidem hemitartrate. Preferably, the solid unit dosage composition contains from about 0.5 to about 4.75 mg of zolpidem hemitartrate, alternatively from about 1.5 to about 2.5 mg of zolpidem hemitartrate, or alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate.

The solid unit dosage composition is typically in the form of a lozenge, a tablet (e.g., chewable tablet, slow-dissolving tablet, quick-dissolving tablet), or a chewing gum. Preferably, the composition is a lozenge or a quick-dissolving tablet. In some embodiments, the solid unit dosage composition provides buccal and/or sublingual dissolution in about 5 minutes or less (e.g., about 4, 3, 2, 1, or 0.5 minutes or less) following administration.

In yet another aspect, the present invention provides a pharmaceutical composition suitable for absorption by the oral mucosa (e.g., buccal and/or sublingual absorption) in the treatment of MOTN insomnia, the composition comprising from about 0.5 mg to about 4.0 mg of zolpidem or a salt thereof and a pharmaceutically acceptable excipient.

A000225

US 8,242,131 B2

11

In some embodiments, the pharmaceutical composition comprises from about 0.5 to about 4.0 mg of zolpidem hemitartrate. Generally, the pharmaceutical composition can comprise about 1.0 mg, alternatively about 1.75 mg, alternatively about 2.5 mg, alternatively about 3.0 mg, or alternatively about 3.5 mg, of zolpidem or a salt thereof such as zolpidem hemitartrate. In other embodiments, the pharmaceutical composition further comprises a binary buffer system. For example, the binary buffer system can comprise a carbonate such as sodium carbonate and a bicarbonate such as sodium bicarbonate. The carbonate and bicarbonate are usually present in a carbonate:bicarbonate ratio of from about 1:1.0 to about 1:1.4 by weight, or alternatively from about 1:1.0 to about 1:1.2 by weight. Preferably, the binary buffer system raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva.

In certain embodiments, the pharmaceutical composition is a solid unit dosage form such as a lozenge or tablet (e.g., chewable tablet, slow-dissolving tablet, quick-dissolving tablet). In another embodiment, the pharmaceutical composition provides complete buccal and/or sublingual dissolution in about 5 minutes or less (e.g., about 4, 3, 2, 1, or 0.5 minutes or less) following administration.

In a further aspect, the present invention provides a solid pharmaceutical composition for delivery across the oral mucosa for treating insomnia comprising zolpidem in an amount less than 5 mg and a buffer.

Generally, the buffer comprises a carbonate buffer, a bicarbonate buffer, or a mixture thereof. In certain instances, the buffer is a binary buffer comprising, e.g., a carbonate buffer and a bicarbonate buffer.

In some embodiments, the amount of zolpidem is less than about $1.30 \times 10^{-5}$ moles of zolpidem. In other embodiments, the amount of zolpidem is from about 0.5 to about 4.75 mg of zolpidem hemitartrate, e.g., from about 1.5 to about 2.5 mg of zolpidem hemitartrate, alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate, alternatively from about 1.0 to about 3.75 mg of zolpidem hemitartrate, or alternatively from about 1.5 to about 3.0 mg of zolpidem hemitartrate.

The solid pharmaceutical composition is typically in a dosage form including, but not limited to, a lozenge, a chewing gum, a chewable tablet, and a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet. Preferably, the solid pharmaceutical composition is in the form of a lozenge or a quick-dissolving sublingual tablet. The zolpidem is typically delivered across the sublingual and/or buccal mucosa.

In a related aspect, the present invention provides a solid pharmaceutical composition for delivery across the oral mucosa for treating insomnia comprising zolpidem in an amount less than about 5 mg and a binary buffer.

In one embodiment, the amount of zolpidem is from about 0.5 to about 4.75 mg of zolpidem hemitartrate. Preferably, the amount of zolpidem is from about 1.5 to about 2.5 mg of zolpidem hemitartrate, alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate, alternatively from about 1.0 to about 3.75 mg of zolpidem hemitartrate, or alternatively from about 1.5 to about 3.0 mg of zolpidem hemitartrate. In certain other instances, the amount of zolpidem is less than about $1.30 \times 10^{-5}$ moles of zolpidem.

In some embodiments, the binary buffer comprises a carbonate buffer such as sodium carbonate and a bicarbonate

12

buffer such as sodium bicarbonate. Preferably, the solid pharmaceutical composition is a lozenge or tablet such as a sublingual tablet.

In another related aspect, the present invention provides a solid unit dosage pharmaceutical composition comprising a dose of zolpidem hemitartrate in an amount of less than about 5 mg and a binary buffer system capable of raising the pH of a subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva, wherein the composition is formulated for delivery of zolpidem across the subject's oral mucosa.

In one embodiment, the solid unit dosage pharmaceutical composition contains from about 0.5 to about 4.75 mg of zolpidem hemitartrate. Preferably, the solid unit dosage pharmaceutical composition contains from about 1.5 to about 2.5 mg of zolpidem hemitartrate, alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate, alternatively from about 1.0 to about 3.75 mg of zolpidem hemitartrate, or alternatively from about 1.5 to about 3.0 mg of zolpidem hemitartrate.

In some embodiments, the binary buffer system comprises a carbonate salt such as sodium carbonate and a bicarbonate salt such as sodium bicarbonate. In other embodiments, the binary buffer system comprises a carbonate salt and a bicarbonate salt in a carbonate:bicarbonate ratio of from about 1:1.0 to about 1:1.4 by weight, or alternatively from about 1:1.0 to about 1:1.2 by weight.

In an additional aspect, the present invention provides a pharmaceutical composition for treating insomnia comprising zolpidem in an amount less than 5 mg and a binary buffer.

The pharmaceutical composition is typically in a dosage form suitable for delivery of zolpidem across a subject's oral mucosa (e.g., buccal and/or sublingual delivery) including, but not limited to, a lozenge, a chewing gum, a chewable tablet, and a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet. In some embodiments, the binary buffer comprises a carbonate buffer such as sodium carbonate and a bicarbonate buffer such as sodium bicarbonate. Alternatively, the binary buffer can comprise any combination of carbonate salt and bicarbonate salt known in the art.

In a related aspect, the present invention provides a pharmaceutical composition for treating insomnia comprising zolpidem in an amount less than 5 mg and a binary buffer, wherein the composition is formulated for delivery of zolpidem across the oral mucosa (e.g., buccal and/or sublingual mucosa) and the binary buffer produces a saliva pH of at least about 8.5, alternatively at least about 9.0, alternatively at least about 9.5, alternatively at least about 10.0, alternatively at least about 10.5, alternatively at least about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting saliva pH.

In another aspect, the present invention provides a method of treating insomnia, the method comprising:

administering to a subject who awakens from sleep and desires to return to sleep within 30 minutes and sleep for less than 5 hours, a single unit dosage composition comprising an effective amount of zolpidem or a salt thereof, formulated for delivery of zolpidem across the subject's oral mucosa,

wherein the effective amount is an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem, and is an amount sufficient to produce a plasma concentration between about 25 ng/ml and

A000226

13

about 50 ng/ml within 20 minutes of administration, when evaluated in an appropriate patient population.

In the methods of the present invention, the single unit dosage composition is typically administered pro re nata ("as needed"). Preferably, the single unit dosage composition is a lozenge or tablet (e.g., chewable tablet, slow-dissolving tablet, quick-dissolving tablet) formulated for buccal and/or sublingual delivery of zolpidem. In some embodiments, the single unit dosage composition further comprises a binary buffer system that raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva.

In a preferred embodiment, the single unit dosage composition comprises from about 0.5 to about 4.75 mg of zolpidem hemitartrate and a binary buffer system that raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva. In one embodiment, the binary buffer system comprises sodium carbonate and sodium bicarbonate.

In a related aspect, the present invention provides a method of treating MOTN insomnia in a subject, the method comprising:

administering to the subject a pharmaceutical composition comprising zolpidem or a salt thereof in an amount of less than $1.30 \times 10^{-5}$ moles of zolpidem,

wherein the administering is on an as-needed basis, and wherein delivery of zolpidem occurs across the subject's oral mucosa to produce a blood level of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration and less than 20 ng/ml at a time 4 hours after administration.

In one embodiment, the pharmaceutical composition provides blood (e.g., plasma) levels of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20, 30, or 40 minutes of administration and less than about 20 ng/ml at a time about 2, 3, or 4 hours after administration. In another embodiment, the pharmaceutical composition provides about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem in about 30 minutes or less, alternatively in about 20 minutes or less, or alternatively in about 10 minutes or less, following administration. Methods for determining the blood (e.g., plasma) level of zolpidem in a subject are described above. The delivery of zolpidem typically occurs across the subject's sublingual and/or buccal mucosa.

In some embodiments, the pharmaceutical composition comprises at least one pH-adjusting agent. Examples of pH-adjusting agents include, but are not limited to, carbonate salts, bicarbonate salts, and mixtures thereof. In other embodiments, the pharmaceutical composition comprises a binary buffer system that raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva. For example, the binary buffer system can comprise sodium carbonate and sodium bicarbonate. Alternatively, the binary buffer system can comprise any combination of carbonate salt and bicarbonate salt known in the art.

14

The pharmaceutical composition is typically in the form of a lozenge, a chewing gum, a chewable tablet, or a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet (e.g., quick-dissolving sublingual tablet). In another embodiment, the pharmaceutical composition contains less than about 5 mg of zolpidem hemitartrate. An effective amount of zolpidem to be administered on an as-needed basis according to the methods of the present invention is described above. Preferably, the pharmaceutical composition contains from about 0.5 to about 4.75 mg of zolpidem hemitartrate, alternatively from about 1.5 to about 2.5 mg of zolpidem hemitartrate, or alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate. In certain instances, the pharmaceutical composition comprises less than a 5 mg dose of zolpidem hemitartrate and a binary buffer system consisting of a carbonate salt and a bicarbonate salt.

In yet another aspect, the present invention provides a method of treating insomnia in a subject, the method comprising:

administering to the subject a pharmaceutical composition comprising zolpidem or a salt thereof,

wherein the composition provides delivery of zolpidem across the subject's oral mucosa, wherein the subject is a subject who awakens from sleep and desires to resume sleep for less than 5 hours, and wherein the composition produces sleep within 30 minutes of dosing and the dose is such that it does not produce residual sedative effects when the subject is awakened at a time 4 hours after dosing.

In one embodiment, the pharmaceutical composition produces sleep within about 20, 30, or 40 minutes of dosing but does not produce residual sedative effects when the subject is awakened at a time about 2, 3, or 4 hours after dosing. In certain instances, the pharmaceutical composition produces polysomnography stage 1 sleep at the onset of sleep.

In another embodiment, the pharmaceutical composition produces blood (e.g., plasma) levels of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20, 30, or 40 minutes of administration and/or less than about 20 ng/ml at a time about 2, 3, or 4 hours after administration. In yet another embodiment, the pharmaceutical composition provides about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem in about 30 minutes or less, alternatively in about 20 minutes or less, or alternatively in about 10 minutes or less, following administration. The zolpidem is typically delivered across the subject's sublingual and/or buccal mucosa.

In some embodiments, the pharmaceutical composition further comprises at least one pH-adjusting agent. In other embodiments, the pharmaceutical composition further comprises a binary buffer system that raises the pH of the subject's saliva to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva. Preferably, the pharmaceutical composition comprises zolpidem hemitartrate, e.g., in an amount of less than about 5 mg. In certain instances, the pharmaceutical composition comprises from about 0.5 to about 4.75 mg of zolpidem hemitartrate, e.g., from about 1.5 to about 2.5 mg of zolpidem hemitartrate, alternatively from about 3.0 to about 3.75 mg of zolpidem hemitartrate, alternatively from about 1.0 to about 3.75 mg of zolpidem hemitartrate, or alternatively from about 1.5 to about 3.0 mg of zolpidem hemitartrate.

In a preferred embodiment, the pharmaceutical composition comprises from about 1.5 to about 2.5 mg of zolpidem hemitartrate or from about 3.0 to about 3.75 mg of zolpidem

TRANSIZ00131418

15

hemitartrate and a binary buffer system consisting of sodium carbonate and sodium bicarbonate.

The pharmaceutical composition is typically in a solid unit dosage form including, but not limited to, a lozenge, a chewing gum, a chewable tablet, and a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet. Preferably, the pharmaceutical composition is in the form of a lozenge or a quick-dissolving sublingual tablet.

In a further aspect, the present invention provides a method of treating insomnia in a subject, the method comprising:

administering a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a buffer, to a subject who awakens from sleep and desires to resume sleep for less than 5 hours,

wherein the solid pharmaceutical composition provides delivery of zolpidem across the subject's oral mucosa, and wherein a blood level of zolpidem is achieved in the subject of between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration.

In a related aspect, the present invention provides a method of treating insomnia, the method comprising the steps of:

providing a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a buffer to a patient who awakens from sleep and desires to resume sleep for less than 5 hours; and

administering the solid pharmaceutical composition to the patient for delivery of the zolpidem across the patient's oral mucosa,

wherein a blood level of zolpidem in the patient is between about 25 ng/ml and about 50 ng/ml within about 20 minutes of administration.

In one embodiment, the solid pharmaceutical composition achieves a blood (e.g., plasma) level of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20, 30, or 40 minutes of administration. In another embodiment, the solid pharmaceutical composition provides a blood level of zolpidem in the subject less than about 20 ng/ml within about 2, 3, or 4 hours of administration.

In some embodiments, the solid pharmaceutical composition dissolves or disintegrates in the subject's mouth in about 2 minutes or less (e.g., about 2, 1.5, 1, or 0.5 minutes or less). In other embodiments, the solid pharmaceutical composition dissolves or disintegrates in the subject's mouth in about 3 to about 6 minutes (e.g., about 3, 3.5, 4, 4.5, 5, 5.5, or 6 minutes). The zolpidem is typically delivered across the subject's sublingual and/or buccal mucosa.

Generally, the buffer that is present in the pharmaceutical composition raises the pH of saliva in the subject's mouth to a pH greater than about 8.5, alternatively greater than about 9.0, alternatively greater than about 9.5, alternatively greater than about 10.0, alternatively greater than about 10.5, alternatively greater than about 11.0, or alternatively between about 9.0 and about 11.0, irrespective of the starting pH of saliva. Preferably, the pH of the saliva is raised above about 9.0 for at least about 2 minutes (e.g., about 2, 2.5, 3, 3.5, 4, 4.5, 5, 5.5, 6, or more minutes). In certain instances, the buffer is a binary buffer. A non-limiting example of a suitable binary buffer includes a mixture of a carbonate buffer and a bicarbonate buffer.

In an additional aspect, the present invention provides a method of treating insomnia, the method comprising:

administering a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a binary buffer, to a subject who awakens from sleep and desires to resume sleep for less than 5 hours,

wherein the solid pharmaceutical composition provides delivery of zolpidem across the subject's oral mucosa,

16

wherein the solid pharmaceutical composition dissolves or disintegrates in about 2 minutes or less in the subject's mouth, and wherein the binary buffer raises the pH of saliva in the subject's mouth to a pH greater than about 9.0.

In a related aspect, the present invention provides a method of treating insomnia, the method comprising the steps of:

providing a solid pharmaceutical composition comprising zolpidem in an amount less than 5 mg and a binary buffer to a patient who awakens from sleep and desires to resume sleep for less than 5 hours; and

administering the solid pharmaceutical composition to the patient for delivery of the zolpidem across the patient's oral mucosa,

wherein the solid pharmaceutical composition dissolves or disintegrates in about 2 minutes or less in the patient's mouth, and wherein the binary buffer raises the pH of saliva in the patient's mouth to a pH greater than about 9.0.

In one embodiment, the solid pharmaceutical composition achieves a blood (e.g., plasma) level of zolpidem in the subject between about 25 ng/ml and about 50 ng/ml within about 20, 30, or 40 minutes of administration. In another embodiment, the solid pharmaceutical composition provides a blood level of zolpidem in the subject less than about 20 ng/ml within about 2, 3, or 4 hours of administration.

In some embodiments, the pH of the saliva is raised above about 9.0 for at least about 2 minutes (e.g., 2, 2.5, 3, 3.5, 4, 4.5, 5, 5.5, 6, or more minutes). In other embodiments, the binary buffer comprises a carbonate buffer and a bicarbonate buffer. The zolpidem is typically delivered across the subject's sublingual and/or buccal mucosa.

IV. Compositions

Typically, the compositions of the present invention will contain zolpidem or a salt thereof in an amount of about 0.5 mg, about 0.8 mg, about 1.0 mg, about 1.5 mg, about 1.75 mg, about 2.0 mg, about 2.5 mg, about 3.0 mg, about 3.5 mg, about 3.75 mg, about 4.0 mg, about 4.5 mg, or about 4.75 mg per administration. However, the amount of zolpidem can be any dose amount less than about 5 mg, alternatively from about 1.5 to about 2.5 mg, or alternatively from about 3.0 to about 3.75 mg. One skilled in the art will appreciate that the amount of zolpidem can be expressed as the number of moles of zolpidem present in the composition. For example, 5 mg of zolpidem hemitartrate is equivalent to about $1.30 \times 10^{-5}$ moles of zolpidem. As such, in some embodiments, the composition will contain an amount of zolpidem hemitartrate that provides less than about $1.30 \times 10^{-5}$ moles of zolpidem.

Any form of zolpidem is suitable for use in the compositions described herein, e.g., a salt form of zolpidem, a free base form of zolpidem, a polymorph of zolpidem, or a mixture thereof. For example, pharmaceutically acceptable salts of zolpidem can include, without limitation, tartrate, hemitartrate, succinate, dihydrochloride, salicylate, hemisuccinate, citrate, maleate, hydrochloride, carbamate, sulfate, nitrate, and benzoate salt forms, as well as combinations thereof. In some embodiments, the zolpidem is in the form of a salt, e.g., zolpidem hemitartrate. In other embodiments, the zolpidem is in the form of a polymorph, e.g., commercially available from Plantex Ltd. (Netanya, Israel).

The compositions of the present invention may take the form of solid, semi-solid, lyophilized powder, or liquid dosage forms, such as, for example, tablets (e.g., chewable, slow-dissolving, quick-dissolving, etc.), pills, capsules, lozenges, gums, powders, solutions, suspensions, emulsions, aerosols, foams, creams, gels, lotions, or the like. Preferably, the compositions of the present invention are formulated as a tablet or

TRANSIZ00131419

17

a lozenge, in particular quick-dissolving tablets or lozenges, such as those described in U.S. Patent Publication No. 20050226925.

As used herein, the term "unit dosage" or "dosage form" refers to physically discrete units suitable as unitary dosages for human subjects and other mammals, each unit containing a predetermined quantity of therapeutic agent calculated to produce the desired onset, tolerability, and therapeutic effects, in association with one or more suitable pharmaceutical excipients such as carriers. Methods for preparing such dosage forms are known or will be apparent to those skilled in the art. For example, in some embodiments, a chewing gum dosage form of the present invention can be prepared according to the procedures set forth in U.S. Pat. No. 4,405,647. In other embodiments, a liquid spray or a solution, tincture, tablet, lozenge, or candy dosage form of the present invention can be prepared according to the procedures set forth, for example, in *Remington: The Science and Practice of Pharmacy*, 20th Ed., Lippincott, Williams & Wilkins (2003); *Pharmaceutical Dosage Forms, Volume 1: Tablets, 2nd* Ed., Marcel Dekker, Inc., New York, N.Y. (1989); and similar publications. The dosage form to be administered will, in any event, contain a quantity of the therapeutic agent in a therapeutically effective amount for relief of the condition being treated when administered in accordance with the teachings of the present invention.

The terms "carrier" or "excipient" refer to a typically inert substance used as a diluent or vehicle for a drug such as a therapeutic agent. The term also encompasses a typically inert substance that imparts cohesive qualities to the composition. Suitable carriers for use in the compositions of the present invention include, without limitation, a binder, a gum base, and combinations thereof. Non-limiting examples of binders include mannitol, sorbitol, xylitol, maltodextrin, lactose, dextrose, sucrose, glucose, inositol, powdered sugar, molasses, starch, cellulose, microcrystalline cellulose, polyvinylpyrrolidone, acacia gum, guar gum, tragacanth gum, alginate, extract of Irish moss, panwar gum, ghatti gum, mucilage of isapol husks, Veegum®, larch arabogalactan, gelatin, methylcellulose, ethylcellulose, carboxymethylcellulose, hydroxypropylmethylcellulose, polyoxyethylene polymers, polyacrylic acid (e.g., Carbopol), calcium silicate, calcium phosphate, dicalcium phosphate, calcium sulfate, kaolin, sodium chloride, polyethylene glycol, propylene glycol, and combinations thereof. These binders can be pre-processed to improve their flowability and taste by methods known in the art such as freeze drying (see, e.g., Fundamentals of Freeze-Drying, *Pharm. Biotechnol.*, 14:281-360 (2002); Lyophililization of Unit Dose Pharmaceutical Dosage Forms, *Drug. Dev. Ind. Pharm.*, 29:595-602 (2003)); solid-solution preparation (see, e.g., U.S. Pat. No. 6,264, 987); and lubricant dusting and wet-granulation preparation with a suitable lubricating agent (see, e.g., *Remington: The Science and Practice of Pharmacy*, supra). For example, Mannogem® and Sorbogem®, sold by SPI Pharma Group (New Castle, Del.), are freeze-dried processed forms of mannitol and sorbitol, respectively. Typically, the compositions of the present invention comprise from about 25% to about 90% by weight of the binder, and preferably from about 50% to about 80%. However, one skilled in the art will appreciate that the compositions of the present invention can be made without any binders, e.g., to produce a highly friable dosage form.

Non-limiting examples of gum bases include materials selected from among the many water-insoluble and saliva-insoluble gum base materials known in the art. For example, in some instances, the gum base comprises at least one hydrophobic polymer and at least one hydrophilic polymer. Non-

18

limiting examples of suitable hydrophobic and hydrophilic polymers for gum bases include both natural and synthetic polymers such as elastomers, rubbers, and combinations thereof. Examples of suitable natural polymers include, without limitation, substances of plant origin such as chicle, jelutong, gutta percha, crown gum, and combinations thereof. Examples of suitable synthetic polymers include elastomers such as butadiene-styrene copolymers, isobutylene and isoprene copolymers (e.g., "butyl rubber"), polyethylene, polyisobutylene, polyvinylester (e.g., polyvinyl acetate and polyvinyl acetate phthalate), and combinations thereof. In other instances, the gum base comprises a mixture of butyl rubber (i.e., isobutylene and isoprene copolymer), polyisobutylene, and optionally, polyvinylacetate (e.g., having a molecular weight of approximately 12,000). Typically, the gum base comprises from about 25% to about 75% by weight of these polymers, and preferably from about 30% to about 60%.

The compositions of the present invention can additionally include lubricating agents; wetting agents; emulsifying agents; solubilizing agents; suspending agents; preserving agents such as methyl-, ethyl-, and propyl-hydroxy-benzoates, butylated hydroxytoluene, and butylated hydroxyanisole; sweetening agents; flavoring agents; coloring agents; and disintegrating agents such as crospovidone as well as croscarmellose sodium and other cross-linked cellulose polymers.

Lubricating agents can be used to prevent adhesion of the dosage form to the surface of the dies and punches, and to reduce inter-particle friction. Lubricating agents may also facilitate ejection of the dosage form from the die cavity and improve the rate of granulation flow during processing. Examples of suitable lubricating agents include, without limitation, magnesium stearate, calcium stearate, zinc stearate, stearic acid, sodium stearyl fumarate, simethicone, silicon dioxide, talc, hydrogenated vegetable oil, polyethylene glycol, mineral oil, and combinations thereof. The compositions of the present invention can comprise from about 0% to about 10% by weight of the lubricating agent, and preferably from about 1% to about 5%.

Sweetening agents can be used to improve the palatability of the composition by masking any unpleasant tastes it may have. Examples of suitable sweetening agents include, without limitation, compounds selected from the saccharide family such as the mono-, di-, tri-, poly-, and oligosaccharides; sugars such as sucrose, glucose (corn syrup), dextrose, invert sugar, fructose, maltodextrin, and polydextrose; saccharin and salts thereof such as sodium and calcium salts; cyclamic acid and salts thereof; dipeptide sweeteners; chlorinated sugar derivatives such as sucralose and dihydrochalcone; sugar alcohols such as sorbitol, sorbitol syrup, mannitol, xylitol, hexa-resorcinol, and the like, and combinations thereof. Hydrogenated starch hydrolysate, and the potassium, calcium, and sodium salts of 3,6-dihydro-6-methyl-1-1,2,3-oxathiazin-4-one-2,2-dioxide may also be used. Of the foregoing, sorbitol, mannitol, and xylitol, either alone or in combination, are preferred sweetening agents. The compositions of the present invention can comprise from about 0% to about 80% by weight of the sweetening agent, preferably from about 5% to about 75%, and more preferably from about 25% to about 50%.

Flavoring agents can also be used to improve the palatability of the composition. Examples of suitable flavoring agents include, without limitation, natural and/or synthetic (i.e., artificial) compounds such as peppermint, spearmint, wintergreen, cinnamon, menthol, cherry, strawberry, watermelon, grape, banana, peach, pineapple, apricot, pear, raspberry, lemon, grapefruit, orange, plum, apple, fruit punch, passion

A000229

TRANSIZ00131420

US 8,242,131 B2

19

fruit, chocolate (e.g., white, milk, dark), vanilla, caramel, coffee, hazelnut, combinations thereof, and the like. Coloring agents can be used to color code the composition, for example, to indicate the type and dosage of the therapeutic agent therein. Suitable coloring agents include, without limitation, natural and/or artificial compounds such as FD & C coloring agents, natural juice concentrates, pigments such as titanium oxide, silicon dioxide, and zinc oxide, combinations thereof, and the like. The compositions of the present invention can comprise from about 0% to about 10% by weight of the flavoring and/or coloring agent, preferably from about 0.1% to about 5%, and more preferably from about 2% to about 3%.

When the dosage form is a chewing gum, the composition can comprise zolpidem or a pharmaceutically acceptable salt thereof ("therapeutic agent"), a carrier or excipient such as a gum base, a pH-adjusting agent or buffer system, and optionally a protecting agent. The chewing gum composition may further comprise lubricating agents, wetting agents, emulsifying agents, solubilizing agents, suspending agents, preserving agents, sweetening agents, flavoring agents, and coloring agents. Typically, the chewing gum composition comprises less than about 5 mg (e.g., from about 0.5 mg to about 4.75 mg, from about 1.5 mg to about 2.5 mg, from about 3.0 mg to about 3.75 mg, etc.) of zolpidem or a salt thereof. One skilled in the art understands that the foregoing amounts will vary depending upon the particular source of zolpidem utilized, the amount of zolpidem desired in the final formulation, as well as on the particular release rate of zolpidem desired. In certain instances, the buffer system of the chewing gum composition provides a final salivary pH in excess of at least about 7.8, preferably at least about 8.5, and more preferably at least about 9 (e.g., about 9-11). The chewing gum composition typically comprises from about 20% to about 95% by weight of the gum base, more typically from about 30% to about 85%, and most typically from about 50% to about 70% of the gum base.

The chewing gum composition may further comprise a protecting agent. The protecting agent coats at least part of the therapeutic agent, typically upon the mixing of the two agents. The protecting agent may be mixed with the therapeutic agent in a ratio of from about 0.1 to about 100 by weight, preferably in a ratio of from about 1 to about 50, and more preferably in a ratio of from about 1 to about 10. Without being bound to any particular theory, the protecting agent reduces the adhesion between the therapeutic agent and the gum base so that the therapeutic agent may be more easily released from the gum base. In this way, the therapeutic agent may be delivered across the mucous membranes of the oral cavity within about 5 hours to about 20 minutes of chewing, preferably within about 10 minutes of chewing. A variety of different protecting agents may be used. Examples of suitable protecting agents include, without limitation, calcium stearate, glycerin monostearate, glyceryl behenate, glyceryl palmitostearate, hydrogenated castor oil, hydrogenated vegetable oil type I, light mineral oil, magnesium lauryl sulfate, magnesium stearate, sodium stearyl fumarate, mineral oil, poloxamer, polyethylene gycol, sodium benzoate, sodium chloride, sodium lauryl sulfate, stearic acid, cab-o-sil, talc, zinc stearate, and combinations thereof.

The gum base may additionally include plasticizers such as softeners or emulsifiers. Such plasticizers may, for example, help reduce the viscosity of the gum base to a desirable consistency and improve its overall texture and bite. Plasticizers may also facilitate the release of the therapeutic agent upon mastication. Non-limiting examples of plasticizers include lecithin, mono- and diglycerides, lanolin, stearic acid,

20

sodium stearate, potassium stearate, glycerol triacetate, glycerol monostearate, glycerin, and combinations thereof. The gum base typically comprises from about 0% to about 20% by weight of the plasticizer, and more typically from about 5% to about 15%.

The gum base may further comprise waxes such as beeswax and microcrystalline wax, fats or oils such as soybean and cottonseed oil, and combinations thereof. Typically, the gum base comprises from about 0% to about 25% by weight of these waxes and oils, and more typically comprises from about 15% to about 20%.

In addition, the gum base may further comprise one or more elastomeric solvents such as rosins and resins. Non-limiting examples of such solvents include methyl, glycerol, and pentaerythritol esters of rosins, modified rosins such as hydrogenated, dimerized or polymerized rosins, or combinations thereof (e.g., pentaerythritol ester of partially hydrogenated wood rosin, pentaerythritol ester of wood rosin, glycerol ester of wood rosin, glycerol ester of partially dimerized rosin, glycerol ester of polymerized rosin, glycerol ester of tall oil rosin, glycerol ester of wood rosin and partially hydrogenated wood rosin and partially hydrogenated methyl ester of rosin such as polymers of alpha-pinene or beta-pinene, terpene resins including polyterpene, and combinations thereof). Typically, the gum base comprises from about 0% to about 75% by weight of the elastomeric solvent, and more typically less than about 10%.

The gum base may further comprise a filler material to enhance the chewability of the final chewing gum composition. Fillers that are substantially non-reactive with other components of the final chewing gum formulation are preferable. Examples of suitable fillers include, without limitation, calcium carbonate, magnesium silicate (i.e., talc), dicalcium phosphate, metallic mineral salts (e.g., alumina, aluminum hydroxide, and aluminum silicates), and combinations thereof. Typically, the gum base comprises from about 0% to about 30% by weight of the filler, and more typically from about 10% to about 20%.

One skilled in the art will appreciate that the gum base need not be prepared from its individual components. For example, the gum base can be purchased with the desired ingredients contained therein, and can be modified to include additional agents. Several manufacturers produce gum bases suitable for use with the described chewing gum compositions. Examples of such gum bases include, without limitation, Pharmagum™ M, S, or C(SPI Pharma Group; New Castle, Del.). In general, Pharmagum™ comprises a mixture of gum base, sweetening agent, plasticizer, and sugar.

In certain instances, the chewing gum composition includes a therapeutic agent centerfill. A centerfill may be particularly suitable when immediate release of the therapeutic agent is preferred. In addition, encapsulating the therapeutic agent in a centerfill may help to mask any undesirable taste that the therapeutic agent may have. In these instances, the gum base surrounds, at least in part, a centerfill. The centerfill comprises at least one therapeutic agent, and may be a liquid or semi-liquid material. The centerfill material can be a synthetic polymer, a semi-synthetic polymer, low-fat, or fat-free and contain one or more sweetening agents, flavoring agents, coloring agents, and/or scenting agents. Preferably, the centerfill includes a buffer system as described herein. Methods for preparing a centerfill chewing gum are described, for example, in U.S. Pat. No. 3,806,290.

The chewing gum compositions can have any desired shape, size, and texture. For example, the chewing gum can have the shape of a stick, tab, gumball, and the like. Similarly, the chewing gum can be any desirable color. For example, the

TRANSIZ00131421

chewing gum can be any shade of red, blue, green, orange, yellow, violet, indigo, and mixtures thereof, and can be color coded to indicate the type and dosage of the therapeutic agent therein. The chewing gum can be individually wrapped or grouped together in pieces for packaging by methods well known in the art.

When the dosage form is a tablet such as a dissolving tablet or chewable tablet, the composition can comprise zolpidem or a pharmaceutically acceptable salt thereof, a carrier or excipient such as a binder, and a pH-adjusting agent or buffer system. The tablet composition may further comprise protecting agents, lubricating agents, wetting agents, emulsifying agents, solubilizing agents; suspending agents, preserving agents, sweetening agents, flavoring agents, coloring agents, and disintegrating agents. Typically, the tablet compositions of the present invention comprise less than about 5 mg (e.g., from about 0.5 mg to about 4.75 mg, from about 1.5 mg to about 2.5 mg, from about 3.0 mg to about 3.75 mg, etc.) of zolpidem or a salt thereof. One skilled in the art understands that the foregoing amounts will vary depending upon the particular source of zolpidem utilized, the amount of zolpidem desired in the final formulation, as well as on the particular release rate of zolpidem desired. In certain instances, the buffer system of the tablet compositions provide a final salivary pH in excess of at least about 7.8, preferably at least about 8.5, and more preferably at least about 9 (e.g., about 9-11).

In certain embodiments, the tablet is a dissolving tablet such as a slow-dissolving or quick-dissolving tablet that is dissolved by a subject's saliva, without the need for chewing. For example, a dissolving tablet placed on the subject's tongue can be used for buccal delivery of the therapeutic agent. Alternatively, a dissolving tablet placed underneath the subject's tongue can be used for sublingual delivery of the therapeutic agent. This type of dosage form may be particularly desirable for pediatric and geriatric patients, since small children and aged individuals often have difficulty chewing certain items. Typically, the dissolving tablet is formulated to dissolve within about 1 to about 15 minutes, preferably within about 2 to about 10 minutes, e.g., within about 2, 3, 4, 5, 6, 7, 8, 9, or 10 minutes, following administration. One skilled in the art will understand that quick-dissolving tablets dissolve faster than slow-dissolving tablets, which are typically dissolved gradually rather than rapidly by a subject's saliva. In a preferred embodiment, the slow-dissolving or quick-dissolving tablet delivers the therapeutic agent across the sublingual mucosa.

In certain other embodiments, the tablet is a chewable tablet that is chewed by a subject and formulated to dissolve either rapidly or gradually. For example, a chewable tablet placed on the subject's tongue can be used for buccal delivery of the therapeutic agent. During chewing, the chewable tablet can be moved around within the mouth and can sometimes be parked between the gums and the cheeks or underneath the tongue. As a result, at least a portion of the therapeutic agent contained within a chewable tablet may also be delivered sublingually (i.e., across the sublingual mucosa). Typically, the chewable tablet is formulated to dissolve within about 1 to about 15 minutes, preferably within about 2 to about 10 minutes, e.g., within about 2, 3, 4, 5, 6, 7, 8, 9, or 10 minutes, following administration.

As described above, the dissolving and chewable tablets of the present invention are typically formulated to dissolve within about 1 to 15 minutes following administration. However, while these time frames are amenable to maximum exposure of the therapeutic agent to the oral mucosa (e.g., to the sublingual and/or buccal mucosa), they are not always amenable to user compliance (e.g., users may swallow too frequently and, therefore, hinder maximal transmucosal absorption). Consequently, in certain instances, it may be desirable to strike a balance between patient compliance and maximum exposure time of the therapeutic agent to the oral mucosa. This can be accomplished, for example, by reducing the tablet size (e.g., from about 700-800 mg to about 200-300 mg or about 100-350 mg) without reducing the concentration or amount per unit dose of the buffer system or the therapeutic agent. In addition, subtle changes to the tablet formulation such as, for example, replacing one flavoring agent for another (e.g., chocolate for spearmint) or replacing one binder or sweetening agent for another (e.g., lactose for mannitol or sorbitol) may be used to reduce salivation.

The carrier or excipient present in the tablets of the present invention is typically a binder that is useful in keeping the tablet in a semi-solid state, and may be a solid or a liquid, and may for example be a high-melting point fat or waxy material. Materials suitable as binders are discussed in detail above and may be used alone or in combination in the tablet compositions of the present invention. In addition, binders such as mannitol, sorbitol, lactose, sucrose, and inositol can impart properties to the tablet that permit or enhance its disintegration in the mouth.

The tablet composition may also comprise one or more elastomeric solvents such as rosins and resins. Non-limiting examples of such solvents are discussed in detail above and may be used alone or in combination in the tablet compositions of the present invention. In addition, the tablet composition may further comprise waxes such as beeswax and microcrystalline wax, fats or oils such as soybean and cottonseed oil, and combinations thereof. Moreover, the tablet composition may additionally include plasticizers such as softeners or emulsifiers. Such plasticizers may, for example, help reduce the viscosity of the salivary solution of the dissolved tablet to a desirable consistency and improve its overall texture and bite and help facilitate the release of the therapeutic agent. Non-limiting examples of such plasticizers are discussed in detail above and may be used alone or in combination in the tablet compositions of the present invention.

In certain instances, the tablet composition includes a therapeutic agent centerfill, e.g., as described above. In certain other instances, the tablet composition of the present invention is multilayered. In this way, the dissolving or chewable tablet can be designed to provide more than one therapeutic agent. For example, with a bi-layered tablet, the first layer can contain zolpidem or a salt thereof and the second layer can contain the same or different hypnotic agent or a non-hypnotic agent. Typically, the first layer comprises the dissolving or chewable portion of the tablet, and the second (i.e., subsequent) layer is coated by the first layer. This type of formulation may be particularly suitable when immediate release of zolpidem, followed by gastrointestinal absorption of a second therapeutic agent, is desirable. Gastrointestinal absorption of the second therapeutic agent may be desirable, for example, in order to mitigate co-morbid symptoms or to sustain the therapeutic benefit of zolpidem in the dissolving or the chewable portion of the tablet. Alternatively, the second layer is present as a layer lateral to the first layer. The second layer typically comprises at least one therapeutic agent, and can also comprise one or more sweetening agents, flavoring agents, coloring agents, and scenting agents as described above. In some instances, the second layer further includes a buffer system as described herein.

In still other instances, the combination of zolpidem or a salt thereof with other hypnotic agents and/or non-hypnotic agents need not take the form of a multilayered tablet, but

A000231

US 8,242,131 B2

23

instead comprises a single homogenous tablet layer. This type of formulation may also be used in the case where gastrointestinal absorption of at least one therapeutic agent is desirable. In this case, the relative extent of ionization of the two or more therapeutic agents determines how they are to be absorbed. For example, those therapeutic agents that are un-ionized are absorbed through the oral mucosa, while the ionized agents are swallowed for gastrointestinal absorption.

The tablet compositions can have any desired shape, size, and texture. For example, the tablet can have the shape of a stick, tab, pellet, sphere, and the like. Similarly, the tablet can be any desirable color. For example, the tablet can be any shade of red, blue, green, orange, yellow, violet, indigo, and mixtures thereof, and can be color coded to indicate the type and dosage of the therapeutic agent therein. The tablets can be individually wrapped or grouped together in pieces for packaging by methods well known in the art.

When the dosage form is a lozenge or candy, the composition can comprise zolpidem or a pharmaceutically acceptable salt thereof, a carrier or excipient such as a binder, and a pH-adjusting agent or buffer system. The lozenge or candy composition may further comprise protecting agents, lubricating agents, wetting agents, emulsifying agents, solubilizing agents; suspending agents, preserving agents, sweetening agents, flavoring agents, coloring agents, and disintegrating agents. A general discussion of lozenges and candies is provided, e.g., in *Pharmaceutical Dosage Forms, Volume 1: Tablets, 2nd* Ed., Marcel Dekker, Inc., New York, N.Y., pages 75-418 (1989). Typically, the lozenge compositions of the present invention comprise less than about 5 mg (e.g., from about 0.5 mg to about 4.75 mg, from about 1.5 mg to about 2.5 mg, from about 3.0 mg to about 3.75 mg, etc.) of zolpidem or a salt thereof. One skilled in the art understands that the foregoing amounts will vary depending upon the particular source of zolpidem utilized, the amount of zolpidem desired in the final formulation, as well as on the particular release rate of zolpidem desired. In certain instances, the buffer system of the lozenge compositions provides a final salivary pH in excess of at least about 7.8, preferably at least about 8.5, and more preferably at least about 9 (e.g., 9-11).

In certain embodiments, the lozenge or candy is dissolved by a subject's saliva, without the need for chewing. For example, a lozenge placed on the subject's tongue can be used for buccal delivery of the therapeutic agent. Alternatively, a lozenge placed underneath the subject's tongue can be used for sublingual delivery of the therapeutic agent. This type of dosage form may be particularly desirable for pediatric and geriatric patients, since small children and aged individuals often have difficulty chewing certain items. Typically, the lozenge is formulated to dissolve within about 1 to about 15 minutes, preferably within about 2 to about 10 minutes, e.g., within about 2, 3, 4, 5, 6, 7, 8, 9, or 10 minutes, following administration. In a preferred embodiment, the lozenge or candy delivers the therapeutic agent across the sublingual mucosa.

As described above, the lozenges the present invention are typically formulated to dissolve within about 1 to about 15 minutes following administration. However, while these time frames are amenable to maximum exposure of the therapeutic agent to the oral mucosa (e.g., to the sublingual and/or buccal mucosa), they are not always amenable to user compliance (e.g., users may swallow too frequently and, therefore, hinder maximal transmucosal absorption). Consequently, in certain instances, it may be desirable to strike a balance between patient compliance and maximum exposure time of the therapeutic agent to the oral mucosa. This can be accomplished, for example, by reducing the lozenge size (e.g., from about 700-

24

800 mg to about 200-300 mg or about 100-350 mg) without reducing the concentration or amount per unit dose of the buffer system or the therapeutic agent. In addition, subtle changes to the lozenge formulation such as, for example, replacing one flavoring agent for another (e.g., chocolate for spearmint) or replacing one binder or sweetening agent for another (e.g., lactose for mannitol or sorbitol) may be used to reduce salivation.

The carrier or excipient present in the lozenges of the present invention is typically a binder that is useful in keeping the lozenge in a semi-solid state, and may be a solid or a liquid, and may for example be a high-melting point fat or waxy material. Materials suitable as binders are discussed in detail above and may be used alone or in combination in the lozenge compositions of the present invention. In addition, binders such as mannitol, sorbitol, lactose, sucrose, and inositol can impart properties to the lozenge that permit or enhance its disintegration in the mouth.

The lozenge composition may also comprise one or more elastomeric solvents such as rosins and resins. Non-limiting examples of such solvents are discussed in detail above and may be used alone or in combination in the lozenge compositions of the present invention. In addition, the lozenge composition may further comprise waxes such as beeswax and microcrystalline wax, fats, or oils such as soybean and cottonseed oil, and combinations thereof. Moreover, the lozenge composition may additionally include plasticizers such as softeners or emulsifiers. Such plasticizers may, for example, help reduce the viscosity of the salivary solution of the dissolved lozenge to a desirable consistency and improve its overall texture and bite and help facilitate the release of the therapeutic agent. Non-limiting examples of such plasticizers are discussed in detail above and may be used alone or in combination in the lozenge compositions of the present invention.

In other embodiments, the lozenge composition includes a therapeutic agent centerfill, is multilayered, or comprises a single homogenous lozenge layer, e.g., as described in detail above.

The lozenge compositions can have any desired shape, size, and texture. For example, the lozenge can have the shape of a stick, tab, pellet, sphere, and the like. Similarly, the lozenge can be any desirable color. For example, the lozenge can be any shade of red, blue, green, orange, yellow, violet, indigo, and mixtures thereof, and can be color coded to indicate the type and dosage of the therapeutic agent therein. The lozenges can be individually wrapped or grouped together in pieces for packaging by methods well known in the art.

In a preferred embodiment, the average particle size of the drug in the compositions described herein is about 20 microns, as compared to a typical average drug particle size of from about 75 to about 100 microns. In another preferred embodiment, the average particle size of the drug in the compositions described herein is less than or equal to the average particle size of the carrier ingredients (e.g., gum base, binders, etc.).

Typically, the pharmaceutical compositions are suitable for buccal or sublingual administration of zolpidem in the low doses provided herein. Compositions suitable for buccal or sublingual administration of zolpidem are those that provide absorption in the buccal cavity of at least about 10%, 20%, or 25% of the dosage of zolpidem in the composition. This amount is generally at least twice the amount of buccal absorption that could be expected for a tablet designed to be swallowed for absorption of the active agent in the gut. Additionally, the time to $C_{max}$ is reduced for such compositions relative to tablets or capsules designed to deliver zolpidem in

A000232

US 8,242,131 B2

25

the gut. The compositions suitable for buccal or sublingual administration of zolpidem in low doses, as noted above, are sufficient to reduce the time to $C_{max}$, enhancing the early effect of zolpidem and increase plasma levels of zolpidem, generally two-fold or more during the first 20 minutes after administration, relative to tablets or capsules designed for delivery in the gut (e.g., to be swallowed immediately upon ingestion).

Typically, the compositions that are suitable for the treatment of MOTN insomnia following buccal or sublingual administration have a unique and discriminatory dissolution profile. Such a dissolution method relies on modified USP method II dissolution procedure and where the pH of the dissolution medium is 6.8, which approximates the pH of the saliva. The method is considered to be a modification as the volume of the medium is reduced to 500 ml from 1 liter and the paddle speed for dissolution is reduced to 15 rpm from a typical speed of 50 or more rpm. This method is sufficiently sensitive to discriminate a 2 to 3 minute dissolution tablet from a tablet that would normally take 5 minutes or more to dissolve in the mouth. Typically, a tablet that would dissolve in the mouth in 3 minutes or less would dissolve more rapidly under experimental conditions of modified USP method II than a tablet that takes 5 or more minutes to dissolve in the mouth (see, Tables 1-2 below)

TABLE 1

Exploratory dissolution profiles of 3 and 5 minute dissolution of zolpidem lozenges using the modified USP dissolution method II. (500 ml of pH 6.8 phosphate buffer at a 37° C. and paddle speed of 15 rpm).

| | Lozenge | | | |
|---|---|---|---|---|
| | "3 minute" dissolution prototype | | "5 minute" dissolution prototype | |
| Time (min) | Dissolution | RSD* | Dissolution | RSD* |
| 5 | 28.60% | 5% | 8.70% | 12.00% |
| 10 | 58.40% | 10% | 20.00% | 11.30% |
| 20 | 79.00% | 20% | 38.30% | 11.40% |

*Relative standard deviation

TABLE 2

Illustrative dissolution profiles of 1, 3.5, and 10 mg "3 minute" zolpidem lozenges using the modified USP dissolution method II. (500 ml of pH 6.8 phosphate buffer at a 37° C. and paddle speed of 15 rpm).

| Lozenge | 1 mg "3 minute" dissolution prototype | | 3.5 mg "3 minute" dissolution prototype | | 10 mg "3 minute" dissolution prototype | |
|---|---|---|---|---|---|---|
| Time (min) | Dissolution | RSD | Dissolution | RSD | Dissolution | RSD |
| 5 | 28.70% | 11.60% | 42.40% | 11.14% | 28.60% | 19.90% |
| 10 | 46.90% | 9.30% | 70.20% | 6.53% | 58.40% | 10.40% |
| 15 | 60.40% | 6.70% | 81.00% | 7.23% | | |
| 20 | 70.50% | 5.20% | 84.30% | 7.14% | 79.00% | 5.10% |

In some embodiments, the compositions of the present invention provide complete buccal and/or sublingual dissolution in about 2 minutes or less following administration. The quick-dissolving tablets of the present invention usually provide complete buccal and/or sublingual dissolution in less than about 0.5 minutes, alternatively in less than about 1 minute, alternatively in less than about 1.5 minutes, alternatively in less than about 2 minutes, alternatively in less than about 2.5 minutes, alternatively in less than about 3 minutes,

26

alternatively in less than about 4 minutes, alternatively in less than about 5 minutes, or alternatively in less than about 6 minutes.

Generally, the compositions described herein comprise a binary or a ternary buffer system, the system comprised of at least one proton donating (acidic) component and at least one proton accepting (basic) component. The components of the buffer system are selected such that their buffering capacity is greatest (the buffer system has a pK value) at a pH of from about 7.2-11.0, usually at a pH of about, for example, 7.2, 7.6, 7.8, 8.0, 8.3, 8.5, 8.8, 9.0, 9.4, 9.5, 9.6, 9.7, or 9.8.

In preferred embodiments, the binary buffer system raises the pH of saliva to a pH greater than about 7.2, 7.6, 7.8, 8.0, 8.3, 8.5, or 8.8, irrespective of the starting pH of saliva. In other embodiments, the binary buffer system raises the pH of saliva to a pH greater than about 9.0, 9.4, 9.5, 9.6, 9.7, or 9.8 (e.g., about 9-11), irrespective of the starting pH of saliva.

Preferably, the buffer system comprises a carbonate and a bicarbonate component. For example, the carbonate salt can be selected from the group consisting of sodium carbonate, potassium carbonate, calcium carbonate, ammonium carbonate, and magnesium carbonate. The bicarbonate salt can be selected from the group consisting of sodium bicarbonate, potassium bicarbonate, calcium bicarbonate, ammonium bicarbonate, and magnesium bicarbonate. In a preferred embodiment, the binary buffer system comprises sodium carbonate and sodium bicarbonate. In another preferred embodiment, the sodium bicarbonate is dessicant-coated sodium bicarbonate. The cations of the carbonate and the bicarbonate components can be the same or different.

The concentration of each buffer system component is tailored such that the final salivary pH is achieved and sustained for a period of time, e.g., for at least about 2 minutes, at least about 5 minutes, at least about 10 minutes, at least about 20 minutes, or at least about 60 minutes. This typically involves a sensory and safety trial and error type of procedure of adding various amounts of each buffer system component and then measuring the final pH over time. In this way, selection of an appropriate weight ratio for each buffer system component can be determined. For example, the weight ratio of carbonate salt to bicarbonate salt can be from about 1:10 to about 10:1, preferably from about 1:5 to about 5:1, more preferably from about 1:4 to about 4:1 or from about 1:3 to about 3:1, and still more preferably from about 1:2 to about 2:1.

In some embodiments, the amount of bicarbonate salt is greater than or equal to the amount of carbonate salt, and the weight ratio of carbonate salt to bicarbonate salt is from about 1:1 to about 1:10, preferably from about 1:1 to about 1:5, and more preferably from about 1:1 to about 1:2, e.g., 1:1, 1:1.1, 1:1.2, 1:1.3, 1:1.4, 1:1.5, 1:1.6, 1:1.7, 1:1.8, 1:1.9, or 1:2.

TRANSIZ00131424

27

Alternatively, the amount of bicarbonate salt is less than or equal to the amount of carbonate salt, and the weight ratio of carbonate salt to bicarbonate salt is from about 1:1 to about 10:1, preferably from about 1:1 to about 5:1, and more preferably from about 1:1 to about 2:1, e.g., 1:1, 1.1:1, 1.2:1, 1.3:1, 1.4:1, 1.5:1, 1.6:1, 1.7:1, 1.8:1, 1.9:1, or 2:1. In some embodiments, the combined amount of carbonate salt and bicarbonate salt is greater than or equal to the amount of zolpidem, and the weight ratio of carbonate salt and bicarbonate salt to zolpidem is preferably from about 1:1 to about 10:1, e.g., 1:1, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1, or 10:1. Alternatively, the combined amount of carbonate salt and bicarbonate salt is less than or equal to the amount of zolpidem, and the weight ratio of carbonate salt and bicarbonate salt to zolpidem is preferably from about 1:1 to about 1:10, e.g., 1:1, 1:2, 1:3, 1:4, 1:5, 1:6, 1:7, 1:8, 1:9, or 1:10.

In some embodiments, the binary buffer system used in compositions described above comprises a carbonate salt such as sodium carbonate and a bicarbonate salt such as sodium bicarbonate, wherein the carbonate salt and the bicarbonate salt are in a carbonate:bicarbonate ratio of from about 1:1.0 to about 1:1.4 by weight, or alternatively from about 1:1.0 to about 1:1.2 by weight.

In other embodiments, the bicarbonate can be used by itself to promote selective absorption of zolpidem.

Other buffer systems are suitable for use in the compositions of the present invention, in addition to or in substitution of a carbonate and bicarbonate buffer system. For example, in an alternative embodiment, the buffer system comprises a carbonate salt or a bicarbonate salt and a second buffering agent such as a metal oxide, a citrate salt, a phosphate salt, a borate salt, an ascorbate salt, an acetate salt, and alkaline starch. In another alternative embodiment, the buffer system comprises a metal oxide and a citrate, phosphate, or borate salt. In yet another alternative embodiment, the buffer system is a ternary buffer system comprising a carbonate salt, a bicarbonate salt, and a third buffering agent such as a metal oxide, a citrate salt, a phosphate salt, a borate salt, an ascorbate salt, an acetate salt, and alkaline starch. In still yet another alternative embodiment, the buffer system comprises a carbonate salt or a bicarbonate salt and two or more buffering agents selected from the group consisting of a metal oxide, a citrate salt, a phosphate salt, and a borate salt.

In still other embodiments, the pharmaceutical compositions comprise a carrier comprising at least one binder and at least one disintegrating agent in such relative proportion to provide a buccal or sublingual dissolution time of about 5 minutes or less, preferably about 2 minutes or less, following administration. Preferably, the ratio of the binder to the disintegrating agent is from about 0.1 to about 10.0, more preferably from about 0.1 to about 1.0, and most preferably from about 0.26 to about 0.79. However, one skilled in the art will appreciate that the compositions of the present invention can be made without any binders, e.g., to produce a highly friable dosage form.

In a preferred embodiment, the zolpidem is delivered across an oral mucosa selected from the group consisting of the sublingual mucosa, the buccal mucosa, and a combination thereof. In a particularly preferred embodiment, the composition is administered sublingually so that the zolpidem is delivered across the sublingual mucosa.

In preferred embodiments of the present invention, the zolpidem is formulated in a binary buffer system comprising sodium carbonate and sodium bicarbonate. Such compositions are preferably formulated in the form of a lozenge, candy, or dissolving tablet (e.g., slow-dissolving tablet or quick-dissolving tablet) for sublingual administration. As a

28

result, upon sublingual administration, zolpidem is delivered across the sublingual mucosa. In another preferred embodiment, the sodium bicarbonate is dessicant-coated sodium bicarbonate. A combined weight percent of sodium carbonate and sodium bicarbonate that is greater than or equal to the weight percent of zolpidem is also preferred.

In some embodiments, the composition comprises from about 0.4, 0.45, or 0.5 to about 1.5, 1.6, 1.7, or 1.8 weight percent zolpidem; from about 6.0 to about 10.0 weight percent sodium carbonate; and from about 9.0 to about 13.0 weight percent dessicant-coated sodium bicarbonate. In a preferred embodiment, the composition comprises about 0.47, 0.8, or 1.7 weight percent zolpidem; about 8.0 weight percent sodium carbonate; and about 11.0 weight percent dessicant-coated sodium bicarbonate. Such compositions are preferably in the form of a lozenge or candy with a mass of from about 100 to about 300 mg, e.g., about 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250, 260, 270, 280, 290, and 300 mg. The lozenges or tablets dissolve in a subject's mouth at a very rapid rate, e.g., within about 2-3 minutes following administration.

In certain other instances, the composition comprises from about 0.4, 0.45, or 0.5 to about 1.5, 1.6, 1.7, or 1.8 weight percent zolpidem; from about 5.0 to about 9.0 weight percent sodium carbonate; and from about 7.0 to about 11.0 weight percent sodium bicarbonate. In a preferred embodiment, the composition comprises about 0.47, 0.8, or 1.7 weight percent zolpidem; about 7.0 weight percent sodium carbonate; and about 9.0 weight percent sodium bicarbonate. Such compositions are preferably in the form of a dissolving tablet such as a slow-dissolving tablet or a quick-dissolving tablet of from about 100 to about 300 mg, e.g., about 100, 110, 120, 130, 140, 150, 160, 170, 180, 190, 200, 210, 220, 230, 240, 250, 260, 270, 280, 290, and 300 mg. The quick-dissolving tablets dissolve in a subject's mouth at a rapid rate, e.g., within about 5 minutes following administration, and the slow-dissolving tablets dissolve in a subject's mouth at a slower rate, e.g., within about 10 minutes following administration.

V. Methods

In carrying out the methods of the present invention for treating MOTN insomnia, the appropriate effective dosage to be administered to a subject can be evaluated in an appropriate patient population that has been selected based on factors such as age, weight, the number of hours of time in bed remaining, and/or the ability of a subject to metabolize zolpidem. For example, a dose of about 2 mg to about 5 mg can be administered to a subject who awakens and still has about 4 or 5 hours of time in bed remaining. Similarly, a dose of about 3 mg to about 5 mg can be administered to non-elderly subjects (i.e., subjects younger than 65 years of age) with a normal capacity to metabolize zolpidem. If the subject awakens with about 2-4 hours of time in bed remaining, a dose of about 0.5 mg to about 2.5 mg can be administered. Likewise, subjects with a diminished capacity to metabolize zolpidem (i.e., subjects 65 years of age and older) can be administered a portion of a dose that would be administered to a subject with a normal capacity to metabolize zolpidem, for example, a half-tablet dose. One of skill in the art will appreciate that there can be some variability in the dose provided to some individuals. For example, hepatically-impaired individuals may use a very low dose such as that typically provided for an elderly patient.

Typically, an effective amount of zolpidem is administered to a subject with MOTN insomnia on an as needed basis, i.e., pro re nata. That is, the individual had previously fallen asleep, and the sleep time has been interrupted with at least

US 8,242,131 B2

29

about 2, 3, 4, or 5 hours of time in bed remaining. Generally, in practicing the present methods, zolpidem is not administered prophylactically, or before initial onset of sleep.

Typically, the methods are carried out by administering a composition of the present invention as described above. Compositions of particular interest for treating MOTN insomnia contain less than about 5 mg of zolpidem or a salt thereof. In certain embodiments, the zolpidem can be administered in a quick-dissolving tablet or lozenge. Efficient delivery of zolpidem can be achieved using a formulation with a binary or a ternary buffer system, for example with carbonate and bicarbonate components, as described above.

Administration of the compositions of the present invention is preferably carried out via any of the accepted modes of administration to the mucous membranes of the oral cavity. Examples of suitable sites of administration within the oral mucosa include, without limitation, the mucous membranes of the floor of the mouth (sublingual mucosa), the cheeks (buccal mucosa), the gums (gingival mucosa), the roof of the mouth (palatal mucosa), the lining of the lips, and combinations thereof. These regions differ from each other with respect to their anatomy, drug permeability, and physiological response to drugs. Preferably, the compositions of the present invention are administered to the sublingual mucosa, buccal mucosa, or a combination thereof.

The oral mucosa, possessing a rich blood supply and suitable drug permeability, is an especially attractive route of administration for systemic drug delivery. Furthermore, delivery of a therapeutic agent across the oral mucosa bypasses hepatic first pass metabolism, avoids enzymatic degradation within the gastrointestinal tract, and provides a more suitable enzymatic flora for drug absorption. As used herein, the term "sublingual delivery" refers to the administration of a therapeutic agent across the mucous membranes lining the floor of the mouth and/or the ventral tongue. The term "buccal delivery" as used herein refers to the administration of a therapeutic agent across the mucous membranes lining the cheeks.

### VI. Examples

The following examples are offered to illustrate, but not to limit, the claimed invention.

### Example 1

### Low Dose Zolpidem Lozenge Compositions

Individuals suffering from middle-of-the-night insomnia are given lozenges containing 0 mg, 1.0 mg, 1.75 mg, or 3.5 mg zolpidem for sublingual delivery that are prepared according to the formulations set forth in Table 3.

TABLE 3

Low dose zolpidem lozenge formulations.

| Component | Quantity (mg/lozenge) Strength | | | | |
| | Placebo | 1.0 mg | 1.75 mg | 1.75 mg | 3.5 mg |
|---|---|---|---|---|---|
| Zolpidem hemitartrate | 0 | 1.0 | 1.75 | 1.75 | 3.5 |
| Pharmaburst ™ B2 Consisting of: mannitol sorbitol crospovidone silicon dioxide | 143 | 142 | 70 | 141.25 | 139.5 |

30

TABLE 3-continued

Low dose zolpidem lozenge formulations.

| Component | Quantity (mg/lozenge) Strength | | | | |
| | Placebo | 1.0 mg | 1.75 mg | 1.75 mg | 3.5 mg |
|---|---|---|---|---|---|
| Croscarmellose sodium | 10 | 10 | 5 | 10 | 10 |
| Sodium carbonate | 17 | 17 | 8.5 | 17 | 17 |
| Sodium bicarbonate | 23 | 23 | 11.5 | 23 | 23 |
| Natural and artificial spearmint FONA# 913.004 | 6.5 | 6.5 | 3.25 | 6.5 | 6.5 |
| Silicon dioxide | 5.5 | 5.5 | 2.75 | 5.5 | 5.5 |
| Sucralose | 1.5 | 1.5 | 0.75 | 1.5 | 1.5 |
| Magnesium stearate | 3.5 | 3.5 | 1.75 | 3.5 | 3.5 |
| Total lozenge weight | 210 | 210 | 105 | 210 | 210 |

The individuals self-administer one lozenge of the above formulations when their sleep is interrupted and they have at least 2 hours of sleep time remaining. Upon awakening, the individuals provide a subjective self-assessment of any residual sedative effects and are given the following psychomotor and memory tests to evaluate any residual sedative effects: a digit symbol substitution test (DSST), a choice reaction time (CRT), a symbol copy test (SCT), and a Buschke Memory Recall Test.

Individuals receiving a placebo lozenge are generally unable to fall back asleep and therefore do not feel refreshed in the morning. Individuals receiving lozenges containing 1.0 mg, 1.75 mg, or 3.5 mg zolpidem fall asleep within about 20 minutes after self-administration of the lozenge and exhibit no or minimal residual sedative effects as evaluated by subjective self-assessment and any of the above-referenced psychomotor and memory tests.

### Example 2

### Pharmacokinetic and Pharmacodynamic Investigation of Low Dose Zolpidem Lozenge Compositions

This example provides an evaluation of the daytime dose-dependent pharmacokinetic and pharmacodynamic effects of the 1.0 mg, 1.75 mg, and 3.5 mg zolpidem lozenges described in Table 3 above.

### SUMMARY

Currently, no medications are available to be used on a pro re nata basis for patients who have middle-of-the-night (MOTN) awakening and who have difficulty falling back asleep. An appropriate therapeutic agent for such insomnia would enable patients to return to sleep rapidly and wake up in the morning without residual effects. This study illustrates, inter alia, that the low dose zolpidem lozenges of the present invention enhance rapid systemic delivery of zolpidem without affecting other pharmacokinetic parameters.

Healthy adults (n=24; mean age=37.6 yrs) participated in this double-blind, placebo-controlled, 4-way crossover study of 2 consecutive days of morning dosing with placebo, or 1 mg, 1.75 mg, or 3.5 mg of the low dose zolpidem lozenges of the present invention. After morning dosing, on Day 1 of each period, pharmacodynamic endpoints (DSST, PVT, VAS-sedation, SCT, and Buschke) were evaluated at pre-dose and at 20 minutes 1, 1.5, 2, 3, 4, and 5 hours post-dose. On Day 2, repeated blood samples for pharmacokinetic assessment were drawn over 12 hours.

A000235

US 8,242,131 B2

31

Baseline DSST scores (±SE) were 57.6±2.9, 58.0±3.1, 58.4±2.3, and 56.9±2.7 for the placebo, 1 mg, 1.75 mg, and 3.5 mg zolpidem lozenge, respectively. Significant reductions in DSST, scores were found for the 1.75 mg and 3.5 mg zolpidem lozenges at the beginning of 20 minutes (–6.6; p=0.0132 and –14.8; p<0.001, respectively) and lasted for 1.5 hours post-dose. Other conditions showed results similar to DSST. Mean $T_{max}$ was 36.0, 37.9, and 37.9 minutes for the 1 mg, 1.75 mg, and 3.5 mg zolpidem lozenge, respectively. Zolpidem $C_{max}$ and AUC were dose-proportional. The 1.75 mg and 3.5 mg zolpidem lozenges reached sedation plasma levels (about 20 ng/ml) within 15 minutes, and these levels were maintained for 15 to 240 minutes.

Low dose zolpidem lozenges provide daytime sedative properties at a dose and a $T_{max}$ of less than half of the approved dose of peroral (PO) zolpidem (10 mg) in adults. This study demonstrates that the low dose sublingual zolpidem lozenges of the present invention can be used to shorten sleep onset upon MOTN administration.

Methods

Design

This was a four-way crossover, placebo controlled, randomized double blind study with healthy male (n=13) and female (n=11) volunteers. Each treatment period consisted of two single-dose consecutive treatment days, and each treatment was separated by a wash-out period of 6 days or more. During each period, lozenges were administered approximately 24 hours apart, and the subjects received the same treatment on each day. During each period, in order to avoid any learning or drug-anticipatory response, the pharmacodynamic effects were measured on Day 1 and blood samples drawn on Day 2 for pharmacokinetic assessment.

Pharmacodynamic assessment consisted of measurements of sedation, memory, and vigilance tests. The sedative effects were quantified by a decrease in post- to pre-dose scores on a Digit Symbol Substitution Test (DSST) and self-rated assessment sedation on a Visual Analog Scale (VAS). Vigilance was assessed by an increase in post- to pre-dose scores by measurement of reaction time and number of lapses in reaction to digital stimuli using a computerized Psychomotor Vigilance Test (PVT). A decrease in post- to pre-dose scores on a Buschke Word Recall Test (Buschke) was used for memory effects. Additionally, a Symbol Copy Test (SCT) was used for measurement of simple cognitive function. The results were statistically analyzed using SAS, ANOVA procedures and significance was assessed using Dunnett's test for comparison.

Serial blood samples were drawn for up to 12 hours at pre-dose, 5, 10, 20, 30, and 45 minutes and 1, 2, 2.5, 3, 3.5, 4, 5, 6, 8, and 12 hours. Non-compartmental pharmacokinetic parameters were estimated using the WinNonlin program (Pharsight Corp.; Palo Alto, Calif.). The parameters estimated were AUC and partial AUC, $C_{max}$, $t_{max}$, and $t_{1/2}$.

Additionally, the plasma levels of the 1.0 mg, 1.75 mg, and 3.5 mg zolpidem lozenges were predicted following single compartment first order input and output modeling of data for a 10 mg zolpidem lozenge using the following equation:

$$Ct=D*K01/V/(K01-K10)*EXP(-K10*T)-EXP(-K01*T),$$

wherein Ct=predicted plasma concentration, D=dose, V=apparent volume of distribution, T=time, K01=absorption rate constant, and K10=the elimination rate constant. The values for V, K01 and K10 were obtained by fitting the plasma data from the 10 mg zolpidem lozenge (i.e., 3 minute dissolution lozenge swallowed every 2 minutes) to the above equa-

32

tion. Unless otherwise indicated, standard deviation is the variance parameter associated with the mean values.

Results

Pharmacokinetics

Zolpidem was rapidly absorbed and eliminated from each of the three low dose sublingual lozenge formulations. The plasma profiles of the three lozenge formulations are shown in FIG. 1, and summary statistics of the pharmacokinetic parameters are described in Table 4. Overall, the $t_{max}$ and $C_{max}$ of the three lozenge formulations were significantly shorter and higher, respectively, than the values either predicted by modeling of the 10 mg data (see, FIG. 2) or reported in the literature.

TABLE 4

| Mean (% CV) bioavailability parameters of the low dose zolpidem lozenges. | | | | | |
|---|---|---|---|---|---|
| Dose mg | $C_{max}$ ng/ml | $t_{max}$ min | AUC 0-12 hr ng · hr/ml | AUC 0-20 mn ng · hr/ml | Mean Bioavailability Rate (ng/ml per min) |
| 1.0 | 17.77 (33%) | 36 (30%) | 65.31 (40%) | 1.53 (42%) | 0.49 |
| 1.75 | 32.17 (32%) | 37.9 (42%) | 119.54 (40%) | 3.20 (42%) | 0.85 |
| 3.5 | 64.14 (33%) | 37.9 (40%) | 229.42 (40%) | 5.80 (41%) | 1.69 |

In particular, this pharmacokinetic study provided the following key observations:

1. The 3.5 mg lozenge produced a $C_{max}$ of about 64 ng/ml in about 38 minutes with an AUC0-12 hr of about 229 ng·hr/ml. The mean value AUC0-20 min was 5.80 ng·hr/ml.

2. The values of the $C_{max}$ and $t_{max}$ for the 1.75 mg lozenge were about 32 ng/ml and 38 minutes, respectively. The values of AUC0-12 hr and AUC0-20 min were 119.54 and 3.20 ng·hr/ml, respectively.

3. The values of the $C_{max}$ and $t_{max}$ for the 1 mg lozenge were about 18 ng/ml and 36 minutes, respectively. The values of AUC0-12 hr and AUC0-20 min were 65.31 and 1.53 ng·hr/ml, respectively.

4. The observed values of $C_{max}$ of all three lozenge formulations were significantly higher than the values predicted by pharmacokinetic modeling of the 10 mg data.

5. The pharmacokinetics of the three lozenge formulations were proportional to the dose.

Pharmacodynamics

Digit Symbol Substitution Test (DSST): The DSST is an objective measure of sedation. As shown in FIG. 3, the 1.75 mg and 3.5 mg zolpidem lozenges produced peak changes in DSST scores within 20 to 60 minutes of administration, and scores returned to baseline within 3 to 4 hours of administration. These scores were significantly different from baseline for up to about 90 minutes. The DSST scores for the 1 mg zolpidem lozenge were statistically similar to that of the placebo.

FIG. 4 shows that the relationship between plasma levels of the zolpidem lozenges and the DSST response is characterized by an anti-clockwise hysteresis loop, which is typical for sedative-hypnotics. This indicates that the rapid pharmacodynamic effects are primarily due to the rapid bioavailability of the zolpidem present in the lozenges and not due to any changes in the receptor pharmacology of the drug.

One of the most surprising findings from the DSST scores for the 3.5 mg zolpidem lozenge is that the sedative response is more rapid than the values reported in the literature for 5 mg

A000236

US 8,242,131 B2

33

and 10 mg peroral (PO) Ambien® (see, Greenblatt et al., *Clin. Pharmacol. Therap.*, 64:553-561 (1998); Greenblatt et al., *Clin. Pharmacol. Therap.*, 64:661-671 (1998)). In particular, FIG. 5 shows that the 3.5 mg zolpidem lozenge was capable of inducing sleep more rapidly than both 5 mg and 10 mg PO Ambien®, but did not cause the excessive sedation associated with 10 mg PO Ambien®.

Self-rated assessment of sedation on VAS: Unlike DSST, the subjective sedative effects of the 1.75 mg and 3.5 mg zolpidem lozenges were similar (FIG. 6). The Visual Analog Scale (VAS) scores for these low zolpidem doses were statistically different than placebo for up to 2 hours.

Vigilance changes as measured by PVT: The 3.5 mg zolpidem lozenge also impaired vigilance, as measured by reaction times using a Psychomotor Vigilance Test (PVT). FIG. 7 shows that the reaction time scores for the 3.5 mg zolpidem lozenge were statistically different for up to about 90 minutes.

Memory impairment (Buschke): Except for the significant effect seen at 20 minutes with the 3.5 mg zolpidem lozenge, the drug effects were comparable to that of the placebo.

Simple motor task impairment (SCT): The effects of the three lozenge formulations were comparable to that of the placebo.

CONCLUSIONS

1. Surprisingly, the zolpidem blood levels established at several time points up to 30 mintues after dosing with the 3.5 mg zolpidem lozenge exceeded those reported in the literature for PO Ambien® doses up to and including 10 mg. In fact, the 3.5 mg zolpidem lozenge was superior to 10 mg PO Ambien® (which contains nearly 3 times the dose of zolpidem) because it provided a significantly greater sedative effect at 30 minutes as measured by DSST testing.

2. The $C_{max}$ (maximum plasma concentration) of zolpidem from the low dose zolpidem lozenges was about 30% higher than the values predicted by pharmacokinetic modeling of data for a 10 mg zolpidem lozenge. The mean $C_{max}$ (64 ng/ml) of the 3.5 mg zolpidem lozenge was in the same range as the values reported for 5 mg PO Ambien®. Further, both 1.75 mg and 3.5 mg zolpidem lozenges produced plasma levels at 30 minutes or earlier that have been reported in the literature to produce sedative effects.

3. The low dose zolpidem lozenges achieved maximum plasma concentrations in about 36 to 38 minutes. A $t_{max}$ of about 35 minutes was significantly earlier than the $t_{max}$ of 1 to 1.5 hours typically reported for 5 mg and 10 mg PO zolpidem (Ambien®), eszopiclone (Lunesta™), zaleplon (Sonata®), and remelteon (Rozerem™)

4. The pharmacodynamic data described above demonstrate that the 1.75 mg and 3.5 mg zolpidem lozenges produced rapid sedative-hypnotic effects without the risk of anterograde amnesia or falling in night, which are side-effects typical of higher PO Ambien® doses.

5. The pharmacokinetic and pharmacodynamic response to the low dose zolpidem lozenges was proportional to the dose. Therefore, the pharmacology of zolpidem at a dose range of between about 1 mg to 3.5 mg, unlike that of 5 mg PO Ambien®, is expected to produce a consistent and predictable response.

6. The pharmacodynamic data described above clearly demonstrate the sedative effects of 1.75 mg and 3.5 mg zolpidem lozenge formulations, which included rapid onset of action. In fact, the onset of action and peak effects as defined by both DSST (objective) and VAS (subjective) occurred within 20 minutes. In contrast, 5 mg PO Ambien® produced peak DSST effects in about 60 min-

34

utes and the magnitude of the response was only about 50% of that seen with the 3.5 mg zolpidem lozenge. The levels of decline in DSST (surrogate for sedation) scores were comparable to those seen with marketed hypnotics.

7. During the pharmacodynamic portion of the study, low dose zolpidem lozenges containing 1.75 or 3.5 mg zolpidem produced peak sedative effects (as measured by DSST and VAS) within about 20 minutes of dosing.

8. The 3.5 mg zolpidem lozenge also impaired vigilance (as measured by reaction times on PVT). The 1.75 mg zolpidem lozenge had no effect on subjects who were non-elderly adults.

9. None of the doses of zolpidem present in the low dose zolpidem lozenges impaired performance on a memory test (Buschke) or a simple motor task capability test (SCT).

Example 3

Low Dose Zolpidem Tablet Composition

An immediate release peroral (PO) tablet containing a low dose of zolpidem can be prepared according to the formulation set forth in Table 5.

TABLE 5

Low dose zolpidem tablet formulation.

| Component | Quantity (mg) |
|---|---|
| Zolpidem Hemitartrate | 3.5 |
| Povidone K29/32 | 15.0 |
| Sodium Starch Glycolate (SSG) | 7.5 |
| Starch 1500 | 15.0 |
| Lactose Fast Flow | 82.0 |
| Prosolv SMCC 90 | 65.5 |
| Sodium bicarbonate | 40 |
| Magnesium Stearate | 1.5 |
| Total | 230 |

Manufacturing Process

Dispensing: Screen the zolpidem hemitartrate and excipients through screen #30. Dispense the required quantities of each ingredient.

Blending:

1. Transfer the zolpidem hemitartrate and Povidone K 29/32 to a V-Shell blender and blend for 2 min.

2. Add SSG and Starch 1500 to Step 1 and blend for another 2 min.

3. Add Lactose Fast Flow and Prosolv SMCC 90 to Step 2 and blend for another 10 min.

4. Mix an equal amount of the blend from Step 3 with magnesium stearate or sodium stearyl fumarate and transfer the mixture back to the V-Shell blender via screen # 30. Blend for 3 min.

Compression: Compress the final blend from Step 4 on a rotary press to a target tablet weight of 210 mg.

All publications and patent applications cited in this specification are herein incorporated by reference as if each individual publication or patent application were specifically and individually indicated to be incorporated by reference. Although the foregoing invention has been described in some detail by way of illustration and example for purposes of clarity of understanding, it will be readily apparent to those of ordinary skill in the art in light of the teachings of this invention that certain changes and modifications may be made thereto without departing from the spirit or scope of the appended claims.

A000237

US 8,242,131 B2

35

What is claimed is:

1. A method of treating middle-of-the-night insomnia in a non-elderly patient without prophylactically administering zolpidem, comprising:

dosing the patient with a pharmaceutical composition comprising about 0.5 to about 4.75 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep, and desires to resume sleep for less than 5 hours,

wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and

wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.

2. The method of claim 1, wherein the patient resumes sleep within 30 minutes.

3. The method of claim 1, wherein about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem is reached in the patient within about 30 minutes or less of dosing.

4. The method of claim 1, Wherein the pharmaceutical composition comprises about 3.0 mg to about 3.75 mg of zolpidem hemitartrate.

5. The method of claim 1, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

6. The method of claim 1, wherein the pharmaceutically acceptable form of zolpidem is a salt form of zolpidem.

7. The method of claim 1, wherein the pharmaceutical composition further comprises sodium stearyl fumarate.

8. The method of claim 1, wherein the pharmaceutical composition comprises about 3.5 mg of zolpidem hemitartrate.

9. The method of claim 4, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

10. The method of claim 8, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

11. The method of claim 1, wherein the pharmaceutical composition is free of other hypnotic agents.

12. A method of treating middle-of-the-night insomnia in an elderly patient without prophylactically administering zolpidem, comprising:

dosing the patient with a pharmaceutical composition comprising about 1.5 to about 2.5 mg of zolpidem hemitartrate or a molar equivalent amount of a pharmaceutically acceptable form of zolpidem, wherein the pharmaceutical composition is substantially free of other hypnotic agents, wherein the patient awakens from sleep, and desires to resume sleep for less than 5 hours,

36

wherein the step of dosing the pharmaceutical composition is performed after the patient awakens from sleep, and

wherein the pharmaceutical composition permits the patient to awaken at a time about four hours after dosing without residual sedative effects.

13. The method of claim 12, wherein the patient resumes sleep within 30 minutes.

14. The method of claim 12, wherein about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem is reached in the patient within about 30 minutes or less of dosing.

15. The method of claim 12, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

16. The method of claim 12, wherein the pharmaceutically acceptable form of zolpidem is a salt form of zolpidem.

17. The method of claim 12, wherein the pharmaceutical composition further comprises sodium stearyl fumarate.

18. The method of claim 12, wherein the pharmaceutical composition comprises about 1.75 mg of zolpidem hemitartrate.

19. The of claim 18, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa.

20. The method of claim 12, wherein the pharmaceutical composition is free of other hypnotic agents.

21. The method of claim 1, wherein the patient has a normal capacity to metabolize zolpidem.

22. The method of claim 1, wherein the pharmaceutical composition comprises about 3.5 mg of zolpidem hemitartrate, wherein the pharmaceutically acceptable form of zolpidem is a salt form of zolpidem, wherein the pharmaceutical composition is free of other hypnotic agents, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa, and wherein the patient resumes sleep within 30 minutes.

23. The method of claim 22, wherein about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem is reached in the patient within about 30 minutes or less of dosing.

24. The method of claim 12, wherein the pharmaceutical composition comprises about 1.75 mg of zolpidem hemitartrate, wherein the pharmaceutically acceptable form of zolpidem is a salt form of zolpidem, wherein the pharmaceutical composition is free of other hypnotic agents, wherein the pharmaceutical composition provides delivery of zolpidem across the patient's oral mucosa, and wherein the patient resumes sleep within 30 minutes.

25. The method of claim 24, wherein about 50% of the maximum plasma concentration ($C_{max}$) of zolpidem is reached in the patient within about 30 minutes or less of dosing.

*    *    *    *    *

A000238

TRANSIZ00131429

# PROOF OF SERVICE

I HEREBY CERTIFY that on this 13th day of July 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record on the following service list by electronic delivery:

Jacob M. Holdreith
**ROBINS, KAPLAN,
MILLER & CIRESI LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
jholdreith@RobinsKaplan.com

Hillel I. Parness
Jeffrey A. Hovden
Oren D. Langer
Miles A. Finn
**ROBINS, KAPLAN,
MILLER & CIRESI LLP**
601 Lexington Avenue,
Suite 3400
New York, New York 10022
hiparness@ RobinsKaplan.com
jahovden@ RobinsKaplan.com
odlanger@ RobinsKaplan.com
mafinn@ RobinsKaplan.com

*Counsel for Appellee Novel
Laboratories, Inc.*

Harry D. McEnroe
**TOMPKINS, McGUIRE,
WACHENFELD & BARRY LLP**
Four Gateway Center
100 Mulberry Street, Suite 5
Newark, New Jersey 07102
hmcenroe@tompkinsmcguire.com

Steven M. Coyle
Nicholas A. Geiger
**CANTOR COLBURN LLP**
20 Church St., 22nd Floor
Hartford, CT 06103
scoyle@cantorcolburn.com
ngeiger@cantorcolburn.com

Jeffery B. Arnold
Christopher A. Potts
**CANTOR COLBURN LLP**
1180 Peachtree Street, Suite 2050
Atlanta, GA 30309
jarnold@cantorcolburn.com
cpotts@cantorcolburn.com

*Counsel for Dr. Reddy's Appellees*

James S. Richter
**WINSTON & STRAWN LLP**
The Legal Center
One Riverfront Plaza, Suite 730
Newark, New Jersey 07102
jrichter@winston.com

Samuel S. Park
Dan H. Hoang
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, IL 60601-9703
spark@winston.com
dhoang@winston.com

Charles B. Klein
**WINSTON & STRAWN LLP**
1700 K Street, N.W.
Washington, DC 20006-3817
cklein@winston.com

*Counsel for Appellee Actavis Elizabeth LLC*

Geri L. Albin
**SAIBER LLC**
18 Columbia Turnpike
Suite 200
Florham Park, NJ 07932
gla@saiber.com

Aziz Burgy
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5342
aziz.burgy@arentfox.com

*Counsel for Appellee Par Pharmaceutical, Inc.*

Donald J. Mizerk
**HUSCH BLACKWELL LLP**
120 South Riverside Plaza
Suite 2200
Chicago, IL  60606
don.mizerk@huschblackwell.com

*Counsel for Appellee TWi Pharmaceuticals, Inc.*

*/s/ Christopher N. Sipes*

Christopher N. Sipes
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5525
Fax: (202) 778-5525
Email: csipes@cov.com

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief of Plaintiff-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and contains 13,230 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been composed in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font.

*/s/ Christopher N. Sipes*
Christopher N. Sipes
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5525
Fax: (202) 778-5525
Email: csipes@cov.com

*Attorney for Plaintiffs-Appellants*